**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Plaintiff,**

v.

**ACUSPORT, INC., et al., Defendants.**

**Nos. 99 CV 3999(JBW), 99 CV 7037(JBW).**

United States District Court, E.D. New York.

July 21, 2003.

Law Office of Elisa Barnes, LLC by Elisa Barnes, Monica Connell, Matthew S. Nosanchuk, New York, NY, National Association for the Advancement of Colored People by Dennis Courtland Hayes, Angela Ciccolo, Baltimore, MD, Educational Fund to Stop Gun Violence by Sayre Weaver, Carolyn Morrissette, La Harra, CA, for Plaintiff, National Association for the Advancement of Colored People (NAACP).

Saiber Schlesinger Satz & Goldstein, LLC by David R. Gross, Christopher M. Chiafullo, Newark, NJ, for Defendants, AcuSport, Inc.; Alamo Leather Goods, Inc.; Bangers, LP; Bill Hick's & Co.; Brazas Sporting Arms, Inc.; Camfour, Inc.; Chattanooga Shooting Supplies, Inc.; Davidson's, Inc.; Dixie Shooters' Supply, Inc.; Ellett Brothers, Inc.; Euclid Avenue Sales Co.; Hicks, Inc.; Interstate Arms Corp.; Kiesler's Police Supply, Inc.; Lew Horton Distributing Company, Inc.; Lipsey's, Inc.; Ron Shirk's Shooters Supply; RSR Group, Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Valor Corporation; Walter Craig, Inc.; Williams Shooters Supply, Inc.; Zanders Sporting Goods, Inc.

Renzulli, Pisciotti & Renzulli, LLP by John F. Renzulli, Leonard S. Rosenbaum, New York, NY, Friday, Eldredge & Clark, LLP by Jonann Coniglio, Will Griffin, Karen S. Halbert, Little Rock, AR, for Defendants, Arms Technology, Inc.; Browning Arms Co.

Renzulli, Pisciotti & Renzulli, LLP by John F. Renzulli, Leonard S. Rosenbaum, Scott C. Allan, New York, NY, for Defendants; Beemiller, Inc. d/b/a Hi–Point Firearms; Bersa S.A.; Century International Arms, Inc.; Eagle Imports, Inc.; European American Armory Corp.; Fratelli Tanfoglio S.n.c.; Glock Ges.m.b.H.; Glock, Inc.; Haskell Manufacturing, Inc.; Import Sports, Inc.; Israel Military Industries, Ltd.; K.B.I., Inc.; Kel–Tec CNC Industries, Inc.; Magnum Research, Inc.; Para–Ordnance, Inc.; Para–Ordnance Mfg. Inc.; SGS Importers International, Inc.

Morrison, Mahoney & Miller, LLP by Brian Preston Heermance, New York, NY, Semmes, Bowen & Semmes by Lauren Lacey, Guido Porcarelli, Robert E. Scott, Jr., Baltimore, MD, Bruinsma & Hewitt by Michael C. Hewitt, Costa Mesa, CA, for Defendants, B.L. Jennings, Inc.; Bryco Arms, Inc.

Budd, Larner, Gross, Rosenbaum, Greenberg & Sade by Timothy A. Bumann, Jennifer C. Kane, Atlanta, GA, for Defendants, Braztech International L.C.; Forjas Taurus SA; Heritage Manufacturing, Inc.; Rossi SA; Taurus International Manufacturing, Inc.

Goldberg, Kohn, Bell, Black, Rosenbloom by Terry Moritz, Roger A. Lewis, Chicago, IL, Balber, Pickard, Battistoni, Maldonado & Van Der Tuin, P.C. by Thomas P. Battistoni, New York, NY, for Defendant Carl Walther GmbH.

Pino & Associates by Thomas Edward Healy, White Plains, NY, for Defendants, Ceska Zbrojovka, A.S.; CZ–USA, Inc.; Excel Industries.

By Timothy G. Atwood, Shelton, CT, for Defendants, Charco 2000, Inc.; International Armament Corp. d/b/a Interarms; L.W. Seecamp Company, Inc.; Uberti (U.S.A.), Inc.

Jones Day by Thomas E. Fennell, Michael L. Rice, Dallas, TX, Pino & Associates by Thomas Edward Healy, White Plains, NY, for Defendant, Colt's Manufacturing Company, Inc.

Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC by Lawrence S. Greenwald, Catherine A. Bledsoe, Lawrence P. Fletcher–Hill, Baltimore, MD, for Defendant, Fabbrica d'Armi Pietro Beretta S.p.A.

Salviano & Tobias, P.C. by David G. Tobias, New York, NY, Wiedner & McAu-

liffe, Ltd. by Richard J. Leamy, Jr., Chicago, IL, for Defendants, Faber Bros., Inc.; Riley's, Inc.

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP by Robert L. Joyce, New York, NY, for Defendants, Hammerli Ltd., a.k.a. Hammerli GmbH; Sigarms Inc.; SIG/Sauer.

Scott L. Braum & Associates, Ltd. by Scott L. Braum, Baltimore, MD, for Defendant, MKS Supply Co.

Post, Polak, Goodsell & McNeill by Frederick B. Polak, Roseland, NJ, for Defendant, Navy Arms Company, Inc.

Beckman and Associates by Bradley T. Beckman, Craig D. Harvath, Shane J. Harrington, Alisa Pindziak Marion, Philadelphia, PA, for Defendant, North American Arms.

Tarics & Carrington, PC, by Michael J. Zomcik, Michael Branisa, Houston, TX, for Defendant, Phoenix Arms.

Shook, Hardy & Bacon LLP by Gary R. Long, Jeffrey S. Nelson, Tina Marie Schaefer, Stacey Elaine Deere, Kansas City, MO, Greenberg & Traurig by Joel M. Cohen, New York, NY, for Defendant, Smith & Wesson Corp.

Wildman, Harrold, Allen & Dixon by James P. Dorr, Anne Giddings Kimball, Chicago, IL, for Defendant, Sturm, Ruger & Co., Inc.

Friedman & Harfenist by Steven Jay Harfenist, Lake Success, NY, for Defendant Sylvia Daniel.

Eliot Spitzer, Attorney General by Peter B. Pope, Hilary Weisman New York, NY, for Observer, Attorney General of the State of New York.

Michael Cardozo, Corporation Counsel by Eric Proshansky, New York, N.Y. for Observer, Corporation Counsel of the City of New York.

United States Attorney's Office, Eastern District of New York by F. Franklin Amanat, Vincent Lipari, Brooklyn, NY, for Observer, Attorney General of the United States.

## MEMORANDUM, ORDER, AND JUDGMENT FINDINGS OF FACT AND LAW

WEINSTEIN, Senior District Judge.

### Table of Contents

**PART ONE**
*Summary of Case* ............................................. 446

 I. Contentions of Parties............................................... 446

 II. Factual Background ................................................. 447

III. Law ................................................................ 448

IV. Procedures ......................................................... 449

 V. Conclusions of Fact and Law ........................................ 449
 A. Nuisance and Its Causes and Prevention......................... 449
 B. Failure to Prove a Special Kind of Harm ........................ 451
 C. Culpability for Violent Urban Crime ............................ 451

**PART TWO**
*Findings of Law* .............................................. 454

I. Standing and Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .454
 A. Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .454
 B. Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .455
 C. Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .455

II. Potential Bars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .456
 A. Effect of the Hamilton Litigation and People of the State of New York
 v. Sturm, Ruger & Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .456
 1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .456
 a. Hamilton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .456
 b. People of the State of New York v. Sturm, Ruger & Co. . . . . . . . . . . .457
 2. Stare Decisis and the Rule of Erie . . . . . . . . . . . . . . . . . . . . . . . . . . . .459
 3. Res Judicata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .459
 B. Second Amendment to the United States Constitution . . . . . . . . . . . . . . . . . .462
 C. Commerce Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .463
 D. Principles of Separation of Powers, Federalism, and Comity . . . . . . . . . . . . .464

III. Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .464
 A. Procedures Used . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .465
 B. Seventh Amendment Right to a Trial by Jury . . . . . . . . . . . . . . . . . . . . . . . .465
 C. The Advisory Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .467
 1. Use in an Equitable Action to Enjoin a Public Nuisance . . . . . . . . . . . . . .469
 2. Verdict is Non–Binding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .471
 3. Non–Unanimous Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .473

IV. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .477
 A. New York State Law Determines the Burden of Proof . . . . . . . . . . . . . . . . . . .477
 B. Burden of Proof is Clear and Convincing Evidence . . . . . . . . . . . . . . . . . . . . .477

V. Public Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .480
 A. History and Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .480
 B. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .482
 1. Existence of a Public Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .482
 2. Conduct of the Defendants Creating, Contributing to, or Maintain-
 ing the Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .487
 a. Tortious Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .487
 (1). Intentional Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .487
 (2). Negligent Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .489
 b. Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .492
 (1). Factual Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .492
 (2). Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .495
 3. Particular Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .497

PART THREE
*Findings of Fact* 499

PART THREE A
*Findings Based upon Defendants' Proposed Findings as Modified by the Court* 499

I. Procedural Posture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .499

II. Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .500

III. Related Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .500

IV. Structure of Firearms Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .501

V. Regulation of the Firearms Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .501

VI. Tracing ................................................................503
 A. AFT Disclosure of Trace Data.........................................503
 B. Limitations of Trace Data ...........................................504
 C. Use of Trace Data—Generally.........................................505
 D. Use of Trace Data—Focused Inspections ..............................506

VII. Firearm Industry Cooperation with ATF ..................................506

VIII. Defendants' Compliance with Laws and Regulations.........................507

IX. Criminal Acquisition of Firearms .......................................507

X. Plaintiff's Injuries ...................................................508

XI. Declining Homicide Rates ...............................................509

XII. Evidence Tying Defendants' Conduct to Plaintiff's Injuries...............509

XIII. Plaintiff's Statistical Analysis of the Trace Database...................510
 A. Sample..............................................................510
 B. Age Bias in the Selection of Firearms to Trace .....................511
 C. FTS Data Are Properly Collected and Analyzed by the ATF and Were
 Properly Analyzed by Experts for Plaintiff..........................511
 D. Changing Methods and Standards of FTS Data Collection ..............512
 E. Plaintiff's Experts' Use of the FTS Database .......................512
 F. Other Data .........................................................513
 1. Smith & Wesson Warranty Card Information .......................513
 2. Dealer Survey .................................................513
 G. Calculation Methods ................................................513
 1. Manufacturer Practices Regression..............................513
 2. Dealer Indicators .............................................514
 3. Traces Related to Straw Purchases..............................514
 4. Problem Dealer Groups .........................................514
 5. Flow of Guns ..................................................514
 6. Percentage of Guns Used in Crime ..............................515
 7. Homicides and Number of Dealers ...............................515

XIV. Analyses of the FTS Database ...........................................515

XV. Analysis of Defendants' Practices ......................................515

XVI. Special Findings as to Carl Walther GmbH ...............................515

XVII. Special Findings as to Fabbrica D'Armi Pietro Beretta S.p.A .............516

XVIII. Special Findings as to Browning Arms Co. and Arms Technology Inc. .......516

XIX. Special Findings as to Ceska Zbrojovka, A.S. and CZ–USA, Inc. ...........517

XX. Special Findings as to Excel Industries, Inc. ..........................517

XXI. Special Findings as to Braztech International, L.C.; Forjas Taurus S.A;
 and Taurus International Manufacturing, Inc. ...........................517

XXII. Special Findings as to Bersa S.A.; Eagle Imports, Inc.; Imports Sports,
 Inc.; SGS Importers International, Inc.; Haskell Manufacturing, Inc.;
 K.B.I., Inc.; Fratelli Tanfoglio S.n.c.; Israel Military Industries Ltd.;
 and Century International Arms, Inc. ...................................518

PART THREE B
*Findings Based upon Plaintiff's Proposed Findings as Modified by the Court* 519

 I. Plaintiff's Witnesses and Contentions ......................................519

 II. Public Nuisance in New York ...........................................519

 III. Defendants Contribute to the Proliferation of Guns Illegally Possessed and
 Used in New York ................................................521

 IV. Defendants ...........................................................523

 V. Evidence in the Record Demonstrated Specific Injury Suffered by Plaintiff.....523

 VI. Remedies Sought .....................................................524

 VII. Damages of a Special Kind............................................526

PART THREE C
*Findings Based upon Joint Submission by Observers, Attorney General of the State
of New York and Corporation Counsel of the City of New York as Modified by the
Court* 526

PART FOUR
*Conclusion* 526

*Appendices* 526

Criminal Users of Handguns .................................................527

Percent of Handguns Sold in 1996 Used in Violent Crime by 2000 By Manufacturer.....528

The Majority of Recovered Handguns that were Purchased Out of State were
Purchased in States with Weaker Gun Laws ....................................529

Open Society Institute, *Gun Control in the United States: A Comparative Survey of
Firearms* (April 2000) .......................................................530

Market Share of U.S. Sales 1996–2000 By Manufacturer; Share of Young Crime
Handgun Traces 1996–2000 By Manufacturer ...................................531

Ratio of Young Crime Handgun Share to Overall Market Share 1996–2000 By
Manufacturer ..............................................................532

Market Share of Sales 1996–2000 By Distributor; Share of Young Crime Handgun
Traces 1996–2000 By Distributor .............................................533

Ratio of Young Crime Handgun Share to Overall Market Share 1996–2000 By
Distributor ................................................................534

Dealer Indicators (1996–1998) Predict the Likelihood that a Dealer's Sales are
Recovered in Crime (1999–2000) ..............................................535

Distribution Management: Countermarketing to Prohibited Customers (Manufacturers) ......................................................................536

Awareness and Knowledge of Diversion to Prohibited Customers (Manufacturers).....537

Distribution Management: Countermarketing to Prohibited Customers (Distributors) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .538

Awareness and Knowledge of Diversion to Prohibited Customers (Distributors) . . . . . . . . .539

## PART ONE

### Summary of Case

Plaintiff, the National Association for the Advancement of Colored People ("NAACP"), is suing for injunctive relief on its own behalf and that of its individual and potential members in the state of New York. The theory is one of public nuisance under New York state law. Jurisdiction is based upon diversity. Defendants are the main manufacturers, importers, and distributors of handguns in the United States.

The case was tried in proceedings lasting some six weeks in March, April, and May 2003. *See* In Limine Rulings, *Nat'l Ass'n for the Advancement of Colored People v. Acusport, Inc.*, e.g., 2003 WL 1609192 (E.D.N.Y. Mar.26, 2003); 2003 WL 1701079 (E.D.N.Y. Mar.31, 2003); 2003 WL 1701101 (E.D.N.Y. Mar.31, 2003); 2003 WL 21242939 (E.D.N.Y. Apr.1, 2003); 2003 WL 2003730 (E.D.N.Y. Apr.2, 2003); 2003 WL 2003750 (E.D.N.Y. Apr.4, 2003); 2003 WL 2003773 (Apr. 4, 2003); 2003 WL 2003788 (Apr. 7, 2003); 2003 WL 2003767 (Apr. 9, 2003); 2003 WL 2003793 (E.D.N.Y. Apr.9, 2003); 2003 WL 2003776 (E.D.N.Y. Apr.11, 2003); 2003 WL 2003797 (E.D.N.Y. Apr.11, 2003); 2003 WL 2003800 (E.D.N.Y. Apr.14, 2003); 2003 WL 2004527 (E.D.N.Y. Apr.15, 2003); 2003 WL 2003785 (E.D.N.Y. Apr.16, 2003); 2003 WL 2004530 (E.D.N.Y. Apr.21, 2003); 2003 WL 2004531 (E.D.N.Y. Apr.21, 2003); 2003 WL 2004532 (E.D.N.Y. Apr.24, 2003); 2003 WL 2005190 (E.D.N.Y. Apr.24, 2003); 2003 WL 2004557 (E.D.N.Y. Apr.28, 2003); 2003 WL 2004641 (E.D.N.Y. Apr.29, 2003); 2003 WL 2003780 (E.D.N.Y. Apr.30, 2003); 2003 WL 2004688 (E.D.N.Y. Apr.30, 2003); 2003 WL 2004725 (E.D.N.Y. May 1, 2003); 2003 WL 21135563 (E.D.N.Y. May 5, 2003); 2003 WL 21135571 (E.D.N.Y. May 7, 2003); 2003 WL 21135576 (E.D.N.Y. May 7, 2003); 2003 WL 21135579 (E.D.N.Y. May 8, 2003); 2003 WL 21135581 (E.D.N.Y. May 8, 2003). Findings of fact and law are based on the evidence presented at trial. The court was aided by the parties' submissions of memoranda and proposed findings of fact and law, and by the Joint Submission of two of the observers, the Attorney General of the State of New York and the Corporation Counsel of the City of New York.

The evidence presented at trial demonstrated that defendants are responsible for the creation of a public nuisance and could—voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns—substantially reduce the harm occasioned by the diversion of guns to the illegal market and by the criminal possession and use of those guns. Because, however, plaintiff has failed to demonstrate, as required by New York law, that it has suffered harm different in kind from that suffered by the public at large in the state of New York, the case is dismissed.

### I. Contentions of Parties

The NAACP contends that defendants are each liable for a public nuisance. Specifically, plaintiff asserts that large numbers of handguns are available to criminals, juveniles, and other people prohibited by law from possessing and using them in New York state; that their availability endangers the people of New York and interferes with their use of public space; that the defendants negligently and intentionally caused this nuisance although they were on notice (from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and

other sources) that this would be the consequence of their imprudent sales and distribution practices throughout the United States; and that defendants negligently and intentionally failed to take practicable marketing steps that would have avoided or alleviated the nuisance by substantially reducing the pool of illegally possessed handguns in New York and in states where handguns were obtained for illegal transport to this state. According to plaintiff, the precautions defendants should have taken include: limiting multiple retail sales of guns to the same person; limiting relatively unsupervised sales of their new guns at gun shows; requiring retailers to conduct anti-straw-purchaser training and to take precautions to prevent that common circumvention of the law (a "straw purchase" being purchase by a person legally entitled to purchase a gun for one obviously not so entitled, such as a felon or youth); cutting off sales of their new guns to retailers that sell a disproportionate number of handguns traced by ATF, usually because of the connection of the guns to criminal activity; requiring retailers to maintain properly stocked, protected, and run establishments; insisting that a retailer not operate under various names to avoid surveillance as an unusual source of traced guns; inspecting retail outlets to see that they are managed appropriately to avoid any overt connection to criminal elements; and taking other inexpensive and effective steps to stop their new guns from being diverted from the legal to the illegal market. Plaintiff contends that it suffered injury different in kind from that experienced by the community at large as a result of the public nuisance caused by defendants.

Defendants individually and collectively contend that they make and sell handguns in full compliance with all applicable laws of the United States, the state of New York and its municipalities, and other states, and with extensive regulation by ATF; that they conduct their individual businesses responsibly, going well beyond the dictates of the law and good practice in protecting against illegal diversion of handguns to criminals; that plaintiff improperly seeks to hold them responsible for the acts of criminals they cannot control, including those who violate the law by illegally diverting handguns to illegal use; that some of the steps proposed by plaintiff would interfere with law enforcement; that nothing about any individual defendant's conduct or omissions or the conduct or omissions of the industry as a whole caused the diversion of handguns to criminals or caused a public nuisance in the state of New York; and that, since the problem of crime touches all citizens, the plaintiff NAACP has not proved that it or its members have suffered harm from the alleged public nuisance different in kind from whatever harm is experienced by others in New York.

## II. Factual Background

There are, generally speaking, three tiers in the merchandising structure of the gun industry's sale of handguns: (1) manufacturers and importers, (2) wholesale distributors, and (3) retail dealers. Entities or individuals in each of the three tiers are licensed by the ATF. Because distributors and retail dealers are classed in the same licensing category, they commonly are referred to collectively as Federal Firearms Licensees ("FFLs"). Entities and individuals in all three tiers must comply with all federal, state and local laws and regulations. Each gun manufactured in or imported into the United States must have a unique serial number that identifies the manufacturer. Manufacturers, distributors, and retailers must keep acquisition and disposition records of all firearms (identified by serial number) bought and sold or otherwise leaving the company's control.

ATF has the capability to "trace," or to determine a handgun's chain of sale, by individual serial number. Traces are initiated in the main from requests by law enforcement agencies to ATF based on the serial number of handguns recovered in connection with criminal investigations. The tracing process works essentially as follows: Upon receipt of a trace request from a law enforcement agency, ATF contacts the manufacturer identified by the serial number. The manufacturer's records will point to the gun's distributor, who is then queried. That distributor's records will reveal the retail dealer. When asked to respond by ATF, the retailer's records will indicate the consumer to whom the handgun was sold. The progress and results of the trace are recorded and retained by ATF in a complex database called the Firearms Tracing System, or FTS database. To aid it in its work, ATF also maintains a second and independent database, called the Firearms Licensing System ("FLS"), which contains records of FFLs kept pursuant to the Gun Control Act of 1968 and other controlling laws and includes, among other data, an FFL's name, number, and application history. This scheme, tracing millions of guns involved in criminal investigations over recent years, is of great assistance to local and national law enforcement.

In the instant case major portions of these large and detailed databases were made available to experts for both sides as part of the civil discovery process. It was the basis of statistical and other analyses by all parties. Plaintiff's experts contended, and defendants' experts denied, that the traces can be utilized in conjunction with other readily available information by manufacturers and distributors acting cooperatively to identify which retail dealers sell a relatively high number of guns traced in connection with criminal investigations, and thus, in the larger statistical sense, linked to probable criminal conduct.

## III. Law

Plaintiff's case is based on the New York law of public nuisance. The term "public nuisance" means the private interference with the exercise of a public right. In order to establish a defendant's liability for public nuisance, a plaintiff must prove each of three elements by clear and convincing evidence:

1. the existence of a public nuisance—a substantial interference with a right common to the public;

2. negligent or intentional conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and

3. particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of that public nuisance.

First, an interference with a public right occurs when the health, safety, or comfort of a considerable number of persons in New York is endangered or injured, or the use by the public of a public place is hindered. To be substantial, an interference with a public right must be real and appreciable, not imagined or petty. The circumstances to be considered in deciding whether such a nuisance exists include the nature of a defendant's business; the nature and degree of the danger to the public; whether the conduct is prohibited or permitted by statute, ordinance, or administrative regulation; whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect; and how, if at all, the danger could be reduced.

Second, a defendant must have acted intentionally or negligently, and its tortious conduct or omissions must have created, contributed to, or maintained the alleged public nuisance. Intervening criminal actions do not break the chain of

causation if a defendant could reasonably have expected that intervention. In an action for injunctive relief, individual defendants may be held liable for tortious conduct creating in the aggregate a public nuisance.

 Third, even if a public nuisance exists, and a defendant's actions or failures to act created, contributed to, or maintained it, a private plaintiff must show that it has suffered a special injury before a successful claim for public nuisance will lie. That is to say, the NAACP or its members must have suffered harm in New York different in kind from the harm experienced by members of the community at large. Differences in degree do not suffice. There must be differences in "kind" under New York law. This requirement is peculiar to public nuisance claims raised by a private plaintiff; it apparently does not apply to a suit brought by a governmental entity such as the Attorney General for the State of New York, or by the Corporation Counsel for the City of New York or the United States Attorney for the Eastern District of New York, all of whom are present in this case as "observers," but not as "parties."

## IV. Procedures

Because this equity case is of major public interest affecting large numbers of people, an advisory jury was empaneled. A searching questionnaire and voir dire produced a highly intelligent jury. Its diverse members represent a cross section of the community experienced in the heterogeneous conditions of life in New York. It sat for six weeks examining technical statistical and other studies with the aid of qualified experts from the fields of statistics, merchandising, and criminology; large data sources; extensive video depositions; government reports; and other proof.

Ultimately the jury advised that some defendants were not liable, but it could not agree on the liability of others. One of the jury's key difficulties was expressed in its first note indicating an inability to reach a decision. It wrote: "We, the members of the jury, cannot reach a unanimous decision as to *whether any particular harm was suffered by plaintiff.*" (emphasis added).

Under the Federal Rules of Civil Procedure, the ultimate decision on liability in a case where an advisory jury is empaneled must be made by the court with explicit findings of fact and law. *See* Fed.R.Civ.P. 52(a) (2003). "The peculiar delicacy of this case, the novelty of some of its circumstances, and the real difficulty attending the points" which occur in it, require a finding by the court on each of the elements of the plaintiff's cause of action. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 154, 2 L.Ed. 60 (1803).

## V. Conclusions of Fact and Law

### A. Nuisance and Its Causes and Prevention

 Plaintiff did establish by clear and convincing evidence the first two of the three elements it was required to prove as to defendants. *See* Part Three A, XVI–XXII, *infra* as to specific defendants. It proved that the criminal possession and use of handguns in New York causes many unnecessary deaths and much unnecessary injury, with relatively greater adverse effect on the NAACP and its members. Its witnesses and proof were more credible and probative than that produced by defendants. The evidence at trial demonstrated that the manufacturers and distributors—marketing tiers one and two—can, through the use of handgun traces and other sources of information, substantially reduce the number of firearms leaking into the illegal secondary market and ultimate-

ly into the hands of criminals in New York. A responsible and consistent program of monitoring their own sales practices, enforcing good practices by contract, and the entirely practicable supervision of sales of their products by the companies to which they sell could keep thousands of handguns from diversion into criminal use in New York. This supervision and control if voluntarily undertaken would be consistent with that of other industries involved with dangerous products. It would not interfere with criminal law enforcement at any level of government, but would be welcomed by all law enforcement agencies.

Careless practices and lack of appropriate precautions on the part of some retailers lead to the diversion of a large number of handguns from the legal primary market into a substantial illegal secondary market. This deflection results in the use of a great number of handguns in connection with increased criminal activity. These inappropriate actions by retailers include "straw sales"—that is, as already noted, sales to a person authorized to buy at retail but buying on behalf of one not so authorized, such as a felon or youth—and many repeat sales (sale of a number of handguns to the same person over a relatively short period of time) or multiple sales (sale of a number of handguns to the same consumer or straw purchaser at the same time). This and other unsafe conduct alleged and proved by plaintiff can be blocked through contract between retailers and distributors, and between distributors and manufacturers. The flow of guns into criminal hands in New York would substantially decrease if manufacturers and distributors insisted that retail dealers who sell their guns be responsible—e.g., that they not sell at gun shows, but sell from the equivalent of a store front with a supply of stocked guns; that they not sell under a variety of names; that they protect against theft; that they train and supervise employees to prevent straw sales

(which are often notoriously obvious to the seller); and that they take other appropriate and available protective action.

That the industry has improved its practices in recent years was demonstrated by defendants. The number of individuals and entities licensed to sell firearms at the distributor or dealer level, FFLs, has been sharply reduced, making supervision by the ATF, manufacturers, and distributors easier. The industry has begun to produce literature and training in conjunction with the ATF to help retailers reduce straw sales. Some individuals and companies have recognized the need for the more effective and conscientious merchandising techniques that would save lives, particularly in urban areas. These steps are late, too few, and even now insufficiently embraced by most individual defendants to eliminate or even appreciably reduce the public nuisance they individually and collectively have created.

Members of the industry continue to fail to take many obvious and easily implemented steps, such as requiring retailers to avoid multiple or repeat sales to the same customers. Such steps are an effective way of checking illegal handgun diversion as revealed by the fact that Virginia, which was a major supplier of illegal handguns to New York, almost immediately largely choked off that supply when it enacted a law limiting multiple sales to the same person. Such a limitation could readily be instituted by contract in industry-wide practice and would substantially reduce the stream of illegally possessed handguns flowing into New York.

The industry as a whole has not adopted a responsible approach to limiting sales and supervising its retail outlets for two main reasons: (1) some members of the industry believe that a unified, well-organized voluntary attempt to limit diversion of guns to criminals would be the equiva-

lent of a public recognition of its failures to take such steps in the past with an implied responsibility for thousands of avoidable deaths, and (2) a strong ideological sense of individuals and organizations associated with the industry—particularly the National Rifle Association and its members—that any limits on merchandising by statute or private initiative, even though lives would be saved, imposes an unacceptable circumscription of the right of individuals to bear arms. Some manufacturers have attempted to control irresponsible handgun sales and to reform the industry; they have largely abandoned these efforts, surrendering to potential boycotts and other forms of pressure brought on these two grounds.

In short, the NAACP has demonstrated the great harm done to the New York public by the use and threat of use of illegally available handguns in urban communities. It also has shown that the diversion of large numbers of handguns into the secondary illegal market, and subsequently into dangerous criminal activities, could be substantially reduced through policies voluntarily adopted by manufacturers and distributors of handguns without additional legislation.

### B. Failure to Prove a Special Kind of Harm

■ Plaintiff did not establish by the required clear and convincing evidence that it suffered the special kind of harm required under New York Law to establish its private cause of action. The NAACP proved that its members and potential members—now predominately African–Americans—did suffer relatively more harm from the nuisance created by defendants through the unnecessary illegal availability of guns in New York. It failed, however, to show that its harm was different *in kind* from that suffered by other persons in New York.

All organizations and persons in this state are guaranteed the equal protection of the law. All are entitled to law enforcement that provides as much equal protection as is practicable from criminally caused death and injury through the use of handguns. While the NAACP has shown that more prudent and easily available merchandising practices on the part of the defendants would have saved many lives in the past—and would save many in the future—in New York, its hurts are no different in kind from those of other New Yorkers. Like their fellow countrymen, NAACP members and potential members are "hurt by the same weapons;" when shot by illegal handguns they, like others, "bleed." William Shakespeare, *The Merchant of Venice* act 3, sc. 1.

The fact that the NAACP and the rest of the community can and would be better protected against handgun violence by relatively cheap and simple responsible policies of manufacturers and distributors of handguns is not decisive. Ironically, the demonstration that all New Yorkers would gain from this method of reducing a dangerous public nuisance prevents the NAACP from obtaining relief under New York law on the ground that it suffers a special kind of harm from irresponsible handgun marketing.

### C. Culpability for Violent Urban Crime

Were it shown that the government was giving inadequate protection against gun violence to neighborhoods of a predominantly African–American population, a suit would lie against the municipality on equal protection or other grounds. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *DeMuria v. Hawkes,* 328 F.3d 704 (2d Cir.2003) (holding allegations that police officer provided two residents with different standard of police protection than that typically afforded municipality's resi-

dents supported equal protection claim). There is absolutely no such showing here, and in any event the defendants could not be deemed responsible for gun violence under such a theory. Nor is the line of cases in which an individual corporation is deemed to be in effect a municipality for these purposes applicable. *See Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). There is no suggestion that the defendants had any direct control over or relationship with New York's criminal milieu.

Defendants vehemently and with some indignation deny that they are responsible for the bulk of criminal conduct and violent crime in urban areas. Their position is understandable, based on the record. The probability of being exposed to violent criminality involving handguns is so much a product of the incredibly complex skein of family and friends, neighborhood and socio-economic status, and expectations and luck, that the gun industry can understandably contend that its contribution to gun crime is relatively slight. Yet it remains appreciable as well as largely avoidable.

The defendants, viewed in the broadest sense, are less culpable than some other elements of society, but their culpability nevertheless cannot be ignored. In the twenty year period between 1979 and 1998, there were just under 300,000 firearm homicides in the United States; handguns were involved in countless more non-fatal injuries and other criminal activity. In the years between 1990 and 2000, on average 662,000 incidents of violent crime were committed nationally with handguns each year. While defendants are justified in disclaiming liability for all these violent crimes and the resulting injuries and deaths, that is hardly a justification for failure to take elementary steps that the evidence demonstrated would have saved the lives of many people unnecessarily lost to handgun violence, and could save the lives of myriad more. The power of the gun industry to reduce deaths from their products is estimated to run into the thousands in any decade. The well supported testimony of plaintiff's expert Lucy Allen was that after increased restrictions on firearms dealers took effect in 1993–1994, a statistically significant relationship between the number of dealers subsequently going out of business in a state and the decline in handgun homicides in the states to which traced handguns originating in that state flow supported the conclusion that approximately 1500 additional homicides would have occurred in the year 2000 had the excluded dealers remained in business.

This case reflects the conjunction of three main elements of American societal organization that historically have cooperated in the interest of the welfare of our people: (1) voluntary non-profit, religious, and other private associations of involved members of the community, here the NAACP seeking to limit the possession of handguns by criminals threatening the safety of New York urban residents on the one hand, and on the other organizations of gun owners bent on limiting control over their lawful possession of firearms; (2) government, here federal, state, and local, through statutes and exercise of regulatory and police power to limit illegal possession and use of handguns; and (3) private entrepreneurial structures, here manufacturers, importers, and distributors of handguns, who control the flow of their product to retailers. These three main components of American organizational life have failed to protect adequately against urban gun violence in different ways.

Voluntary non-profit, religious, and other private associations have failed in reducing the proclivity of youngsters in some communities to be drawn into violent lawlessness. Individual family structures, peer pressures, and neighborhood controls

have also been less than fully successful in this respect, often for reasons beyond their immediate control.

Government has failed to provide the socio-economic stability, work, and education that might reduce criminal propensities. Some contend that the federal and state governments are also at fault for failing to exercise more control over handgun sales. *See, e.g.,* Open Society Institute, *Gun Control in the United States: A Comparative Survey of State Firearm Laws* (April 2000); Mona A. Wright, Garen J. Wintemute, & Frederick P. Rivara, *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence,* 89 Am. J. Pub. Health 88–90 (1999). It would, however, require a form of political myopia to ignore the effect of strong differences of opinion among substantial articulate portions of the population—particularly urban vs. rural—on governmental gun control and related policies. *Cf. The Federalist No. 10* (James Madison) (foreseeing factional differences that must be resolved through compromise not completely satisfactory to any of the factions' strong opposing views).

Private manufacturers and distributors of handguns have failed to take minimum circumspect steps to limit leakage of their guns into criminal hands. The evidence showed that the portion of the FTS data available to the industry together with other on hand information could be used by defendants to substantially reduce sales of guns to "bad apple" dangerous retailers or to insist that such merchants change their practices.

The huge amount of relevant data available as a result of the opening up of the ATF's trace request databases in federal discovery practice in this case may not be ignored—as the defendants argue it should be. Obviously the raw data itself is of little value without analysis and theory— "the data alone would be worthless without a theory to give them meaning." James Gleick, *Isaac Newton* 153 (2003). Neither the ATF's data bases nor the analyses of the plaintiff's experts are perfect. Together they do give us a picture only slightly out of focus of the merchandising practices of defendants that enormously increase the probability of unnecessary deaths caused by criminals using the guns they sell. Plaintiff's experts, contrary to the caviling of defendants' experts, have produced "a practical formula for calculating … a hybrid sequence of equations and measurements," *id.* at 155, that tell us what we need to know with accuracy sufficient to the enterprise. *See Falise v. Am. Tobacco Co.,* 258 F.Supp.2d 63, 67–68 (E.D.N.Y. 2000) (approval of statistical analysis and experts' opinions based partly on estimates and lack of full randomly selected data in compliance with *Daubert* requirements). Prudent merchandising practices voluntarily adopted could have, and could in the future, save the lives of many people who have been, or will be, killed by handguns irresponsibly merchandised by defendants.

The evidence demonstrated that there is, in the reduction of dangers from handguns, no inconsistency or necessary conflict in the aims and actions of these three groups—government, industry, and private associations—whose affinity and cooperation should be congenial. Each can help reduce criminal use of handguns without jeopardizing its own integrity: the government by more effective enforcement of adequate gun laws; industry by controlling its own members through contract and other devices to help ensure that its handguns are not diverted to an illegal market for criminals; and private organizations by helping to reduce criminal and careless conduct of those it can influence. Personal responsibility of all these and of potential criminals—however influenced—is the ultimate touchstone. Vehement differences of opinion concerning the role of guns in our society and the proper function of each

element of society in promoting that role do not excuse private industry from exercising its responsibilities to the public at large.

In the end, "there is nothing to do except to . . . declare what fair and reasonable men, mindful of the habits of life of the community, and of the standards of justice and fair dealing prevalent among them, ought in such circumstances to do . . . ." Benjamin N. Cardozo, *The Nature of the Judicial Process* 142–43 (1921); *see also* Plato, *Laws, in* John Bartlett, *Familiar Quotations* 96a (14th ed. 1968) ("And this . . . is the very highest . . . right idea . . . whereby you may live your life well or ill."); *cf.* Harold Hongju Koh, Lecture, *A World Drowning in Guns*, 71 Fordham L.Rev. 2333 (2003). A free people and its institutions do not need the government to require them to do what they know they ought to do to prevent unnecessary violence from handguns, nor is industry prevented from monitoring itself by any rule of law. *Cf.* Jacob M. Schlesinger & Thaddeus Herrick, *Will the Industry Police Itself?*, Wall Street J., May 21, 2003, at A1 (voluntary measures taken by other industries). *But cf.* William Lee Miller, *Lincoln's Virtues: An Ethical Biography* 387 (2002) ("Think of the rationalizations, the resistance, the difficulty of winning even small victories over the tobacco industry, at the time of this writing. And tobacco is a much less egregious evil, and is a much smaller industry, than was slavery. And its harmful effects are differently distributed across the population."); James B. Jacobs, *Can Gun Control Work?* (2002) (skeptical of any controls that will reduce gun violence).

## PART TWO

### Findings of Law

This case raises a number of perplexing issues in addition to the question of ultimate liability:

1. Does the NAACP have standing to bring an action sounding in public nuisance for injunctive relief against gun manufacturers, importers, and distributors? Does the court have personal and subject matter jurisdiction?

2. Is this action barred by prior decisions of the New York state courts and the Court of Appeals for the Second Circuit? If not, can the New York substantive common law of public nuisance live within the interstices of a fairly comprehensive federal and state statutory scheme for controlling gun sales?

3. How can and should an advisory jury and the verdict of that jury be treated in an equitable action?

4. What is the burden of proof on a private plaintiff like the NAACP in a public nuisance action arising under New York substantive law brought in a federal court in the state of New York based on diversity jurisdiction?

5. Has plaintiff proved facts suggesting that the conduct of defendants, individually or collectively, created a public nuisance in the state of New York and caused it harm of a kind different than that suffered by others?

I. Standing and Jurisdiction

A. Standing

The question of whether the NAACP has standing to bring and maintain this action has already been answered in the affirmative. *See Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 210 F.R.D. 446 (E.D.N.Y.2002); *see also In re Colt's Mfg. Co.* No. 02–3083 (2d Cir. March 16, 2003) (mandate). There is an actual case or controversy. *See U.S.*

Const. Art. III; *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Plaintiff NAACP has established that it possesses standing in its own right: (1) it has suffered concrete, on-going injury in fact; (2) there is a causal connection between the injury suffered and the conduct of the defendants; and (3) it is probable that the injury would be substantially redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Warth v. Seldin*, 422 U.S. 490, 495, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The NAACP has further established representational standing to pursue this action on behalf of its members and constituents: (1) its members can meet the requirements to show standing in their own right; (2) the interests sought to be protected are germane to its purpose; and (3) no participation in the suit by the individual members is required. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

The NAACP has not, after trial, met its burden of proof on the quasi-standing element of its public nuisance claim—that is, the requirement in public nuisance suits brought by non-governmental persons that plaintiff demonstrate " 'special' or 'peculiar' injury … different in kind, and not just degree, from that sustained by the community." *Wheeler v. Lebanon Valley Auto Racing Corp.*, 303 A.D.2d 791, 755 N.Y.S.2d 763, 765 (2003) (citing *532 Madison Ave. Gourmet Foods v. Finlandia Ctr. Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1104–05 (2001)). This does not mean, however, that the NAACP and its members have failed to demonstrate injury in fact for jurisdictional purposes. To the contrary, the NAACP and the African–American community that it repre-sents suffer great harm from the illegal use and possession of handguns and have standing.

## B. Subject Matter Jurisdiction

Diversity jurisdiction exists. *See* 28 U.S.C. § 1332 (2003); *Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 210 F.R.D. 446, 458, 461–62 (E.D.N.Y.2002). The NAACP is organized under the laws of the state of New York and has its principal place of business in Maryland. While the NAACP has members in all fifty states, the District of Columbia, and overseas, the case has been limited to the harm suffered by New York members and by the NAACP in its operations and activities in New York. The case was tried according to this limitation, and the court has borne it in mind when assessing the evidence presented. The defendants are citizens of many states and several foreign countries, but none is a citizen of either Maryland or New York. The requirements for complete diversity are therefore satisfied. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Airlines Reporting Corp. v. S and N Travel, Inc.*, 58 F.3d 857, 862 (2d Cir. 1995).

## C. Personal Jurisdiction

Personal jurisdiction in diversity cases is determined in accordance with the law of the forum state, here New York, subject to federal due process constraints. *See, e.g., Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir.1990); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986). It exists over those defendant gun manufacturers, importers, and distributors in the instant case not already dismissed for lack of personal jurisdiction. *See* N.Y. C.P.L.R. 302(a)(3) (2003) (providing for jurisdiction over de-

fendants who commit a tortious act outside of New York that causes injury within New York). The court's exercise of this jurisdiction comports with federal due process. *See Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 210 F.R.D. 446, 458, 462 (E.D.N.Y.2002); *Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms.*, 2003 WL 21242939 (E.D.N.Y. Apr. 1, 2003).

Numerous motions to dismiss and renewals of motions to dismiss for lack of personal jurisdiction have been made by defendants. Those defendants allege that the evidence presented has shown that their participation in the national and New York gun markets and impact, if any, on the alleged public nuisance are insufficient to meet the standards set by the New York long arm statute and federal due process. A number of defendants for which this is the case were dismissed on de minimis grounds. *See Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms.*, 2003 WL 21242939 (E.D.N.Y. Apr. 1, 2003); *Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 210 F.R.D. 446 (E.D.N.Y.2002); *Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 2001 WL 282923 (E.D.N.Y. March 16, 2001); *Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 2000 WL 1789094 (E.D.N.Y. Dec.7, 2000). With the exception of those defendants who have previously contested this court's exercise of personal jurisdiction over them, defendants concede that personal jurisdiction exists.

## II. Potential Bars

### A. Effect of the *Hamilton* Litigation and *People of the State of New York v. Sturm, Ruger & Co.*

Two prior actions against members of the handgun industry are of particular relevance to the case at bar: (1) the *Hamilton* litigation, an action brought by individ-ual victims of handgun violence and their representatives and tried before this court on a theory of negligence; and (2) *People of the State of New York v. Sturm, Ruger & Co.* ("*Sturm, Ruger*"), a suit brought by the Attorney General for the State of New York in the New York state courts on a public nuisance theory. *See Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36, 41, 46 (2d Cir.2000); *Hamilton v. Beretta U.S.A. Corp.*, 95 N.Y.2d 878, 715 N.Y.S.2d 213, 738 N.E.2d 360 (2000); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001); *Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21 (2d Cir.2001); Memorandum and Judgment, *Hamilton v. Beretta U.S.A. Corp.* No. 95 CV 49 (E.D.N.Y. Sept. 17, 2001); *People of the State of New York v. Sturm, Ruger & Co., et al.* Index No. 402856/00 (N.Y.Sup.Ct. Aug. 10, 2001) (*Sturm, Ruger I*); *People of the State of New York v. Sturm, Ruger & Co.*, —— A.D.2D ——, 761 N.Y.S.2d 192 (2003) ("*Sturm, Ruger II*").

The effects on the instant case of decisions of the New York courts and the United States Court of Appeals for the Second Circuit in these other actions lie somewhere in the area between *stare decisis* and *res judicata*. Neither doctrine consists of hard and fast, mechanically applied rules; both require a court to exercise judgment, fairness, and comity in their administration. *See, e.g., Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 205, 76 S.Ct. 273, 100 L.Ed. 199 (1956); *Strubbe v. Sonnenschein*, 299 F.2d 185, 188–89 (2d Cir.1962); *Restatement (Second) of Judgments* ch. 1, intro. ("A measure of intuition and discretion ... is required in administering the law of *res judicata* ....").

#### 1. Background

##### a. *Hamilton*

The *Hamilton* litigation was initiated by a complaint filed in January 1995.

Relatives of six people killed by handguns, as well as one injured survivor and his mother, have sued twenty-five handgun manufacturers for negligence. They claim that the manufacturers' indiscriminate marketing and distribution practices generated an underground market in handguns, providing youths and violent criminals like the shooters in these cases with easy access to the instruments they have used with lethal effect. . . . After a four-week trial, the jury found negligent fifteen of the defendants; nine of them were found to have proximately caused injury to one or more plaintiffs. Damages were found only in favor of plaintiff Steven Fox and his mother, Gail Fox, against American Arms, Inc. (.23% liability), Beretta U.S.A. Corp. (6.03% liability), and Taurus International Manufacturing, Inc. (6.8% liability).

*Hamilton v. Accu–Tek,* 62 F.Supp.2d 802, 808 (E.D.N.Y.1999). Judgment was entered in accordance with that verdict. Defendants appealed to the Court of Appeals for the Second Circuit. Because of the novelty and difficulty of the state law issues presented, the Second Circuit certified two questions to the New York Court of Appeals: (1) "[w]hether the defendants owed plaintiffs a duty to exercise reasonable care in the marketing and distribution of the handguns they manufacture"; and (2) "[w]hether liability may be apportioned on a market share basis, and if so, how." *Hamilton v. Beretta U.S.A. Corp.,* 222 F.3d 36, 41, 46 (2d Cir.2000).

The New York Court of Appeals answered both certified questions in the negative, holding that on the particular facts of the case the evidence as presented at trial did not support the imposition of a duty of care on the defendant gun manufacturers and that market share liability was inapplicable because guns are not fungible products:

Tort law is ever changing; it is a reflection of the complexity and vitality of daily life. Although plaintiffs have presented us with a novel theory—negligent marketing of a potentially lethal yet legal product, based upon the acts not of one manufacturer, but of an industry—we are unconvinced that, on the record before us, the duty plaintiffs wish to impose is either reasonable or circumscribed. Nor does the market share theory of liability accurately measure defendants' conduct. Whether, in a different case, a duty may arise remains a question for the future.

*Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 233, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001); *see also Hamilton v. Beretta U.S.A. Corp.,* 95 N.Y.2d 878, 715 N.Y.S.2d 213, 738 N.E.2d 360 (2000). Accordingly, the judgment was reversed and the case dismissed. *See Hamilton v. Beretta U.S.A. Corp.,* 264 F.3d 21 (2d Cir. 2001); Memorandum and Judgment, *Hamilton v. Beretta U.S.A. Corp.* No. 95 CV 49 (E.D.N.Y. Sept. 17, 2001).

The *Hamilton* case, while an action against members of the handgun industry and providing some insight into the issues currently presented, is readily distinguished from the case at bar. Plaintiffs in *Hamilton* were individuals seeking compensation for damages to themselves arising out of specific incidents of gun violence, not an organization suing on behalf of itself and its members as a private quasi-attorney general. *Hamilton* was tried on claims of negligence rather than on a theory of public nuisance.

b. *People of the State of New York v. Sturm, Ruger & Co.*

In June 2000 the Attorney General of the State of New York sued certain gun manufacturers and wholesalers in New York Supreme Court, New York County.

See People of the State of New York v. Sturm, Ruger & Co., et al. Index No. 402856/00 (N.Y.Sup.Ct. Aug. 10, 2001). Sought was "an abatement of an alleged public nuisance arising from the manufacture and distribution of handguns that are unlawfully possessed and used in New York." Sturm, Ruger I at 1–2. The State Supreme Court granted defendants' motion to dismiss the complaint for failure to state a cause of action in August 2001. See id.; N.Y. C.P.L.R. 3211(a)(7) (2003). That decision was affirmed by the Appellate Division, First Department on the Attorney General's appeal in June 2003. See People of the State of New York v. Sturm, Ruger & Co., —— A.D.2D ——, 761 N.Y.S.2d 192 (2003).

Shortly before trial was scheduled to commence in the instant case, defendants requested that this case be stayed pending the resolution of Sturm, Ruger, arguing that abstention in deference to the New York state courts was appropriate under Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) or Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The motion was denied in February 2003. See Nat'l Ass'n for the Advancement of Colored People, 2003 WL 1049011, at *1–*5 (E.D.N.Y. Feb.24, 2003).

Important differences between Sturm, Ruger and the instant action include: (1) the timing and status of the proceedings; (2) the identity and nature of the plaintiff; (3) the defendants named; and, critically, (4) the evidence alleged or presented.

The complaint in Sturm, Ruger was filed almost a year after the NAACP's action was initiated. The New York state complaint is in a number of respects general; the form that the requested injunctive relief might take is not specified. Defendants' motion to dismiss in the state action for failure to state a cause of action was

heard and decided before answers or discovery.

Sturm, Ruger was brought by the Attorney General of the State of New York on behalf of the people of New York in its capacity as parens patriae. The case stands on a different footing from one brought by a private associational plaintiff on behalf of itself and its members. The proof offered will necessarily vary somewhat from that offered by an organization or an individual claiming a public nuisance that causes it special harm.

Most, but not all, of the defendants in Sturm, Ruger were also named by the NAACP in its previously filed complaints. The NAACP also, however, tried claims against a number of additional defendants. The verdict sheet in the instant action listed sixty-eight defendants, almost triple the number of entities involved in the motion to dismiss in Sturm, Ruger.

The Appellate Division, First Department, premised its decision to uphold the Supreme Court's dismissal of the complaint in Sturm, Ruger on the availability of only that ATF trace data obtained during discovery and trial of the Hamilton case. See, e.g., People of the State of New York v. Sturm, Ruger & Co., —— A.D.2d ——, 761 N.Y.S.2d 192, 200 (2003) ("There is no reason to believe that the level of knowledge flowing from the instant trace requests today is any greater than it was when Hamilton was decided."). It did not take into account the critical factor that, as a part of federal discovery practice in the instant action, much more extensive and more recent data from the ATF databases was released to the parties than was available during Hamilton, or has ever before been available in any litigation. Furthermore, since the trial of Hamilton four years ago, the development of a greater understanding of the ATF database and additional scientific studies of the handgun

industry and criminal handgun use have led to more sophisticated analyses of trace data. Not only are different factual transactions at issue in the instant action than in *Hamilton* or in *Sturm, Ruger* as decided by the Appellate Division, there is an enormous amount of additional evidence and greater understanding of the evidence concerning those transactions.

2. *Stare Decisis* and the Rule of *Erie*

▮ Under the rule of *Erie*, New York common law governs this case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 210 F.R.D. 446, 454 (E.D.N.Y.2002). The court is bound to apply New York law of public nuisance as explicated by the New York Court of Appeals, the highest court in the State of New York and therefore the authoritative interpreter of New York law. It is required to apply that law "as interpreted by New York's intermediate appellate courts" unless it finds "persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion." *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999); *see also Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 84 (2d Cir.1991); *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 678 (2d Cir.1985); *Entron Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 132 (2d Cir.1984) ("We believe, however, that the court's reasoning in *Miller* is incorrect and that the New Jersey Supreme Court would reach a different conclusion."). A "federal court is bound to apply the law of the state as found by an intermediate appellate court in the absence of 'more convincing evidence of what the state law is.'" *Strubbe v. Sonnenschein*, 299 F.2d 185, 188 (2d Cir.1962) (quoting *Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 178, 61 S.Ct. 176, 85 L.Ed. 109 (1940)).

▮ A determination of state law cannot be made mechanically; "a federal court is bound to consider all relevant factors." *Strubbe*, 299 at 188–89 (2d Cir. 1962) (citing *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 205, 76 S.Ct. 273, 100 L.Ed. 199 (1956)); *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) ("It is the duty of the [federal courts] in every case to ascertain from all the available data what the state law is and apply it. . . .").

This court is obligated to apply New York public nuisance law as announced and interpreted in the Appellate Division, First Department's decision in *People of the State of New York v. Sturm, Ruger & Co.*, — A.D.2d ——, 761 N.Y.S.2d 192 (2003) and in the many other public nuisance claims that have faced the New York courts. That law will be determined in the context of all pertinent considerations. To the extent that there are inconsistencies in this body of law, the weight of the precedent will govern.

Also controlling are the decisions of the New York Court of Appeals and those of the Court of Appeals for the Second Circuit in the *Hamilton* litigation. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001); *Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36 (2d Cir.2000); *Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21 (2d Cir. 2001).

3. *Res Judicata*

[16] Plaintiff's claim is not barred as a matter of *res judicata* by the decision of the New York Supreme Court in *People of the State of New York v. Sturm, Ruger & Co.*, No. 4502586/00 (N.Y.Sup.Ct. Aug. 10, 2001) or the affirmation of that decision by the Appellate Decision, First Department, in *People of the State of New York v.*

*Sturm, Ruger & Co.,* —— A.D.2D ——, 761 N.Y.S.2d 192 (2003).

■■■■ As a preliminary matter, the Attorney General for the State of New York and the Corporation Counsel for the City of New York take the narrow procedural position that defendants, because they did not raise the issue of *res judicata* in their answers to plaintiff's Fifth Amended Complaint, are now barred from asserting it. *Res judicata* is an affirmative defense that a defendant, if intending to rely on, generally should raise in its responsive pleadings. *See* Fed.R.Civ.P. 8(c) (2003). The court may, however, freely grant leave to amend pleadings "when justice so requires." Fed.R.Civ.P. 15(a) (2003). The grant or denial of leave to amend lies within the discretion of the trial court, but is "limited when there is 'undue delay, bad faith or dilatory motive' on the part of the moving party, and 'undue prejudice to the opposing party.' " *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 46–47 (2d Cir.1983) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

■■■ Plaintiff has suffered no prejudice, and there is no evidence of bad faith or dilatory motive on the part of defendants. The effects of *Sturm, Ruger* on the instant matter have been actively litigated. *See Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms,* 2003 WL 1049011, at *4 (E.D.N.Y.2003) (denying defendants' motion for an interim order of stay and stating, "[T]hese proceedings ... are not parallel to or duplicative of the state court proceedings in *Sturm, Ruger & Co.* A decision affirming or reversing the New York Supreme Court's decision on the motion to dismiss in *Sturm, Ruger & Co.* would likely have little, if any, impact on the instant case."); *see also* Mandate, *In re Various Gun Manufacturers and Distributors* No. 03–3025 (2d Cir. March 27, 2003). It should also be noted that, because of plaintiff's filing of amended complaints and the motion, discovery, and trial schedule set by the court, answers to the most current complaint (the Fifth Amended Complaint) were not prepared and filed until the beginning of October of 2002, at which point the instant consolidated cases had been on-going for over three years and a trial date in this complex litigation was scheduled for little more than a month away. The answers therefore played only a minor, if any, role in notifying plaintiff of the issues defendants would litigate. In fact, it was not plaintiff who asserted that defendants had waived the defense of *res judicata,* but observers the State of New York and the City of New York by a joint submission made after the parties' final submissions had been received.

In a case of this importance to society, to bar defendants from raising *res judicata* on procedural grounds represents too constrained a notion of procedural propriety. It would ignore a fundamental relationship between state and federal courts addressing essentially the same issue. Defendants' answers are deemed amended to assert the affirmative defense of *res judicata.* On the merits of the defense, however, defendants' argument is rejected.

■■■■ Federal courts must give preclusive effect to a state court decision where preclusive effect would be given by the courts of that state. *See Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); 28 U.S.C. § 1738 (2003). The doctrine of *res judicata* in New York means that once a final decision on the merits is issued on a claim, all other claims among the parties or their privies arising out of the same transaction or series of transactions are barred. *See O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981); *Green v. Santa Fe Indus., Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 514 N.E.2d

105 (1987); *In re Shea's Will*, 309 N.Y. 605, 616, 132 N.E.2d 864 (1956).

If a state brings suit on behalf of its citizens to enjoin a public nuisance, and a consent decree or final judgment is reached in that action, it is possible that under some circumstances a private plaintiff would be barred, as a matter of *res judicata*, from later seeking injunctive relief in a public nuisance action against the same defendant or defendants on the basis of the same factual transactions. *See, e.g., United States v. Olin Corp.*, 606 F.Supp. 1301 (N.D.Ala.1985); 66 C.J.S. *Nuisances* § 65 (2002); 58 Am.Jur.2d *Nuisances* § 248 (2002); *cf. City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 340–41, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) ("[T]hey, in their common public rights as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment."); *State v. Bridgehampton Road Races Corp.*, 44 A.D.2d 725, 354 N.Y.S.2d 717, 719 (App. Div.2d Dep't 1974) ("The real party in interest in this action is the People. The Attorney General ... instituted this action as Parens patriae of those individuals who have been or will be injured by the alleged public nuisance."). That is not, however, the situation before this court.

The New York Supreme Court in *Sturm, Ruger* granted a motion to dismiss for failure to state a claim made before answers were filed or discovery was taken, and specifically noted facts which, if alleged, might be sufficient to state a cause of action. *People v. Sturm, Ruger & Co., et al.* Index No. 402586/00 (N.Y.Sup.Ct. Aug. 10, 2001), *aff'd*, — A.D.2d —, 761 N.Y.S.2d 192 (2003). This is not a final decision on any possible merits of a similar claim. *See Hodge v. Hotel Employees*, 269 A.D.2d 330, 703 N.Y.S.2d 184 (2000); N.Y. C.P.L.R. 5013 (2003) ("A judgment dismissing a cause of action before the close of the proponent's evidence is not a dis-

missal on the merits unless it specifies otherwise, but a judgment dismissing a cause of action after the close of the proponent's evidence is a dismissal on the merits unless it specifies otherwise."); *compare Strange v. Montefiore Hosp.*, 59 N.Y.2d 737, 739, 463 N.Y.S.2d 429, 450 N.E.2d 235 (1983); *Lampert v. Ambassador Factors, Corp.*, 266 A.D.2d 124, 698 N.Y.S.2d 234, 235 (1999) (dismissal of the complaint "was not merely for a technical pleading defect, but manifestly on the merits").

*Sturm, Ruger* is rather a decision that, as pleaded, no cause of action was stated by plaintiff's complaint. *See People of the State of New York v. Sturm, Ruger & Co.*, — A.D.2d —, —, 761 N.Y.S.2d 192, 212–13 (2003) (Rosenberger, J., dissenting). The defects alleged might be remedied by amended pleadings reflecting further evidence of the merits. *See Plattsburgh Quarries v. Palcon Indus.*, 129 A.D.2d 844, 513 N.Y.S.2d 861, 862 (1987) ("Given the limited scope of a determination on a motion addressed to the sufficiency of the pleadings, ... we conclude that the dismissal of the complaint in the prior action was not sufficiently close to the merits for claim preclusion purposes to bar a second action.") (internal citation omitted); *Allston v. Incorporated Village of Rockville Ctr.*, 25 A.D.2d 545, 267 N.Y.S.2d 564, 565–66 (1966) (dismissal "for failure to state facts sufficient to constitute a cause of action ... does not bar another action brought for the same cause, where the defects or omissions adjudged to be present in the first action are corrected or supplied by the pleading in the second"); *cf. Lampert v. Ambassador Factors Corp.*, 266 A.D.2d 124, 698 N.Y.S.2d 234 (1999) ("[T]he dismissal of the prior action ... was not merely for a technical pleading defect, but manifestly on the merits, based on a finding that plaintiff's failure to exercise such due diligence precluded him from prevail-

ing on his fraud cause of action against such defendants, regardless of what other facts he might allege."); *Saud v. The Bank of New York*, 929 F.2d 916 (2d Cir. 1991) (*res judicata* not applicable where newly available evidence could not have been discovered previously with due diligence).

Here the evidence adduced was far different, more comprehensive, and more recent than that visualized and depended upon by the court in *Sturm, Ruger.*

### B. Second Amendment to the United States Constitution

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." There are two primary interpretations of this Amendment: (1) a "collective or militia-based" understanding, which holds that the Amendment applies only to service in a militia organized and regulated by the government and (2) an "individualist" view, which argues that the Amendment protects an individual's right to bear arms unconnected to service in a militia. *See, e.g.,* H. Richard Uviller and William G. Merkel, *The Militia and the Right to Arms, Or, How the Second Amendment Fell Silent* 1 (2002) ("While many of us regard guns in private hands as the scourge of our times, and favor government imposition of controls and punitive deterrence of all sorts, many others think of possession of firearms . . . as the gift of the Founders, immune to government restriction and regulation."); Robert J. Spitzer, *The Second Amendment "Right to Bear Arms" and United States v. Emerson*, 77 St. John's L.Rev. 1 (2003). The former, militia-based, understanding is the prevailing view. *See, e.g., United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *United States v. Toner*, 728 F.2d 115, 128 (2d Cir.1984); *see also,*

*e.g., United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875); *Presser v. Illinois*, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886); *Miller v. Texas*, 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812 (1894); *Lewis v. United States*, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980). *But see United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 184 (2002).

This is a case invoking state tort law; the Second Amendment limits only the powers of the federal government. *See Presser v. Illinois*, 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886) ("[T]he [second] amendment is a limitation only upon the power of congress and the national government, and not upon that of the state."); *Hamilton v. Accu-tek*, 935 F.Supp. 1307, 1318 (E.D.N.Y.1996) ("[T]he Supreme Court's continued citation of *Presser*, and the absence of more recent contrary Supreme Court authority, indicates that *Presser* continues to serve as authority denying the Second Amendment's application to the states."). Even if it were found to apply to the states, however, whatever view is taken of the Second Amendment is immaterial in this case. *See Nat'l Ass'n for the Advancement of Colored People*, 2003 WL 1701079, at *3 (E.D.N.Y.2003) (precluding reference to the Second Amendment); H. Richard Uviller & William G. Merkel, *The Militia and the Right to Arms, Or, How the Second Amendment Fell Silent* 228–29 (2002) ("What this means is that on the pressing question of gun control, the Constitution is neutral."). Ideological views of guns have nothing to do with prudent marketing. There is no justification in the federal Constitution for private persons failing to exercise reasonable care in meeting their legal responsibility to help ensure a safe society. Moreover, the customers of the gun industry, the consumers of handguns,

constitute a large proportion of American society; to the extent that practices of the gun industry place society at risk, those customers who own guns legally are also put in the way of harm.

### C. Commerce Clause

 The Commerce Clause is relied upon by defendants as a bar to this action. *See* U.S. Const. art. I, sec. 8, cl. 1–3 ("The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States. . . .").

It has not been argued that Congress has exercised its power over interstate and foreign commerce in guns to preclude or preempt states from providing civil and criminal legal protections to its citizens. *Cf. Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 541–53, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *In re Simon II Litigation,* 211 F.R.D. 86, 141–43 (E.D.N.Y. 2002). To the contrary, Congress has expressly recognized that state regulation of the sale, possession, and use of guns are necessary complements to federal regulation of firearms. *See* 18 U.S.C. § 927 (2003) ("No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together."); *see also Hamilton v. Accu-tek,* 935 F.Supp. 1307, 1318 (E.D.N.Y.1996) ("The states and their political subdivisions continue to have a substantial role in our federal system in regulating the sale and use of guns.") (citing *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Quilici v. Village of Morton Grove,* 695 F.2d 261, 267–70 (7th Cir.1982); *Richmond Boro Gun Club, Inc. v. City of New York,* 896 F.Supp. 276, 283–84 (E.D.N.Y.1995)). State tort law is one way in which states, in exercising their police powers to protect their citizens' welfare, act to regulate firearms. *See Hamilton v. Accu-tek,* 935 F.Supp. 1307, 1319 (E.D.N.Y.1996) (citing *Cipollone v. Liggett Group Inc.,* 505 U.S. 504, 522–23, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Burke v. Dow Chem. Co.,* 797 F.Supp. 1128, 1136 (E.D.N.Y.1992)). There appears to be no reason in the law of federal preemption or public policy for not allowing New York common law and equity to protect New York residents in a way not inconsistent with the federal statutory scheme.

 State law, including state common law, *cf. New York Times Co. v. Sullivan,* 376 U.S. 254, 256, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), not precluded or preempted by Congress may nevertheless be barred by the interstate or foreign Commerce Clause under some circumstances. *See Kassel v. Consol. Freightways Corp. of Delaware,* 450 U.S. 662, 669, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981); *W. & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 652, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) ("In terms, the Clause is a grant of authority to Congress, not an explicit limitation on the power of the States. In a long line of cases stretching back to the early days of the Republic, however, this Court has recognized that the Commerce Clause contains an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce."); *Barclays Bank PLC v. Franchise Tax Bd. of California,* 512 U.S. 298, 302–03, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) (state tax affecting foreign commerce may not survive Commerce Clause scrutiny if it creates an enhanced risk of multiple taxation or impairs the ability of the federal government to "speak with one voice when regulating commercial relations with foreign governments") (quoting *Japan Line Ltd. v. Los Angeles County,* 441

U.S. 434, 449, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979)); *cf. Amer. Ins. Ass'n v. Garamendi,* —— U.S. ——, 123 S.Ct. 2374, —— L.Ed.2d —— (2003). To determine whether state regulation is barred by the Commerce Clause, courts must apply the following analysis: Where state law acts "even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

■ The Commerce Clause is not designed to prevent individual states from protecting those within the state from tortious action by those engaged in commerce whose products or activities put the state's citizens at risk. *See, e.g., Berman Enters. Inc. v. Jorling,* 793 F.Supp. 408, 417 (E.D.N.Y.1992) ("Plaintiffs would instead have the state rely entirely on distant and overextended officials in Washington, D.C. for basic environmental protections. Such an ineffective scheme is not contemplated by the federal Constitution."); *Tigue v. E.R. Squibb & Sons, Inc.,* 136 Misc.2d 467, 518 N.Y.S.2d 891, 897 (1987) ("Here, the local benefit is providing a forum to innocent victims of alleged wrongdoing by relaxing the traditional product identification requirement in tort law. Clearly, a legitimate state interest is furthered.... [Defendant] has failed to demonstrate that the burden here would be clearly excessive compared to the benefit."). The Commerce Clause furnishes no defense under the circumstances of the instant case to conduct occurring inside and outside the state that causes a public nuisance within the state; any burden placed on interstate commerce is far outweighed by the substantial positive effect on the New York public's health and safety that more scrupulous supervision of the sale of their handguns by gun manufacturers and distributors would have.

### D. Principles of Separation of Powers, Federalism, and Comity

■ No principle of separation of powers, comity, or federalism relied upon by defendants prevents a suit for tortious conduct causing a public nuisance in violation of state law. *See* Part Two II.C, Commerce Clause, *supra.*

### III. Jury

Under the Seventh Amendment to the United States Constitution, "[i]n Suits at common law ... the right of trial by jury shall be preserved." This right will be referred to as trial by a "constitutional jury." The Federal Rules of Civil Procedure provide for trial by an "advisory jury" in cases not covered by the Seventh Amendment: "In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury...." Fed.R.Civ.P. 39(c) (2003). During the course of these proceedings, it proved necessary to answer a number of questions about the use and role of a jury in the case. First, does the Seventh Amendment entitle the defendant handgun manufacturers, importers, and distributors to assert a right to trial by a constitutional jury? Since this question is answered in the negative, second, may the court empanel an advisory jury to aid it in deciding the case? Third, because an advisory jury was empaneled, what regulations, customs, or practices govern its use? In particular, must an advisory verdict be unanimous? And, finally, is the verdict of an advisory jury binding on the court, which must under law ultimately make its own findings of fact and law? Because there is little guidance in the modern case law on the use of advisory juries in equita-

ble actions in federal court, these questions will be discussed in some detail.

A. Procedures Used

At a hearing in September 2002, the parties were advised that the court was considering trying the case with the aid of an advisory jury. *See* Transcript of Sept. 9, 2002, at 44–45, *Nat'l Ass'n for the Advancement of Colored People v. Acusport, Corp.*, 2002 WL 31548729 (E.D.N.Y.2002). Briefs were invited from any party believing it was entitled to trial by a constitutional jury or desiring a bench trial. The court further requested that parties brief generally any procedures, customs, or practices applying to an advisory jury.

No briefs or objections were received. The case was set for trial with an advisory jury. *See Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.*, 226 F.Supp.2d 391 (E.D.N.Y.2002).

After the order setting the case for trial with an advisory jury was issued, some manufacturer and distributor defendants filed answers to the Fifth Amended Complaint in which they requested trial by a constitutional jury. Those defendants then moved for a trial by constitutional jury. Papers in opposition were received by plaintiff, and the motion was fully argued before the court at a hearing in January 2003. The court denied defendants' motion orally on the record at that hearing and further explained its reasoning in a subsequently issued written memorandum. *See Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms*, 2003 WL 1049011 (E.D.N.Y. Feb.24, 2003).

A panel of potential jurors was assembled at the end of March 2003. A searching questionnaire and voir dire produced a highly intelligent jury representing a wide sampling of the community. The members of the jury were not told that they were sitting in an advisory capacity. In accordance with the court's earlier discussions on the issue of an advisory jury, the jury was treated generally during the trial of the case as a constitutional jury would have been treated.

A brief preliminary charge was given on the role of the jury, the proceedings, and the law governing the case. The jury then sat for six weeks examining highly technical statistical and other studies with the aid of qualified *Daubertized* experts from the fields of statistics, merchandising, and criminology; large data sources; extensive video depositions; government reports; and other proof. Jurors were each given a loose-leaf notebook and were authorized to take notes. A limited number of admitted exhibits identified by the parties as particularly useful were placed in these notebooks during the course of the trial. *See, e.g.*, In Limine Evidentiary Rulings April 11, 2003 Order, *Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms*, 2003 WL 2003800, at ¶ 1 (E.D.N.Y. Apr.14, 2003). The jury's attention to the proceedings was exemplary.

Following summations, the jury was charged on the applicable law. In brief, it was instructed that:

> In order to establish a defendant's liability for public nuisance, plaintiff must prove each of three elements by clear and convincing evidence:
>
> 1. the existence of a public nuisance;
> 2. conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and
> 3. particular harm suffered by plaintiff arising from the public nuisance that was different in kind from that suffered by the community at large as a result of conduct or omissions by a defendant.

Court Exhibit 4 of May 7, 2003, at 12, *Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms* 99 CV 3999 &

7037, 2003 WL 21135571 (E.D.N.Y.2003). Each element of the charge was explained in greater detail. *Id.* at 12–15. The jury was then asked, for each of the sixty–eight defendants listed on the verdict sheet, to consider whether it found the named defendant liable or not liable. The charge pertained only to the liability of the defendants; the jury was not consulted on the question of appropriate relief, if any.

During its deliberations, the jury had available to it at its request any of the hundreds of exhibits admitted into evidence and any of the trial testimony. Testimony presented in the form of designated portions of videotaped deposition testimony was also available to be shown to the jurors in the courtroom. The jury asked to hear the testimony of several witnesses read back, including that of Mildred Roxborough, the witness designated as a representative of the NAACP, and Kweisi Mfume, the President and Chief Executive Officer of the NAACP, and to see numerous exhibits.

In the final charge, the jurors were instructed that: "Unanimity is desirable." When, on its third day of deliberations, the jury expressed an inability to reach a unanimous decision the parties were consulted as to whether a less than unanimous verdict could or should be accepted from an advisory jury sitting in an equity case. Plaintiff voiced no objection to a non-unanimous verdict; defendants reiterated their position that they believed they were entitled to a unanimous verdict from a constitutional jury, but noted that the court could "use the advisory jury the way that it sees fit." Transcript of May 9, 2003, *Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms,* 99 CV 3999 & 7037 (E.D.N.Y. May 9, 2003). The jury was subsequently instructed that the court would accept a verdict agreed to by at least 10 jurors—that is, a verdict that was unanimous, 11–1, or 10–2.

With that instruction the jury ultimately reached a verdict of "not liable" as to 45 defendants, but could not reach a verdict on the liability of 23 others. Apparently one of the jury's key difficulties was with the third element of plaintiff's cause of action—whether plaintiff proved that it suffered harm different in kind from that suffered by the general public. Based on the testimony the jury asked to have read back, it can be inferred that this was a central question it debated. In its first note indicating an inability to reach a decision, it wrote: "We, the members of the jury, cannot reach a unanimous decision as to *whether any particular harm was suffered by plaintiff.*" (emphasis added).

## B. Seventh Amendment Right to a Trial by Jury

Defendants opposed the use of an advisory jury on the ground that they had a constitutional right to a jury trial based on the legal nature of the issues presented and the relief sought. The court has, on several prior occasions, ruled defendants were not entitled to a jury trial as a matter of constitutional right. *See Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.,* 226 F.Supp.2d 391 (E.D.N.Y.2002); *Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms,* 2003 WL 1049011 (E.D.N.Y. Feb.24, 2003); *see also, e.g.,* Thomas O. Main, *Traditional Equity and Contemporary Procedure,* 78 Wash. L.R. 429 (2003).

The Seventh Amendment preserves the right to trial by jury in suits analogous to common law actions recognized in 1791, but does not apply to suits similar to eighteenth century equity cases. *See* U.S. Const. amend. VII; Fed.R.Civ.P. 38(a) (2003). In order to determine whether an action is closer to a common law than to an equitable action, a court must consider both the nature of the cause of action and

the nature of the remedy sought. *Tull v. United States,* 481 U.S. 412, 417–18, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

An action to enjoin a public nuisance is equitable in nature. *See, e.g., In re Debs,* 158 U.S. 564, 587–93, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Conner v. City of Santa Ana,* 897 F.2d 1487, 1493 (9th Cir.1990); *United States v. Wade,* 653 F.Supp. 11, 13 (E.D.Pa.1984); 8 James Wm. Moore et al., *Moore's Federal Practice* § 38.30. *Compare Hudson v. Caryl,* 44 N.Y. 553 (1871) (action involving request for recovery of damages occasioned by a nuisance must be tried to a jury); 3 William Blackstone, *Commentaries on the Laws of England* 220–22 (1765–69) (historical writ for assize of nuisance resulting in judgment abating the nuisance and awarding damages tried by jury); William Draper Lewis, *Injunctions Against Nuisances and the Rule Requiring the Plaintiff to Establish His Right at Law,* 56 U. Pa. L.Rev. 289, 314 (1908) (noting that some discussion of the right to a jury trial in nuisance cases stemmed from the historical reluctance of chancery to determine disputed issues of fact or from confusion among public nuisance, private nuisance and trespass on easements); Note, *Trial by Jury in Suits to Enjoin Nuisances,* 25 Colum. L.Rev. 641, 646 (1925) (same). That a defendant may be required to expend funds to abate a nuisance does not convert an equitable action to a legal one where any expenditure is preventative and ancillary to or intertwined with the injunctive relief requested. *See* 8 Moore, *supra,* § 38.30; *Teamsters, Local No. 391 v. Terry,* 494 U.S. 558, 571, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (citing *Tull v. United States,* 481 U.S. 412, 424, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)); *United States v. Price,* 688 F.2d 204, 212–13 (3rd Cir.1982); *United States v. Wade,* 653 F.Supp. 11, 13 (E.D.Pa.1984). The cases referring to damages are not applicable since no damages were to be allowed in the instant case.

Since both the issues presented and the relief sought in the instant action are equitable in nature, no right to trial by a constitutional jury exists.

### C. The Advisory Jury

The use of juries in equitable actions has its roots in practices of the English Chancery Court. *See* Richard E. Guggenheim, *A Note on the Advisory Jury in Federal Courts,* 8 Fed. Bar Ass'n J. 200, 200 (1947). The Chancery Court historically "did not usually exercise authority to resolve contested issues of fact and seemingly did not regard itself as competent to do so." Harold Chesnin & Geoffrey C. Hazard, Jr., *Chancery Procedure and the Seventh Amendment: Jury Trial of Issues in Equity Cases Before 1791,* 83 Yale L.J. 999, 999–1000 (1974). To resolve factual questions, therefore, a chancellor sitting in equity had the right to present an issue to a common law court so that a jury might decide the disputed issues and "enlighten the conscience" of the Chancery. *(Am.) Lumbermens Mut. Cas. Co. of Ill. v. Timms & Howard,* 108 F.2d 497, 500 (2d Cir.1939) (quoting *Vosburg Co. v. Watts,* 221 F. 402, 408 (4th Cir.1915)).

Three different procedures were employed by the English courts of chancery to bring an issue before the common law courts: (1) the case stated for determination by the justices of the courts of common law; (2) the action at law; and (3) the feigned issue. *See* Harold Chesnin & Geoffrey C. Hazard, Jr., *Chancery Procedure and the Seventh Amendment: Jury Trial of Issues in Equity Cases Before 1791,* 83 Yale L.J. 999, 1001 (1974). Most analogous to the use of a modern advisory jury was the "feigned issue:" "A wager was made [by the parties] concerning the issue in controversy which was to be determined by a jury in a court of common law." *Id.* at 1005–10. Greater control was re-

tained in the courts of equity through the use of this procedure than the others. *Id.* at 1001. It allowed Chancery to have an issue of fact tried by a jury, but to reserve the judgment of the parties' legal rights to itself. *Id.* at 1005–10. Over time, a "standardized formula" for the trial of a feigned issue developed through the repeated use of the procedure:

> After hearing the arguments the Lord Chancellor would select the appropriate jury to hear the issue and order that a trial proceed at law. The court then would formulate the issue to be presented before the jury, declare which parties were to be plaintiffs at law and which defendants at law, and refer the issue to one of the Masters of the Court to settle the said issues in case the parties differ about the same. The final portion of the court's order always reserved "considerations of costs and of all further directions until after the said trial shall be had when any of the parties are to be at liberty to apply to the Court as there shall be occasions."

*Id.* at 1007–08 (internal quotations omitted).

There is evidence that the English use of the feigned issue was incorporated into the American legal system at the state and federal levels, but the time and manner of that incorporation are not entirely clear and appear to have varied among the federal and various state systems. *See* Harold Chesnin & Geoffrey C. Hazard, Jr., *Chancery Procedure and the Seventh Amendment: Jury Trial of Issues in Equity Cases Before 1791*, 83 Yale L.J. 999, 1010–1011 (1974); *see also, e.g., Field v. Holland*, 10 U.S. (6 Cranch) 8, 3 L.Ed. 136 (1810); *Den v. Fen*, 1 Cai. R. 487 (N.Y.Sup.Ct.1803). The use of juries in equitable actions in the United States has continued to evolve both parallel to and independently from the English practice since that time. *See* Chesnin & Hazard, *supra*, at 1018 ("The trend ... culminated

in the total detachment of the form of the procedure from an understanding of its historical substance. The use of the feigned issue became an exercise in the rote application of the discretionary powers possessed by a resourceful Chancellor."); *see also Nashville Ry. & Light Co. v. Bunn*, 168 F. 862, 864 (6th Cir.1909) ("Indeed, the issue so submitted to a jury called in an equity case is called a 'feigned issue' because of its purely advisory character...").

The historical "feigned issue" procedure is in certain respects analogous, but by no means identical, to the modern American understanding and use of an advisory jury pursuant to the Federal Rules of Civil Procedure. *See* Note, *Practice and Potential of the Advisory Jury*, 100 Harv. L.Rev. 1363, 1364–65 (1987). Two differences are of particular significance.

First, it is now unquestioned that a United States federal court trying an equitable issue can and must decide contested issues of fact of its own accord, but may empanel an advisory jury to aid it in its decision. During the late eighteenth and early nineteenth century both in England and in the United States, the authority of the Chancellor to try issues of fact before a jury began to be understood as more discretionary. *Id.* at 1000, 1011 ("The court was moving from a rule that disputed fact issues were generally, if not invariably, submitted to juries to one that made such submissions discretionary."); *see also, e.g., Van Alst v. Hunter*, 5 Johns. Ch. 148 (1821). By the mid-nineteenth century it was well-recognized that the choice to consult or not to consult a jury in an equitable action was a matter entirely within the court's discretion. *See* Chesnin & Howard, *supra*, at 1000, 1010.

The court's discretionary right to empanel an advisory jury in an equitable action is codified in Federal Rule of Civil

Procedure 39(c). *See also Glanzman v. Schaffer*, 252 F.2d 333, 334 (2d Cir.1958) ("[A] court of equity may, in its discretion, impanel an advisory jury."), *vacated on grounds complaint abated*, 357 U.S. 347, 78 S.Ct. 1370, 2 L.Ed.2d 1368 (1958). Today not only does a court have the authority to decide disputed factual questions in an equitable action, it has the obligation to do so. The United States Constitution and the Federal Rules of Civil Procedure recognize the judge in an equitable action as the ultimate trier of fact even when the discretionary right to empanel an advisory jury is invoked. *See* U.S. Const. Art. III; Fed.R.Civ.P. 52(a) (2003).

Second, as is consonant with the role of equity to do justice when no adequate remedy at law exists, *see Hecht v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.... The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."), the methods used to present equitable issues to a jury have extended beyond that of the feigned issue and have become more flexible in their application. *See* Harold Chesnin & Geoffrey C. Hazard, Jr., *Chancery Procedure and the Seventh Amendment: Jury Trial of Issues in Equity Cases Before 1791*, 83 Yale L.J. 999, 1011 ("[T]hose American courts that blended equity and legal procedure, in one fashion or anther, tended to deformalize the feigned issue procedure. Equity procedure in the federal courts illustrates this ... tendency."). This was true even of "[t]hose American jurisdictions, such as New Jersey and New York, that maintained the classic English separation of equity and law court systems [and] imported the feigned issue in essentially its origi-

nal form." *Id.; see; e.g., Vermilyea v. Palmer*, 52 N.Y. 471, 474 (1873) ("The order for trial by jury of a specific question of fact [in an action of an equitable nature] was borrowed from the chancery practice, and in terms is introduced as a substitute for the proceeding by feigned issue."). This process of "deformalization" has been influenced in particular by the procedural merger of law and equity jurisdiction into single courts. *See* U.S. Const. art. III § 2 ("The judicial Power shall extend to all Cases, in Law and Equity...."); N.Y. Const. of 1846 art. 6, § 3, art. 14, §§ 5–9, *reprinted in 7 Sources and Documents of United States Constitutions* 192, 199, 207–08 (William F. Swindler ed., 1978) (abolishing the court of chancery as a separate and distinct court; transferring equity and law jurisdiction to a newly created supreme court); *cf.* Fed.R.Civ.P. 2 (1937) ("There shall be one form of action to be known as 'civil action.' ").

1. Use in an Equitable Action to Enjoin a Public Nuisance

Under the Federal Rules of Civil Procedure, in any case in which there is no right to a trial by jury a court may, on its own initiative, try any issue with an advisory jury. Fed.R.Civ.P. 39(c) (2003); *see Major v. Phillips–Jones Corp.*, 192 F.2d 186, 189 (2d Cir.1951); *(Am.) Lumbermens Mut. Cas. Co. of Illinois v. Timms & Howard*, 108 F.2d 497 (2d Cir.1939); *cf.* N.Y. C.P.L.R. 4212 (2003). A court's decision to impanel an advisory jury is discretionary. *See Glanzman v. Schaffer*, 252 F.2d 333, 334 (2d Cir.1958), *vacated on grounds complaint abated*, 357 U.S. 347, 78 S.Ct. 1370, 2 L.Ed.2d 1368 (1958); 8 *Moore's Federal Practice* § 39.40[4] ("No party has a clear right to either have an advisory jury or to be free of one, and it is hard to imagine how a claim of abuse of discretion could be constructed in these circumstances."); Richard E. Guggenheim,

*A Note on the Advisory Jury in Federal Courts,* 8 Fed. Bar Ass'n J. 200, 200 (1947). This power has been explained as going beyond what is required by the Constitution: "The constitutional guarantee to a civil jury provides only the minimum threshold for jury use. Trial judges have extraordinary discretion to decide when and in what way to go beyond this constitutional minimum." Note, *Practice and Potential of the Advisory Jury,* 100 Harv. L.Rev. 1363, 1380–81 (1987).

Advisory juries have become a fundamental part of the American legal system; they are used in tort actions, including nuisance suits, to aid courts in determining liability. *See, e.g., Nat'l Ass'n for Advancement of Colored People v. Acusport,* 226 F.Supp.2d 391, 397–98 (E.D.N.Y.2002); *Neal v. Darby,* 282 S.C. 277, 318 S.E.2d 18 (1984) (advisory jury convened to advise on whether a landfill constituted a public nuisance by virtue of its location and method of operation); *see also, e.g., Carroll v. Hurst,* 103 Ill.App.3d 984, 59 Ill.Dec. 587, 431 N.E.2d 1344 (1982) (private nuisance claim against landowner for maintaining a junkyard on his property); *Town of Hokes Bluff v. Butler,* 404 So.2d 623 (Ala.1981) (suit against city alleging that a proposed sewer lagoon was a private nuisance); *Rode v. Sealtite Insulation Mfg. Corp.,* 3 Wis.2d 286, 88 N.W.2d 345 (1958) (private nuisance suit for offensive smoke, gases, particles, and odors against the owner of a local manufacturing plant).

It is appropriate for a court to empanel an advisory jury where it, in its discretion, believes that the advice of a jury would be of particular aid given the nature of the action or the proof to be submitted:

> We base our decision to award a jury trial in this case on our discretion as a Court of equity to submit any questions of fact to a jury. There is no principle of law, nor any constitutional guarantee, which requires us to try an issue without a jury. We base the exercise of our discretion in this matter on our belief that the questions of fact to be determined in the separate trial are best answered by a jury.

*Taxin v. Food Fair Stores, Inc.,* 24 F.R.D. 457, 460 (E.D.Pa.1959). An advisory jury allows for community participation and may incorporate both the public's views of morality and experience with the societal circumstances underlying a cause of action. *See, e.g., Skoldberg v. Villani,* 601 F.Supp. 981, 982 (S.D.N.Y.1985) (question of whether to empanel an advisory jury involves, "[a]t bottom, ... whether there are special factors in this action which suggest that a jury composed of members of the community would provide the Court valuable guidance in making its own findings and conclusions"). Such advice from members of the community is of special value in a case in which the content of a legal norm is dependent in part on the public sense of right and justice. *Birnbaum v. United States,* 436 F.Supp. 967, 988 (E.D.N.Y. 1977) (using an advisory jury to aid in the determination of whether the distress suffered in illegal opening of private mail by government agencies during the Cold War was of the sort that would be experienced by reasonable people under the circumstances and, if so, the extent of compensation needed), *aff'd in relevant part,* 588 F.2d 319 (2d Cir.1978); *State ex rel. Leis v. William S. Barton Co.,* 45 Ohio App.2d 249, 344 N.E.2d 342 (1975) (discussing the use of an advisory jury in light of community based obscenity standards); *McNary v. Carlton,* 527 S.W.2d 343, 348 (Mo.1975) (ordering the use of an advisory jury in light of community based obscenity standards). *See generally* Note, *Practice and Potential of the Advisory Jury,* 100 Harv. L.Rev. 1363, 1371–76 (1987).

This is an equity case alleging the creation of a public nuisance in the state of New York; the issues at stake are of some

public interest, and the relief requested could have a considerable effect on the New York public. As previously explained by the court:

> It is appropriate to take into consideration the values and standards of the community through the use of an advisory jury in determining whether the conduct of the defendant gun manufacturers and distributors illegally endangers the public health, safety, and peace.... This case implicates important questions of public policy, adding weight to advice from a jury representative of our diverse community.

*Nat'l Ass'n for Advancement of Colored People v. Acusport,* 226 F.Supp.2d 391, 400 (E.D.N.Y.2002); *see also* Note, *Practice and Potential of the Advisory Jury,* 100 Harv. L.Rev. 1363, 1376 (1987) ("Like the jury by right, the advisory jury increased the legitimacy of the administration of law through the participation of the people who live under that law."). Although there is no right to a constitutional jury and the case is factually complex and heavily statistical, the court exercised its discretion to empanel an advisory jury so that it might have the aid of the jurors' experiences with, and reactions to, the underlying relevant conditions of life in New York.

### 2. Verdict is Non–Binding

It was early said that a chancellor was not bound by a feigned issue jury verdict, although it has been noted that there do not appear to be any recorded cases in which a chancellor rejected such a verdict. *See* Harold Chesnin & Geoffrey C. Hazard, Jr., *Chancery Procedure and the Seventh Amendment: Jury Trial of Issues in Equity Cases Before 1791,* 83 Yale L.J. 999, 1009 (1974) (citing *Hampson v. Hampson,* 3 Ves. & Bea. 41, 35 Eng. Rep. 395 (1804)). Because, however, the use of the feigned issue was "concerned only with satisfying the conscience of the court concerning dis-

puted facts," Chancery could and did order the retrial of feigned issues. *Id.* at 1008–09 ("[I]f ... upon any material and weighty reason the verdict is not such as to satisfy the court to found a decree upon, there are several cases, in which this court has directed a new trial for further satisfaction, notwithstanding it would not be granted, if in a court of common law ....") (quoting *Stace v. Mabbot,* 2 Ves. Sr. 552, 553–54, 28 Eng. Rep. at 353).

Rather than ordering a retrial, the practice in the United States federal courts has long been for a court to simply fail to follow the findings of the advisory jury:

> The [feigned] issue is directed to be tried for the purpose of informing the conscience of the Chancellor, and aiding him to come to a proper conclusion. If he thinks the trial has not been a fair one, or for any other reason desires a new trial, it is in his discretion to order it. But he may proceed with the cause though dissatisfied with the verdict, and make a decree contrary thereto, if in his judgment the law and the evidence so requires.

*Johnson v. Harmon,* 94 U.S. 371, 372, 24 L.Ed. 271 (1876); *see also Idaho & Oregon Land Improvement Co. v. Bradbury,* 132 U.S. 509, 515–16, 10 S.Ct. 177, 33 L.Ed. 433 (1889); *Watt v. Starke,* 101 U.S. 247, 250–52, 25 L.Ed. 826 (1879); Harold Chesnin & Geoffrey C. Hazard, Jr., *Chancery Procedure and the Seventh Amendment: Jury Trial of Issues in Equity Cases Before 1791,* 83 Yale L.J. 999, 1017 (1974); *cf. Vermilyea v. Palmer,* 52 N.Y. 471, 474–75 (1873); *McClave v. Gibb,* 157 N.Y. 413, 420–22, 52 N.E. 186 (1898) (citing cases).

Under the modern Federal Rules of Civil Procedure, the court is required to make and explain its own independent findings of fact and conclusions of law in an equitable action even where an advisory jury has rendered a verdict. *See* Fed.R.Civ.P.

52(a) (2003); *DeFelice v. Am. Int'l Life Assurance Co. of New York,* 112 F.3d 61, 65 (2d Cir.1997) (noting that a trial court using an advisory jury must both make "its own factual findings and conclusions, in reliance upon the advisory jury's verdict if the court so chooses, and ... explain how it arrived at those findings and conclusions"). That an advisory verdict is not binding on the court in making those findings is firmly entrenched in modern case law. *See, e.g., Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 907 (2d Cir. 1993) ("A district court is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard." (quoting *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 122 (5th Cir.1973))); *Felker v. Pepsi–Cola Co.,* 101 F.3d 109, 1996 WL 141802 (2d Cir.1996) (unpublished opinion) (upholding trial court's rejection of advisory jury findings); *Hine v. Mineta,* 238 F.Supp.2d 497 (E.D.N.Y.2003); *Forest Labs., Inc. v. Abbott Labs.,* 1999 WL 33299123 (W.D.N.Y. June 23, 1999); *cf. Mercantile & General Reinsurance Co., plc v. Colonial Assurance Co.,* 82 N.Y.2d 248, 604 N.Y.S.2d 492, 624 N.E.2d 629, (1993) ("[The court] could disregard the advisory verdict, even if there was evidence to support it."); *see also Kohn v. McNulta,* 147 U.S. 238, 240, 13 S.Ct. 298, 37 L.Ed. 150 (1893); *Merex v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 826 (2d Cir.1994) ("[A]bsent the consent of the parties, it would be highly questionable for a court to submit an equitable issue to an advisory jury for a binding verdict."). It has even been stated that, because a court's decision to use an advisory jury is a discretionary one, any appeal "is from the court's judgment as though no jury had been present" and a judge's discretionary decision "to set aside such a verdict ... is not reviewable." *(Am.) Lumbermens Mut. Cas. Co. of Illinois v. Timms & Howard,* 108 F.2d 497, 500 (2d Cir.1939);

*see also Idaho & Oregon Land Imp. Co. v. Bradbury,* 132 U.S. 509, 516, 10 S.Ct. 177, 33 L.Ed. 433 (1889) ("The action of the district court ... in setting aside the general verdict, and substituting its own findings of fact for the special findings of the jury, was a lawful exercise of its equitable jurisdiction, the propriety of which cannot be reviewed by this court...."); *Mallory v. Citizens Utilities Co.,* 342 F.2d 796, 797 (2d Cir.1965); *Major v. Phillips–Jones Corp.,* 192 F.2d 186, 189 (2d Cir.1951); 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2335, at 211–13; 8 *Moore's Federal Practice* § 39.43; Richard E. Guggenheim, *A Note on the Advisory Jury in Federal Courts,* 8 Fed. Bar Ass'n J. 200, 204 (1947).

A court empaneling an advisory jury to aid in the consideration of the evidence presented is best situated to determine just how to use that jury's verdict in arriving at a final judgment. *See Birnbaum v. United States,* 436 F.Supp. 967, 988 (1977) ("The verdict of such an advisory panel is only part of the data taken into consideration in arriving at the court's independent conclusion."), *aff'd in relevant part,* 588 F.2d 319 (2d Cir.1978); *cf. McClave v. Gibb,* 157 N.Y. 413, 422, 52 N.E. 186 (1898) ("[W]here a trial by jury is not required by the Constitution or by express provisions of statute, the verdict is treated as evidence in the case, having no binding force or other effect upon the determination of the trial judge."). It need not accept or reject the jury's verdict in whole, but may give it such role in its own determination of the case as it sees fit:

> The case being one of equitable jurisdiction only, the court was not bound to submit any issue of fact to the jury, and, having done so, was at liberty to disregard the verdict and findings of the jury, either by setting them, or any or them, aside, or by letting them stand, and

allowing them more or less weight, in its final hearing and decree, according to its own view of the evidence in the cause. *Idaho & Oregon Land Improvement Co. v. Bradbury,* 132 U.S. 509, 515–16, 10 S.Ct. 177, 33 L.Ed. 433 (1889); *see also Basey v. Gallagher,* 87 U.S. (20 Wall.) 670, 22 L.Ed. 452 (1874); Richard E. Guggenheim, *A Note on the Advisory Jury in Federal Courts,* 8 Fed. Bar Ass'n J. 200, 202–03 (1947); Note, *Practice and Potential of the Advisory Jury,* 100 Harv. L.Rev. 1363, 1365–66 (1987) ("[A] judge who believes it worthwhile to empanel such a jury will likely find it worthwhile to listen to what that jury has to say.").

The advisory jury's verdict in the instant action was less than conclusive. That the jury was unable to reach complete consensus is understandable given the difficult factual questions presented. *Cf.* Paula L. Hannaford, Valarie P. Hans, & G. Thomas Munsterman, *How Much Justice Hangs in the Balance?,* 83 Judicature 59, 61 (1999) ("Judges surveyed ... attributed most hung juries to evidentiary factors."). In reaching its decision, the court has carefully considered the evidence presented at trial, the verdicts reached and not reached by the jury, and the jury's communications with the court during its deliberative process.

### 3. Non–Unanimous Verdict

■ There is no express modern requirement that the verdict of an advisory jury be unanimous. Historically, equitable issues to be tried by a jury were actually physically or procedurally brought before common law courts and were therefore subject to the procedures employed generally in those courts. *See, e.g., Hampson v. Hampson,* 3 Ves. & Bea. 41, 35 Eng. Rep. 395 (1804); *Nashville Ry. & Light Co. v. Bunn,* 168 F. 862, 864 (1909) ("[T]he chancellor may send an issue involving a purely legal question to a court of law to be there tried by a jury."); *Birdsall v. Patterson,* 51 N.Y. 43, 47, 50 (1872) (explaining the process by which issues in an equitable action were submitted to a jury in New York); *see also* Richard E. Guggenheim, *A Note on the Advisory Jury in Federal Courts,* 8 Fed. Bar Ass'n J. 200, 201–02 (1947) ("[I]t is apparent that the selection of and rules and procedures applicable to the advisory jury are governed by the same legal principles as in the case of the conventional jury in an action at law."). As a general rule, this meant that jury verdicts in equitable and in legal actions were required to be unanimous. *See* Sally Lloyd–Bostock & Cheryl Thomas, *Decline of the "Little Parliament": Juries and Jury Reform in England and Wales,* 62 L. & Contemp. Probs. 7, 36–37 (1999) ("For centuries, juries' verdicts in England had to be unanimous, and this served as the model for the United States.").

The requirement that a jury verdict be unanimous first arose during the Middle Ages. *Apodaca v. Oregon,* 406 U.S. 404, 407–08, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). There is no single clear historical answer for the adoption of a unanimity requirement or for its longevity and hold in the American jury system. *See, e.g., Apodaca,* 406 U.S. at 407 n. 2, 92 S.Ct. 1628; Jeffrey Abramson, *The Unanimous Verdict, in We, the Jury: The Jury System and the Ideal of Democracy* 182 (1994); Stephan Landsman, *The Civil Jury in America: Scenes from an Unappreciated History,* 44 Hastings L.J. 579, 585–86 (1993). Unanimity of the petty jury by and large remained a fundamental understood characteristic of jury verdicts and the jury system despite continual transformations in the perceived importance of the role of jurors and in their identified function "from neighbor-witness to judge of proofs." John Marshall Mitnick, *From Neighbor–Witness to Judge of Proofs: The Transformation of the English Civil Juror,* 32 Am. J. Legal Hist.

201 (1988). *See, e.g., Am. Pub. Co. v. Fisher*, 166 U.S. 464, 467–68, 17 S.Ct. 618, 41 L.Ed. 1079 (1897) ("[U]nanimity was one of the peculiar and essential features of trial by jury at the common law. No authorities are needed to sustain this proposition."); Austin Wakeman Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv. L.Rev. 669, 675 (1918) ("Trial by jury, then, involves a unanimous determination by twelve disinterested and reasonably competent persons.").

██ In practice, the "rule" of unanimity has been undergoing significant erosion. *See* Lawrence M. Friedman, *Some Notes on the Civil Jury in Historical Perspective*, 48 DePaul L.Rev. 201, 203 (1998) ("For the civil jury, the process began more than a hundred years ago."). There is a growing acceptance of non-unanimous jury verdicts in civil cases in the United States today. Valerie P. Hans, *The Power of Twelve: The Impact of Jury Size and Unanimity on Civil Jury Decision Making*, 4 Del. L.Rev. 1, 22 (2001); *see* Fed. R.Civ.P. 48 (2003) (allowing non-unanimous verdict in civil actions in federal court where so stipulated by the parties); *see also Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (conviction of crime pursuant to state law by verdict of 11–1 or 10–2 does not violate constitutional rights); Juries Act, 1974, c. 23, s. 17 (Eng.) (providing for majority jury verdicts in proceedings in the High Court—civil cases—or the Crown Court—criminal cases); *The New Penguin Guide to the Law* 615 (John Pritchard ed., 4th ed.2001) (in British criminal cases if the jurors "have not all agreed on a verdict within two hours, the judge may—if he or she wishes—call them into court and tell them that he or she will accept a majority decision of the jury"). Nevertheless the Seventh Amendment where applicable—in federal court in civil cases analogous to historical common law cases—still is held to encompass the right to a unanimous jury verdict. *Am. Pub. Co. v. Fisher*, 166 U.S. 464, 467–68, 17 S.Ct. 618, 41 L.Ed. 1079 (1897); *cf. Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) ("[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element."); Fed. R.Crim.P. 31(a) (2003); *Burch v. Louisiana*, 441 U.S. 130, 134, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979) (conviction by a non-unanimous six person state jury violates the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments).

██ In modern practice in the United States, the use by the court of a jury in an equitable action is not constrained by the strictures applicable in trials by a constitutional jury. As a general rule, the procedures employed by a court in obtaining the advice of a jury in an equitable action are of no legal significance. *See* Richard E. Guggenheim, *A Note on the Advisory Jury in Federal Courts*, 8 Fed. Bar Ass'n J. 200, 204–05 (1947). This is evidenced by the fact that the jury verdict is not subject to review. *See, e.g., Johnson v. Harmon*, 94 U.S. 371, 372, 24 L.Ed. 271 (1876) ("A decree in equity, therefore, when appealed from, does not stand or fall according to the legality or illegality of the proceedings on the trial of a feigned issue in the cause; for the verdict may or may not have been the ground of the decree."); *Roufaiel v. Ithaca Coll.*, 280 A.D.2d 812, 721 N.Y.S.2d 124, 126 (2001) ("In view of the fact that Supreme Court was not bound by the advisory jury's verdict and, indeed, was free to adopt, modify or disregard the verdict entirely, the propriety of the court's charge is immaterial.") (internal citation omitted); *see also* Note, *Practice and Potential of the Advisory Jury*, 100 Harv. L.Rev. 1363, 1365 (1987) ("This invisibility of the advisory jury allows the trial judge to be infor-

mal, experimental, or even sloppy with the advisory jury without risk of reversible error.").

Procedural flexibility in trying a case with the aid of an advisory jury follows from the fact that it is not binding upon the court, which must be the ultimate finder of fact. *See* 9 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 2335, at 214 ("Since the use of an advisory jury is of no legal significance, and the responsibility for the decision remains with the judge, he or she should be allowed whatever help in reaching the decision he or she thinks desirable."). If requiring an advisory verdict to be reached only by the unanimous consent of all jurors could be inconsistent with or hinder its role in informing "the mind or conscience of the court," it is appropriate for a court to allow a less than unanimous verdict. *Vermilyea v. Palmer*, 52 N.Y. 471, 475 (1873); *cf. Snell v. Loucks*, 12 Barb. 385 (N.Y.Sup.1852) ("The object of a feigned issue is to satisfy the conscience of the court upon the matters of fact; and the object is attained when the conscience of the judge is satisfied that, at the trial, justice has been substantially done.").

Practical considerations also militate, under the circumstances of the instant action, in favor of allowing an advisory jury to submit a less than unanimous verdict to the court. Where an advisory jury is impaneled to allow for community participation in a decision making process and to provide insight for the court with respect to public values and standards, a non-unanimous verdict may provide the court with as much aid as would a unanimous one.

It is somewhat difficult to generalize concerning the impact of a majority as opposed to a unanimous decisional rule on jury deliberations and verdicts. *See, e.g.,* Paula L. Hannaford, Valarie P. Hans, & G. Thomas Munsterman, *How Much Justice Hangs in the Balance? A New Look at Hung Jury Rates,* 83 Judicature 59, 62 (1999) ("[A] number of definitional and exogenous factors may affect the likelihood that a jury will be unable to reach a verdict in any given case."). Allowing non-unanimous jury verdicts is unlikely to have any significant impact in practice on the rate of juries able to reach a verdict, and therefore will not change the outcome in the overwhelming majority of cases.

The percentage of juries that "hang" in the United States, particularly in civil cases in federal court, is low. *See* Harry Kalven, Jr. & Hans Zeisel, *The American Jury* 487–88 nn. 12–13 (1966) (five percent of jury deliberations result in hung juries); Paula L. Hannaford, Valarie P. Hans, & G. Thomas Munsterman, *How Much Justice Hangs in the Balance? A New Look at Hung Jury Rates,* 83 Judicature 59 (1999) (hung jury rate in federal court between 1980 and 1997 between one and two percent and lower in civil than in criminal cases; hung jury rate in state courts likely to be less than six percent). Whether or not a verdict must be unanimous, a jury close to the margin is likely to reach agreement on a verdict while a jury in the middle—i.e., an "evenly split" jury—is not. Studies on mock criminal juries "show that the overall ratio of convictions to acquittals does not differ for unanimity and majority-rule juries." Valerie P. Hans, *The Power of Twelve: The Impact of Jury Size and Unanimity on Civil Jury Decision Making,* 4 Del. L.Rev. 1, 27–28 (2001). It has been suggested that this conclusion can be generalized to include civil juries as well, and that the "overall plaintiff and defense win rate would be comparable under the two decision rules." *Id.* What the numerical majority should be set at is not decisive, but a 10–2 requirement should leave the court with a comfortable feeling of consensus.

There are a number of frequently raised potential negative consequences of permitting majority as opposed to unanimous jury verdicts. Two of the most important are a suggested decrease in the quality of jury deliberations, *see, e.g.,* Reid Hastie, Steven D. Penrod, & Nancy Pennington, *Inside the Jury* (1983); John Guinther, *The Jury in America* 83 (1988); Valerie P. Hans, *The Power of Twelve: The Impact of Jury Size and Unanimity on Civil Jury Decision Making,* 4 Del. L.Rev. 1, 25–26 (2001), and the disproportionate elimination of the viewpoints of historically excluded groups, *see, e.g.,* Kim Taylor–Thompson, *Empty Votes in Jury Deliberations,* 113 Harv. L.Rev. 1261, 1264 (2000). *See also* Hans, 4 Del. L.Rev. at 29–30 ("The available research shows that moving to majority verdicts and smaller civil juries will come at the cost of reduced representativeness, accuracy, and predictability, and a more limited role for minority voices.").

The Supreme Court has explicitly rejected the argument that allowing less than unanimous verdicts in state criminal trials will affect the quality of the deliberations. *See Johnson v. Louisiana,* 406 U.S. 356, 361, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) ("We have no grounds for believing that majority jurors, aware of their responsibility and power over the liberty of the defendant, would simply refuse to listen to arguments presented to them in favor of acquittal, terminate discussion, and render a verdict."). *But see Johnson,* 406 U.S. at 399, 92 S.Ct. 1651 (Stewart, J., dissenting) ("The requirement that the verdict of the jury be unanimous ... provides the simple and effective method endorsed by centuries of experience and history to combat the injuries to the fair administration of justice that can be inflicted by community passion and prejudice."); *id.* at 389–90, 92 S.Ct. 1651 (Douglas, J., dissenting) ("human experience teaches that polite and academic conversation is no substitute for

the earnest and robust argument necessary to reach unanimity"), *id.* at 396, 92 S.Ct. 1651 (Brennan, J., dissenting), *id.* at 402–03, 92 S.Ct. 1651 (Marshall, J., dissenting). The Court has likewise dismissed the assertion that majority verdicts would silence the input of racial or ethic minorities:

> We cannot assume that the majority of the jury will refuse to weigh the evidence and reach a decision upon rational grounds, just as it must now do in order to obtain unanimous verdicts, or that a majority will deprive a man of his liberty on the basis of prejudice when a minority is presenting a reasonable argument in favor of acquittal. We simply find no proof for the notion that a majority will disregard its instructions and cast its votes for guilt or innocence based on prejudice rather than the evidence.

*Apodaca v. Oregon,* 406 U.S. 404, 413, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). *But see Johnson,* 406 U.S. at 396, 92 S.Ct. 1650 (Brennan, J., dissenting) ("When less than unanimity is sufficient, consideration of minority views may become nothing more than a matter of majority grace. In my opinion, the right of all groups in this Nation to participate in the criminal process means the right to have their voices heard. A unanimous verdict vindicates that right. Majority verdicts could destroy it."), *id.* at 397, 92 S.Ct. 1650 (Stewart, J., dissenting) ("Under today's judgment, nine jurors can simply ignore the views of their fellow panel members of a different race or class.").

The outcome of the instant case is not inconsistent with the general proposition that allowing majority verdicts is unlikely to change the winner in any individual case. While instructing the jury that a majority verdict would be accepted appears to have spurred further deliberations, it did not induce the jurors to reach

a verdict as to all of the defendants. While the court will not speculate as to what happened during jury deliberations or the precise reasons for any particular decision made by the jurors, the final verdicts reached do not necessarily indicate that because the court was willing to accept a less than unanimous verdict the jury was able to resolve its first expressed hurdle—an inability to reach agreement on the question of whether plaintiff had proved that it suffered harm not just greater in degree but also different in kind.

## IV. Burden of Proof

### A. New York State Law Determines the Burden of Proof

■ Since the court in the instant case is exercising diversity jurisdiction, the New York substantive law of public nuisance will be applied. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under *Erie,* a federal court in diversity cases must apply the state substantive law that would be applied by its forum state, but should continue to apply federal procedural law.

■ It is generally accepted that burden of proof is a substantive question requiring the application of state law. *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) ("putting to one side abstractions regarding 'substance' and 'procedure,' we have held that in diversity cases the federal courts must follow the law of the State as to burden of proof") (citing *Cities Serv. Oil Co. v. Dunlap,* 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196, (1939)); *Palmer v. Hoffman,* 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645 (1943) ("The question of the burden of establishing contributory negligence is a question of local law which federal courts in diversity of citizenship cases must apply." (internal citation omitted)); *United States v. McCombs,* 30 F.3d

310, 323–24 (2d Cir.1994) ("Presumptions and other matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue."). There is no governing federal law or rule, and the burden of proof in public nuisance cases brought by private plaintiffs under New York law is so inextricably intertwined with the state right as to be outcome determinative. *See, e.g., Palmer,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

The burden required under New York law should therefore be employed in the present case.

### B. Burden of Proof is Clear and Convincing Evidence

The law in New York seems to be that public nuisance must be proved by clear and convincing evidence. Perhaps the most explicit statement of this standard for the burden of proof was made by the Appellate Division, Second Department in *DeStefano v. Emergency Housing Group, Inc.:* "To sustain a cause of action sounding in public nuisance the plaintiff must establish by clear and convincing evidence ... a substantial and unreasonable interference with the public right." 281 A.D.2d 449, 722 N.Y.S.2d 35, 37 (2001) (internal citations omitted).

The court in *DeStefano* cited multiple cases applying "clear and convincing" evidence or "clear" evidence as the appropriate standard. *Id.; see City of Rochester v. Premises Located at 10–12 So. Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 526 (1998) ("A review of the evidence submitted shows that the City has established, by clear and convincing evidence, the existence of a nuisance and the necessity for abatement."); *State of New York v. Waterloo Stock Car Raceway, Inc.,* 96 Misc.2d 350, 409 N.Y.S.2d 40, 43 (1978) ("[A public

nuisance] must be established by clear evidence before the preventive remedy will be granted."); *County of Sullivan v. Filippo*, 64 Misc.2d 533, 315 N.Y.S.2d 519, 539 (1970) ("It is the rule in this State that a public nuisance must be established by clear evidence before the preventive remedy will be granted."). The same holds true in other New York cases. *See, e.g., Hoover v. Durkee*, 212 A.D.2d 839, 622 N.Y.S.2d 348, 349 (1995) ("Our review of the record supports Supreme Court's conclusion that a public nuisance has been established by clear evidence."); *State v. Fermenta ASC Corp.*, 166 Misc.2d 524, 630 N.Y.S.2d 884, 891 (1995) ("The burden is on the plaintiffs to establish a public nuisance by clear evidence before the preventive remedy of abatement will be granted."); *Durand v. Bd. of Co–op. Educ. Servs.*, 70 Misc.2d 429, 334 N.Y.S.2d 670, 676 (1972) ("Those seeking to enjoin the legal use of another's property on the ground of nuisance have the burden of establishing by clear evidence that such use has or actually Will [sic] result in a nuisance." (internal citation and quotations omitted)); *People v. HST Meth., Inc.*, 74 Misc.2d 920, 346 N.Y.S.2d 146, 149 (1973) ("A public nuisance must be established by clear evidence before the preventive remedy will be granted."). Although "clear," rather than "clear and convincing," evidence is often referenced in the cases, the circumstances make apparent the intent of the courts to require more convincing proof than would generally be required under a preponderance of the evidence standard. *Cf. California ex. rel. Cooper v. Mitchell Brothers' Santa Ana Theater*, 454 U.S. 90, 93 n. 6, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981) ("The precise verbal formulation of this standard varies . . . ."). At least one court has required proof even greater than clear and convincing evidence. *See Findley Lake Property Owners, Inc. v. Town of Mina*, 31 Misc.2d 356, 154 N.Y.S.2d 775, 795 (1956) ("On him who asserts a public nuisance rests the burden of establishing it beyond a reasonable doubt.").

Many of the cases in which plaintiffs have been required to prove a claim for public nuisance by clear evidence involve applications for injunctive relief. *See, e.g., City of Rochester v. Premises Located at 10–12 So. Washington St.*, 180 Misc.2d 17, 687 N.Y.S.2d 523 (1998). Section 64 of the New York Jurisprudence treatise on nuisances states: "[I]t has been held that a public nuisance must be established by clear evidence before the preventive remedy of injunction will be granted." 81 N.Y. Jur.2d Nuisances § 64. It is possible that clear and convincing is the applicable burden only where an injunctive remedy is sought. Since the NAACP requests primarily injunctive relief in the instant case, the court need not and does not decide this question.

There are significant policy arguments in favor of application of a clear and convincing burden. The Supreme Court of Alaska, in holding that the appropriate standard under an Alaskan nuisance abatement statute was clear and convincing evidence, discussed the need for requiring nuisance to be proved by that higher standard where injunctive relief is requested and cases in other jurisdictions are in accord with this conclusion. *See Spenard Action Comm. v. Lot 3, Block 1, Evergreen Subdivision*, 902 P.2d 766, 774–75 (Alaska 1995). These reasons include the nature of a *public* nuisance action, and the potentially severe and wide-ranging consequences that flow from a finding of liability.

The United States Supreme Court has explained that

[t]he purpose of a standard of proof is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Three standards of

proof are generally recognized, ranging from the "preponderance of the evidence" standard employed in most civil cases, to the "clear and convincing" standard reserved to protect particularly important interests in a limited number of civil cases, to the requirement that guilt be proved "beyond a reasonable doubt" in a criminal prosecutions.

*California ex. rel. Cooper v. Mitchell Brothers' Santa Ana Theater,* 454 U.S. 90, 92–93, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981) (internal quotations and citations omitted). The reasons cited by the Alaska Supreme Court in *Spenard Action Comm.* mirror the general position of the New York courts that the clear and convincing standard is appropriately applied "where the interests at stake are deemed more significant than ordinary." New York Pattern Jury Instruction 1:64, cmt. at 85 (citing *In re Storar,* 52 N.Y.2d 363, 379, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981)); *see also, e.g., State of Connecticut v. Zuckerman,* 30 Conn. L. Rptr. 426, 2001 WL 821541, at *10 (Conn.Super.Ct.2001) (unpublished opinion) ("Clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty as where this high standard is required to sustain claims which have serious consequences or far-reaching effects on individuals, to prove willful, wrongful and unlawful acts or justify an exceptional judicial remedy, or to circumvent established legal safeguards." (quoting *Schaffer v. Lindy,* 8 Conn.App. 96, 511 A.2d 1022 (1986))).

The Attorney General for the State of New York, in a letter submitted in his status as observer in the instant action, argues that the burden of proof for a public nuisance action in the New York state courts is a preponderance of the evidence. *See* Letter of May 3, 2003 from Peter Pope for Eliot Spitzer, Attorney General of the State of New York, Court Exhibit 4 of May 5, 2003, *Nat'l Ass'n for Advancement of Colored People v. Acusport,* 226 F.Supp.2d 391 (E.D.N.Y.2002). The cases cited in support of the position—four New York Appellate Division cases from various departments and one case decided in federal court in the Western District of New York—are useful but not persuasive in the context of the instant case.

The two Appellate Division, First Department, cases cited by the Attorney General are decisions based on the New York City Administrative Code. The first, *City of New York v. Les Hommes,* 258 A.D.2d 284, 685 N.Y.S.2d 49 (1999), was a nuisance abatement action brought to permanently enjoin defendants from operating an adult bookstore and theater in violation of New York City's zoning regulation—not a common law public nuisance case. The court held without discussion of the appropriate burden that the City had demonstrated by a preponderance of the evidence that the defendant had not complied with the zoning regulation; the New York Court of Appeals subsequently reversed on the ground that an element of the zoning regulations had been incorrectly applied, and thus did not reach other grounds for appeal. In the second case, *Little Antigone Theatres, Inc. v. City of New York,* 82 A.D.2d 777, 440 N.Y.S.2d 650 (1981), it was alleged that a building was improperly demolished as a nuisance under a New York Administrative Code provision defining various illegal nuisances, including public nuisance at common law or in equity jurisprudence. The question to be decided was not liability for a public nuisance; the First Department held that plaintiffs were entitled to damages because they had shown that the building destroyed was not a nuisance by a "fair preponderance of the evidence."

The Third and Fourth Department cases cited, *Kenyon v. Plastimold, Inc.*, 8 A.D.2d 452, 188 N.Y.S.2d 803 (1959), and *Jostlen v. Great Atl. & Pac. Tea Co.*, 153 A.D. 528, 138 N.Y.S. 456 (1912), quoted jury instructions charging a preponderance of the evidence, but reversed the judgments for failure to properly charge contributory negligence. Neither the Third nor the Fourth Department in either case discussed the burden of proof or stated directly that the proper burden was preponderance of the evidence.

The New York district court opinion cited by the Attorney General, *United States v. Hooker Chems. & Plastics Corp.*, 748 F.Supp. 67 (W.D.N.Y.1990), is not helpful on this point. At issue was a motion to dismiss or for partial summary judgment on plaintiff State of New York's claim for punitive damages on its common law public nuisance claim. In denying the motion to dismiss, the court held that the proper burden for establishing an entitlement to punitive damages was a preponderance of the evidence, not the beyond a reasonable doubt standard, as contended by defendant. *Id.* at 78–80. The burden of proof for liability on a claim of public nuisance was not at issue and was not discussed; the court specifically noted that defendant did not claim that the proper burden for liability was beyond a reasonable doubt. *Id.* at 78 n. 13.

There are older New York public nuisance cases that refer to a preponderance of the evidence burden. *See, e.g., Orangetown v. Gorsuch*, 718 F.2d 29 (2d Cir.1983) ("From our review of the evidence presented at trial, we find no basis for overturning the district court's ruling that Orangetown's evidence, taken as a whole, failed to prove by a preponderance that the county plant operation resulted in a public nuisance."); *City of Rochester v. Charlotte Docks Co.*, 114 N.Y.S.2d 37, 48 (1952) ("the fair preponderance of the credible evidence rule in civil cases, such as those [nuisance cases] at Bar"); *Sweet v. State*, 195 Misc. 494, 89 N.Y.S.2d 506, 519 (N.Y.Ct.Cl.1949) (noting in a public nuisance action for damages that "it cannot be said that the claimants have established by a fair preponderance of proof"); *Cahill v. Moran*, 91 Misc. 301, 155 N.Y.S. 23, 24 (1915) ("The burden on this motion is upon the plaintiff to establish to the satisfaction of the court, by a fair preponderance of evidence, adduced by affidavits, that such a situation is presented, having in mind the interests of the public, of the residents of the immediate locality, as would require the court to make an order which would cause the immediate suspension of the [alleged public nuisance]"); *Martin v. City of New York*, 77 N.Y.S. 1013, 1014 (N.Y.Sup.Ct.1902) ("If the defendants' averments are to be accepted, there is not ground for an injunction, since the matter complained of is disclosed to be too inconsiderable for the denomination as a nuisance, and I find no good reason for holding that the preponderance is with the plaintiff."); *Butterfield v. Klaber*, 52 How. Pr. 255, 1876 WL 11216 (1876) (noting in an action for public nuisance that "I am forced, by a great preponderance of evidence, to find that the noise produced by defendants' machinery was not *unusual.*" (emphasis in original)).

The weight of the authority—particularly in recent cases and suits for injunctive relief—and of policy arguments support application of a clear and convincing evidence standard in a public nuisance action brought by a private plaintiff for injunctive relief.

## V. Public Nuisance

### A. History and Development

As a general term, "nuisance" "means no more than harm, injury, inconvenience, or annoyance." *Copart Indus., Inc. v.*

*Consol. Edison Co. of New York,* 41 N.Y.2d 564, 567, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977) (citing *Webster's Third New International Dictionary* 571; *American Heritage Dictionary* 900); *see also Oxford English Dictionary (Second Edition)* 585 (1989) (adopted from the Old French *nuisance, nusance;* a form of *nuis-, nuire,* meaning to hurt or harm). The modern tort of public nuisance is "the invasion of an interest, a type of harm or damage, through any conduct which falls within the three traditional categories of liability"—intent, negligence, or strict liability. William L. Prosser, *Private Action for Public Nuisance,* 52 Va. L.Rev. 997, 1004 (1966).

■■■ It is important to distinguish between the two types of nuisance in modern tort law—private nuisance and public nuisance. *See McFarlane v. City of Niagara Falls,* 247 N.Y. 340, 344, 160 N.E. 391 (1928) ("Statements appropriate enough in their application to nuisances of one class have been thoughtlessly transferred to nuisances of another."). The New York Court of Appeals in *Copart Indus., Inc.* aptly characterized the differences between public and private nuisance:

> A private nuisance threatens one person or a relatively few, an essential feature being an interference with the use or enjoyment of land.... A public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency. It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all....

*Copart Indus., Inc.,* 41 N.Y.2d at 568, 394 N.Y.S.2d 169, 362 N.E.2d 968.

Private nuisance, historically known by a variety of labels, developed from a single theory of liability affording a remedy for interference with a plaintiff's use or enjoyment of land that stopped short of dispossession or physical entry onto the land, i.e., trespass. *See, e.g.,* Prosser, *supra,* at 997–98. In contrast, the concept of a public nuisance began to appear in connection with "the entirely separate principle that an infringement of the rights of the crown was a crime;" early actions involved purprestures, or encroachment upon the royal demesne or the king's highway. Prosser, *supra,* at 998; *see also Copart Indus., Inc.,* 41 N.Y.2d at 567–68, 394 N.Y.S.2d 169, 362 N.E.2d 968 (citing Stephen, *General View of the Criminal Law of England* 105 (1890)); *Restatement (Second) of Torts* § 821B cmt. a. The two doctrines developed independently as separate theories of liability. While sharing a name presumably because of the "superficial resemblance between the obstruction of a private right of way and the obstruction of a public right of passage," they are otherwise unrelated. Prosser, *supra,* at 998; *see also State v. Shore Realty Corp.,* 759 F.2d 1032, 1050 (2d Cir.1985) ("Public and private nuisance bear little relationship to each other. Although some rules apply to both, other rules apply to one but not the other.").

Public nuisance law in New York has evolved from its historical form in two important respects. First, the classes of offenses recognized as a public, or "common" nuisance, gradually have expanded greatly. Second, a private right of action with civil remedies has been recognized in limited circumstances. *See* Prosser, *supra,* at 998–1001, 1004–06. What remains unaltered is the general principle.

■■ It is uncontested that the historical purpose of the doctrine of public nuisance was primarily to protect the public from harm or danger; the same is equally true of the modern tort of public nuisance. This focus on public harm has two important implications for public nuisance ac-

tions that will figure throughout this discussion. First, a public nuisance was and is subject to prosecution generally, if not exclusively, at the hand of some branch of a sovereign governmental authority. *See Copart Indus., Inc.*, 41 N.Y.2d at 568, 394 N.Y.S.2d 169, 362 N.E.2d 968; Robert Abrams & Val Washington, *The Misunderstood Law of Public Nuisance*, 54 Alb. L.Rev. 359, 362–63 (1990). A state actor is both in the best position and has a responsibility to protect the public that has entrusted it with their representation. Private suits on behalf of the public have come to be recognized as appropriate only under special circumstances.

▬ Second, while a plaintiff, private or public, must of course prove conduct or omissions on the part of defendant that create, contribute to, or maintain the nuisance, the focus in an equitable public nuisance action is on the harm to the public and how it might be abated. The fact that conduct is otherwise lawful is no defense where that conduct results in a public nuisance. The actions or failures to act of multiple defendants creating in the aggregate a public nuisance can justify liability in an equitable action to enjoin the nuisance. Intervening actions do not necessarily break the connection between the conduct of a defendant and harm suffered by the public.

### B. Law

▬ A public nuisance under New York law as it is understood today "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co. of New York*, 41 N.Y.2d 564, 568, 394 N.Y.S.2d

169, 362 N.E.2d 968 (1977); *see also, e.g., 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001). A private person "who suffers damage or injury, beyond that of the general inconvenience to the public at large, may recover for such nuisance in damages or obtain an injunction to prevent its continuance." *Leo v. General Elec. Co.*, 145 A.D.2d 291, 538 N.Y.S.2d 844, 846 (2d Dep't 1989) (quoting *Graceland Corp. v. Consol. Laundries Corp.*, 7 A.D.2d 89, 180 N.Y.S.2d 644, 646 (1st Dep't 1958)).

"Public nuisance," in addition to referring to a field of tort liability, is used to refer more narrowly to "the *consequences* of conduct"—that is, to the invasion of the public right on which a claim for public nuisance must be based. *Copart Indus., Inc.*, 41 N.Y.2d at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968.

In order to establish a defendant's liability for the tort public nuisance, a plaintiff must prove each of three elements by clear and convincing evidence:

1. the existence of a public nuisance;

2. conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and

3. particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of the public nuisance.

#### 1. Existence of a Public Nuisance

As already noted, a public nuisance exists when there is a substantial interference with a public right. A wide variety of specific types of danger and injury to the public have been recognized in New York as public nuisances. *See, e.g., New York Pattern Jury Instructions* 3:17, cmt. at 127 (2d ed.2003) (citing, *inter alia, Melker v. City of New York*, 190 N.Y. 481, 83 N.E.

565 (1908) (discharge of fireworks in a busy highway in the midst of a large city where a large number of people are assembled); *Callanan v. Gilman,* 107 N.Y. 360, 14 N.E. 264 (1887) (blocking the sidewalk for four or five hours out of each business day); *Hoover v. Durkee,* 212 A.D.2d 839, 622 N.Y.S.2d 348 (3rd Dep't 1995) (maintaining a noisy racetrack in a tranquil, rural, residential community); *Town of Mt. Pleasant v. Van Tassell,* 7 Misc.2d 643, 166 N.Y.S.2d 458 (1957), *aff'd,* 6 A.D.2d 880, 177 N.Y.S.2d 1010 (1958) (maintaining a piggery in such location and manner as materially to interfere with the health, well being and property rights of neighbors and the public generally); *Warren v. Parkhurst,* 45 Misc. 466, 92 N.Y.S. 725 (1904), *aff'd* 105 A.D. 239, 93 N.Y.S. 1009 (1905), *aff'd* 186 N.Y. 45, 78 N.E. 579 (1906) (discharge into a creek of waste by defendants engaged in business as tanners and colorers of skin and manufacturers of leather); *City of Rochester v. Premises Located at 10–12 South Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 527 (1998) ("congestion of public thoroughfares of the kind proven here, both by affidavit and videotape, coupled with disorderly behavior and frequent shooting of firearms and fighting")); *see also Restatement (Second) of the Law of Torts* § 821B, cmt. b (noting that at common law the crime of public nuisance came to include "interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malaria mosquitoes; with the public safety, as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets; with the public morals, as in the case of houses of prostitution or indecent exhibitions; with the public peace, as by loud and disturbing noises; with the public comfort, as in the case of widely disseminated bad odors, dust and smoke; with the public convenience, as by the obstruction of a public highway or a navigable stream; and with a wide variety of other miscellaneous public rights of a similar kind").

■ Interferences actionable in equity are not limited to previously recognized categories so long as the wrong is one common to the public. *See Briggs v. City of N. Tonawanda,* 213 A.D. 781, 210 N.Y.S. 643, 646 (1925) ("Standards for determining right and wrong doing are continually changing, and what may be deemed lawful under given social conditions may assume the character of a nuisance at another time.") (quoting 20 R.C.L. 398, 399); *cf. Lawton v. Steele,* 152 U.S. 133, 140, 14 S.Ct. 499, 38 L.Ed. 385 (1894) ("While the legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so, a good deal must be left to its discretion in that regard; and, if the object to be accomplished is conducive to the public interests, it may exercise a large liberty of choice in the means employed."), *aff'g* 119 N.Y. 226, 23 N.E. 878 (1890).

■ A nuisance is public when "a public right or privilege common to every person in the community is interrupted or interfered with," or when it is "committed in such place and in such manner that the aggregation of private injuries becomes so great and extensive as to constitute a public annoyance and inconvenience, and a wrong against the community." *People v. Rubenfeld,* 254 N.Y. 245, 248, 172 N.E. 485 (1930) (internal quotations and citations omitted); *see also Hoover v. Durkee,* 212 A.D.2d 839, 622 N.Y.S.2d 348, 350 (1995) ("To be free of these conditions is a right which the neighborhood possesses at large, and not one which one man or a few men covet to themselves. It is an affront to and invasion of the community in the enjoyment of its common rights." (internal quotation and citation omitted)). It is well established that such circumstances exist

when the health, safety, or comfort of a considerable number of persons in New York is endangered or injured, or interference with the use by the public of a public place in New York occurs. *See Copart Indus., Inc. v. Consol. Edison Co. of New York,* 41 N.Y.2d 564, 568, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977).

To be substantial, the interference with the public right must be real and appreciable, not imagined or petty. All circumstances should be considered in making this determination. *See New York Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 81, 85 N.E.2d 873 (1949). Such circumstances include the nature and degree of the danger and harm to the public, *see, e.g., Graceland Corp. v. Consol. Laundries Corp.,* 7 A.D.2d 89, 180 N.Y.S.2d 644, (1958) (holding that an obstruction need not be total; the relevant question is whether there is a significant impairment of the use of the street); the nature of the interference, here the nature of the defendant's business, *see, e.g., Robert v. Powell,* 168 N.Y. 411, 414–15, 61 N.E. 699 (1901); whether the conduct is prohibited or permitted by a statute, ordinance or administrative regulation, *see, e.g., Clawson v. Cent. Hudson Gas & Elec. Corp.,* 298 N.Y. 291, 298–99, 83 N.E.2d 121 (1948) ("[T]he [statutory or regulatory] authority which will thus shelter an actual nuisance must be express, or a clear and unquestionable implication from powers conferred, should be certain and unambiguous, and such as to show that the legislature must have contemplated the doing of the very act in question." (quotations and citations omitted)); whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, *see, e.g., Callanan v. Gilman,* 107 N.Y. 360, 14 N.E. 264 (1887); and how, if at all, the danger could be reduced, *see, e.g., City of Rochester v. Premises Located at 10–12 South Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 526 (1998) ("A review of the evidence submitted shows that the City has established, by clear and convincing evidence, the existence of a nuisance and *the necessity for abatement*" (emphasis added)). *See also New York Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 81, 85 N.E.2d 873 (1949) (holding that the "method, frequency, location and general character" of an alleged nuisance are relevant to determining whether it is a substantial interference with a public right).

While the fact that a defendant's conduct is otherwise lawful is a factor to consider in determining whether the interference with the public right is substantial, it is no defense to an action for public nuisance. *See State v. Waterloo Stock Car Raceway, Inc.,* 96 Misc.2d 350, 409 N.Y.S.2d 40, 44–45 (1978) (holding that a racetrack operated lawfully and in accord with applicable regulations can still be enjoined as a public nuisance because "[e]very business has a duty to conduct its operations in a reasonable manner such that it does not materially interfere with the general well-being, health or property rights of neighbors or of people generally") 81 N.Y. Jur.2d Nuisances § 55; *cf. Friedman v. Columbia Mach. Works & Malleable Iron Co.,* 99 A.D. 504, 91 N.Y.S. 129, 130 (1904) (finding it no defense in a private nuisance action that "the defendant's business or works is lawful, and is a great benefit, utility, and convenience to the public, and is rightfully carried on in a proper, suitable, and convenient place, and in a careful and orderly manner, and in the best and most improved manner"). It is well-settled that an otherwise lawful business may be enjoined when it creates or contributes to a public nuisance because of the manner or circumstances in which it operates. *See, e.g., New York Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 85 N.E.2d 873 (1949) (quarry operations); *Hoover v. Durkee,* 212 A.D.2d 839, 622

N.Y.S.2d 348 (1995) (auto racetrack); *City of Rochester v. Premises Located at 10–12 South Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 527 (1998) (nightclub); *Town of Preble v. Song Mountain, Inc.,* 62 Misc.2d 353, 308 N.Y.S.2d 1001 (1970) (open air concert); *see also McFarlane v. City of Niagara Falls,* 247 N.Y. 340, 343, 160 N.E. 391 (1928) ("Other situations there are, however, where what was lawful in its origin may be turned into a nuisance by negligence in maintenance.").

The only exception is where the specific conduct at issue is *"fully* authorized by statute, ordinance or administrative regulation." *Restatement (Second) of Torts* § 821B, cmt. f (emphasis added); *Clawson v. Cent. Hudson Gas & Elec. Corp.,* 298 N.Y. 291, 298–99, 83 N.E.2d 121 (1948) ("The doctrine that what the law specially sanctions cannot itself be wrongful has been narrowly applied in this court ... [T]he authority which will thus shelter an actual nuisance must be express....."). That a regulatory statutory scheme exists to govern some conduct does not alone mean that conduct is fully authorized. *Cf. People v. Vanderbilt,* 26 N.Y. 287, 294–95 (1863) ("A statutory remedy never takes away a previous remedy at common law, unless such an intention is declared, but it is always held to be cumulative merely."); *Renwick v. Morris,* 3 Hill 621, 1842 WL 4382 (N.Y.1842) ("Nor does the imposition of a penalty by the statute take away the right of abatement."), *aff'd,* 7 Hill 575 (N.Y.1844).

It should be remembered in the context of the instant case that, although the gun industry is in some respects regulated at the federal, state, and local levels, the particular marketing and distribution practices engaged in by defendant manufacturers and distributors remain almost wholly unregulated. *See People of the State of New York v. Sturm, Ruger & Co.,* —— A.D.2d ——, 761 N.Y.S.2d 192, 210–11 (2003) (Rosenberger, J., dissenting) ("[T]he complaint in this action does not allege that the lawful sale of guns constitutes the public nuisance, but rather, that particular design, manufacturing, marketing and distribution practices of the defendants, which are not regulated by statute, create and/or contribute to the public nuisance of illegal guns."); *City of Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142–43 (2002); *Chicago v. Beretta U.S.A. Corp.,* 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16, 27–28 (2002).

"Unreasonableness" is used interchangeably with "substantial" under some circumstances in public nuisance actions. A requirement that an interference be "unreasonable" appears in several New York cases involving public passage through the streets. *See, e.g., Lyman v. Potsdam,* 228 N.Y. 398, 406, 127 N.E. 312 (1920) ("the use was reasonably necessary"); *Hofeler v. Buck,* 110 Misc. 402, 180 N.Y.S. 563, 566 (1920) ("These news stands, then, must be held a public nuisance, unless they come within the exception of being only temporary; that is, not permanent or habitual, or that they are both necessary and reasonable."); *Cuilo v. New York Edison Co.,* 85 Misc. 6, 147 N.Y.S. 14, 16 (1914) ("[T]he rule has always been applied that when an obstruction of a street serves some public necessity, is temporary in its nature, and reasonable in degree, it does not constitute a nuisance."); *Callanan v. Gilman,* 107 N.Y. 360, 365, 14 N.E. 264 (1887) ("Whether an obstruction in the street is necessary and reasonable must generally be a question of fact to be determined upon the evidence relating thereto.").

The Restatement describes a public nuisance as an "unreasonable," rather than a "substantial," interference with a public

right. *Restatement (Second) of Torts* § 821B(1). The factors used to determine whether an interference is unreasonable as summarized by the Restatement are virtually identical to those used to assess whether an interference is substantial:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect on the public right.

*Restatement (Second) of Torts* § 821B(2).

There is some suggestion that "reasonableness" is an independent element, and that the burden shifts to the defendant to prove it. *See New York Pattern Jury Instructions* 3:17, cmt. at 128 (2d ed.2003). Such a rule as a universal proposition for all public nuisance cases is unsupported in the case law and unnecessarily confuses the analysis. It has arisen almost exclusively in cases involving the use of a public sidewalk or street; in general the same factors would be implicated as must already have been found proven by clear and convincing evidence to show the existence of a public nuisance. *See, e.g., Callanan v. Gilman*, 107 N.Y. 360, 370, 14 N.E. 264 (1887) (holding that the trial judge should have made findings on defendant's contention that its use of the public sidewalk was reasonable, but that such an error was harmless where the judge had already found that defendant's conduct created a public nuisance because even a finding in favor of defendants could not change the judgment); *Lyman v. Potsdam*, 228 N.Y. 398, 405–06, 127 N.E. 312 (1920) (citing *Callanan* for the proposition that ordinarily a defendant must show reasonableness, but remanding for a new trial in part for plaintiff to prove that a "pile of rubbish was . . . reasonably calculated to frighten horses of ordinary gentleness, steadiness and courage"); *cf. Clifford v. Dam*, 81 N.Y. 52 (1880) (holding that defendant must allege and prove any justification in a case of "absolute nuisance"). To the extent that defendant's interference with a public right is grounded in negligent conduct a showing that the interference with the public right is "unreasonable" would be duplicative of the evidence of unreasonableness required to prove negligence. *Cf. Restatement (Second) of Torts* § 821B, cmt. g ("If the interference was unintentional, the principles governing negligent or reckless conduct, or abnormally dangerous activities all embody in some degree the concept of unreasonableness.").

■ The illegal possession and use of handguns in New York may constitute a public nuisance:

There can be no dispute that the unlawful use of handguns constitutes a public nuisance. . . . Moreover, the injuries and deaths that result from such activities clearly constitute a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons.

*People v. Sturm, Ruger & Co., et al.* Index No. 402586/00, at 20 (N.Y.Sup.Ct. Aug. 10, 2001) (internal quotation omitted); *see also* N.Y. Penal Law § 400.05(1) ("Any weapon, instrument, appliance or substance specified in article two hundred sixty-five, when unlawfully possessed, manufactured, transported or disposed of, or when utilized in the commission of an offense, is hereby declared a nuisance.").

2. Conduct of the Defendants Creating, Contributing to, or Maintaining the Nuisance

 Even in cases where it is obvious that there is a substantial interference with a public right, a defendant cannot be held liable unless it is proven that it, by virtue of conduct or omissions which are intentional, are negligent, or amount to abnormally dangerous or ultrahazardous activity, created, contributed to, or maintained that interference. *See Copart Indus. Inc. v. Consol. Edison Co. of New York*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977); *McFarlane v. City of Niagara Falls*, 247 N.Y. 340, 343–44, 160 N.E. 391 (1928); *White v. La Due*, 197 Misc. 589, 94 N.Y.S.2d 552, 555 (1950) ("Nuisance, except absolute nuisance, is dependent upon wrongdoing or negligence."); *see also New York Pattern Jury Instructions* 3:16, Introductory Statement, at 110–12; *Restatement (Second) of Torts* § 821B, cmt. e ("[T]he defendant is held liable for a public nuisance if his interference with the public right was intentional or was unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct or for abnormally dangerous activities."); William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L.Rev. 997, 1003 (1966).

a. Tortious Conduct

Plaintiff urges that whether a defendant acted intentionally or negligently is not relevant in an equitable action for public nuisance—that is, that once a substantial interference with a public right is found to exist, liability may be established by a showing only that a defendant's conduct created, contributed to, or maintained that nuisance. This contention finds support only in public nuisance actions brought by the state concerning the release of hazardous wastes into the environment, conduct likely to be found abnormally dangerous or ultrahazardous. *See United States v.*

*Hooker Chems. & Plastics Corp.*, 722 F.Supp. 960, 968 (W.D.N.Y.1989) ("New York public nuisance law is clear that, *in an action brought by the State* in the exercise of its police powers for either abatement or restitution, fault is not an issue . . . ." (emphasis added)) (citing *State v. Schenectady Chems., Inc.*, 117 Misc.2d 960, 459 N.Y.S.2d 971, 979, n. 1 (1983) ("with respect to public nuisances and *inherently dangerous activities,* fault is not an issue" (emphasis added))); *see also State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir.1985); *United States v. Occidental Chem. Corp.*, 965 F.Supp. 408, 415 (W.D.N.Y.1997).

Plaintiff does not contend that the "abnormally dangerous" prong applies; the relevant alleged conduct and omissions of the defendant gun manufacturers, importers, and distributors do not constitute, as a legal matter, abnormally dangerous or ultrahazardous activities. To sustain this equitable action for public nuisance plaintiff must prove that defendants acted intentionally or negligently.

(1). Intentional Conduct

 A defendant acts intentionally if it acts or fails to act with the purpose of interfering with a public right, knew that such interference was resulting or was substantially certain to result from its conduct, or became aware that its conduct was causing such interference and nevertheless continued it. *See New York Pattern Jury Instructions* 3:17 cmt.; 3:16 and Introductory Statement; *Restatement (Second) of Torts* § 825; *see also Copart Indus. Inc. v. Consol. Edison Co. of New York*, 41 N.Y.2d 564, 571, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977); *Greentree at Murray Hill Condo. v. Good Shepherd Episcopal Church*, 146 Misc.2d 500, 550 N.Y.S.2d 981, 988 (1989); *Finch v. Swingly*, 42 A.D.2d 1035, 348 N.Y.S.2d 266, 268 (1973). There is no need to prove that defendants acted

for the purpose of causing harm to the public; the question is whether a defendant acted or failed to act with awareness that the public was suffering or would suffer injury as a result of its conduct.

Many of the cases discussing the requirement of intent in nuisance actions involve a private, rather than a public, nuisance. While the same definition of intentional conduct applies in both private and public nuisance actions, in cases where public nuisance is alleged the question is whether a defendant knew that interference with a public right—rather than an individual's use and enjoyment of land—was resulting, or was substantially certain to result, from its conduct. *See Restatement (Second) of Torts* § 825, cmt. b.

■ Intent may be proven by circumstantial evidence, that is, by inferences reasonably drawn from the facts established. *See Staples v. Sisson*, 274 A.D.2d 779, 711 N.Y.S.2d 550, 552 (2000); *Higgins v. Village of Orchard Park*, 277 A.D.2d 989, 716 N.Y.S.2d 845, 847 (2000); *see also New York Pattern Jury Instructions* 3:1, cmt. (2003).

General awareness—an understanding that harm is resulting or will result from the illegal use and possession of handguns—is not enough to satisfy the requirement that a defendant knew interference with a public right was resulting or be substantially certain to result from its conduct. *See, e.g., Finch v. Swingly*, 42 A.D.2d 1035, 348 N.Y.S.2d 266 (1973) ("A mere knowledge and appreciation of a risk is not the same as the intent to cause injury." (citing Prosser, *Torts* Sec. 8, at 31–32 (3rd ed.))). "Intent" does not, however, require knowledge that a specific gun sold to a specific dealer will be diverted into the illegal market and cause harm to the public and the NAACP. It is enough that a manufacturer, importer, or distributor of handguns knows or is substantially certain that its marketing practices have a significant impact on the likelihood that a gun will be diverted into the illegal market and used in crime, and that substantial harm to the public will result.

■ That a defendant was unaware in the past that certain conduct resulted in an interference with a public right is not alone determinative; if a defendant becomes aware that harm is resulting and continues to act in the same manner it has acted intentionally to contribute to a public nuisance. *See Restatement (Second) of Torts* § 825 cmt. d & illus. ("[T]he first invasion resulting from the actor's conduct may be either intentional or unintentional; but when the conduct is continued after the actor knows that the invasion is resulting from it further invasions are intentional."). Furthermore, if a defendant becomes aware that its actions or failures to act are causing interference with a public right in the context of new developments and does not change its conduct in response, it has acted intentionally to contribute to the nuisance. *See Clawson v. Cent. Hudson Gas & Elec. Corp.*, 298 N.Y. 291, 296, 83 N.E.2d 121 (1948) ("No landowner may expect the area surrounding his property to remain in a static condition. Times change and responsibilities change with them."). In *Clawson*, the defendant was the owner of a dam adjacent to a State highway bridge. Mist and spray from the dam caused no problem for the twenty-some years the bridge had a wood planking floor. Ice began to form on the bridge when the State replaced the old bridge with one made of steel and concrete. The New York Court of Appeals held that the fact that the State had constructed the new bridge did not relieve the dam owner of its obligation to maintain the dam in a manner in which it would not obstruct or make dangerous safe passage over the new bridge, which had created a change in conditions.

## (2). Negligent Conduct

Plaintiff does not assert a traditional cause of action for negligence against any of the defendants. Rather, it claims a public nuisance arising in part out of the negligent conduct of one or more of the defendants. *See* Edward J. Kionka, *Torts in a Nutshell* § 4–1, at 54 (1999) ("The term 'negligence is used in two senses'.... Second, 'negligence' describes that form of wrongful conduct itself which is an element of various tort causes of action...."); *Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc.*, 41 N.Y.2d 564, 569, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977) (noting that plaintiff's contention missed "the fundamental difference between types of conduct which may result in nuisance and the invasion of interests ... which is the nuisance"); *McFarlane v. City of Niagara Falls*, 247 N.Y. 340, 343, 160 N.E. 391 (1928) ("If danger there was, then also there was nuisance, though nuisance growing out of negligence."). To show that a defendant's conduct was negligent in a public nuisance action, a plaintiff must show: (1) a duty of care owed by the defendant to the public; and (2) a breach of that duty occasioned by the defendant's failure to conform to the required standard of conduct.

While the New York Court of Appeals has not addressed the issue of defendants' culpability in precisely the type of case now before this court, the question of whether gun manufacturers owe a duty to individual victims of gun violence to exercise reasonable care in the marketing and distribution of the handguns they manufacture was certified to the New York Court of Appeals by the Court of Appeals for the Second Circuit in the *Hamilton* litigation. *See Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36 (2d Cir.2000); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001). The statements of the New York Court of Appeals in *Hamilton* are instructive in considering whether a duty exists not to create a public nuisance by imprudently merchandising guns.

It is necessary to bear in mind two things about the *Hamilton* decision. First, the decision in *Hamilton* was predicated upon the assertion of significantly less evidence than is now available concerning (1) guns recovered by law enforcement agencies and traced by ATF and (2) the marketing practices of members of the gun industry. Second, the existence of a duty of care was raised in *Hamilton* in the context of a negligence cause of action prosecuted by individuals who were themselves injured by gun violence, or were family members of persons so injured or killed. In the instant case, the issue at stake is not whether a duty is owed to specific individual victims of gun violence, but rather whether handgun manufacturers, importers, and distributors owe a duty to the members of the public in New York State. A public nuisance is in its essence an offense against the state; an action sounding in public nuisance seeks redress for a "wrong common to the public." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center*, 96 N.Y.2d 280, 292, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001). Precisely the opposite holds true in individual negligence cases, where the aim is to redress a wrong visited upon a specific injured party by an identified person who owes him or her a specific duty. Thus, in negligence, the plaintiff must show that the defendant "owed not merely a general duty to society but a specific duty to him or her." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001); *cf. also Levine v. New York*, 309 N.Y. 88, 92–92, 127 N.E.2d 825 (1955) ("Negligence is not a stereotyped thing, but, as courts have wisely said, it is a matter of time, place and circumstance; and the same act of a defen-

dant may be a breach of duty toward one person while not a breach of duty toward another."); *Sadowski v. Long Island R. Co.*, 292 N.Y. 448, 55 N.E.2d 497 (1944).

A private plaintiff's nuisance claim based on breach of a duty of care cannot be treated as if it were merely a private negligence action. Were this true, the two causes of action under the circumstances of the case at bar would be duplicative. A private plaintiff's public nuisance action based on negligence would be superfluous, since it would entail proof of elements— harm to the public resulting from defendant's conduct—not necessary to sustain a claim. *See Khoury v. County of Saratoga*, 267 N.Y. 384, 196 N.E. 299 (1935). *But cf. McKenna v. Allied Chem. & Dye Corp.*, 8 A.D.2d 463, 188 N.Y.S.2d 919, 924 (1959) (asserting, without citation, that "if negligence is found, a recovery can be had on that ground; nothing of value is added by going through the circuitous process of making the finding of negligence the basis of a further finding of nuisance.").

While the burden on a private plaintiff seeking to abate a public nuisance is heavy, *see* Part Two, Section V.B.3, Particular Harm, *infra*, it does not include showing, where the nuisance is based on negligence, that the defendant owes a particular injured person, as opposed to the public, a duty of care. At issue in a public nuisance action is a duty of care to the public or to a substantial number of persons. *See, e.g., Morello v. Brookfield Constr. Co., Inc.*, 4 N.Y.2d 83, 172 N.Y.S.2d 577, 149 N.E.2d 202 (1958) (no prejudice could arise from a failure to charge a jury on nuisance based on negligence where the jury failed to find the defendants' conduct negligent); *Khoury v. County of Saratoga*, 267 N.Y. 384, 389, 196 N.E. 299 (1935) ("In these and like situations, the danger being a continuing one, is often characterized as a nuisance, though dependent upon negligence."). A

number of older cases discussing public nuisance claims arising out of negligent conduct do express a concern that a plaintiff not be allowed to "avert the consequences" of a negligence action by pleading a claim in nuisance; the consequences referred to are those of contributory negligence. *See, e.g., Copart Indus. Inc. v. Consol. Edison Co. of New York*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977); *McFarlane v. City of Niagara Falls*, 247 N.Y. 340, 160 N.E. 391 (1928). The bar of contributory negligence could not be avoided by pleading the case as one of nuisance. *See, e.g., Copart*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968; *McFarlane*, 247 N.Y. 340, 160 N.E. 391.

There are fact patterns under which the difference between negligence actions and nuisance actions brought by private plaintiffs based on negligent conduct has little practical significance, but there are other situations in which it is determinative. In *Khoury*, the New York Court of Appeals specifically emphasized the importance of the distinction:

> The insistence, therefore, of the appellants that this case should have been tried in negligence and not nuisance is of little point. If the negligence depended solely on the failure to warn travelers of the ice on the night in question, there could be no recovery, as it had not been there long enough to have furnished notice to the city, but this is not the only claim of the plaintiffs. The continued gathering of ice from spray, not rain or snow, so that this was the only dangerous spot on the highway, was a condition the authorities had faced for some years and had done nothing about it.

267 N.Y. at 389, 196 N.E. 299.

"Duty" at its essence is a question of policy. While there is a general reluctance to impose liability where harm results in part from the conduct of third-party tor-

tious or criminal conduct, *see D'Amico v. Christie,* 71 N.Y.2d 76, 88, 524 N.Y.S.2d 1, 518 N.E.2d 896 (1987), the New York Court of Appeals has found that a duty of care could be imposed on gun manufacturers where there was a "tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries and .... defendants were realistically in a position to prevent the wrongs." *See Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 234, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001).

A showing of a direct link between the negligence and damage to the public at large ensures that there is no threat of a "specter of limitless liability." *Id.* at 233, 727 N.Y.S.2d 7, 750 N.E.2d 1055. Important in the determination is that a plaintiff not rely merely on the foreseeability of harm to attempt to hold all members of an industry liable, but rather present "evidence tending to show to what degree the[ ] risk of injury was enhanced by the presence of negligently [or intentionally harmfully] marketed and distributed guns...." *Id.* at 235, 727 N.Y.S.2d 7, 750 N.E.2d 1055; *see also Pulka v. Edelman,* 40 N.Y.2d 781, 785, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976). Where there is a "statistically significant relationship between *particular classes* of dealers [and specific dealer practices] and crime guns," defendant handgun manufacturers, importers, and distributors may be realistically in a position to prevent the wrongs. *Hamilton,* 96 N.Y.2d at 236, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (emphasis in original).

The New York Court of Appeals recognizes that a duty may be imposed on gun manufacturers on the basis of a theory of negligent entrustment:

> The tort of negligent entrustment is based on the degree of knowledge the supplier of a chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dan-

gerous fashion.... The negligent entrustment doctrine might well support the extension of a duty to manufacturers to avoid selling to certain distributors in circumstances where the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis.

*Hamilton,* 96 N.Y.2d at 237, 727 N.Y.S.2d 7, 750 N.E.2d 1055; *see also People of the State of New York v. Sturm, Ruger & Co.,* —— A.D.2d ——, 761 N.Y.S.2d 192, 199–200 (2003); *Splawnik v. Di Caprio,* 146 A.D.2d 333, 540 N.Y.S.2d 615 (1989); *Cullum & Boren–McCain Mall v. Peacock,* 267 Ark. 479, 592 S.W.2d 442 (1980); *Semeniuk v. Chentis,* 1 Ill.App.2d 508, 117 N.E.2d 883 (1954); *cf. Restatement (Second) of Torts* § 390. The same reasoning would apply with respect to sales by manufacturers directly or indirectly to dealers and to sales of distributors to dealers. While the New York Court of Appeals held that no such evidence was presented in *Hamilton,* "a showing that specific groups of dealers play a disproportionate role in supplying the illegal market" could support a finding of a duty of care with respect to other members of the gun industry dealing with those particular retailers. 96 N.Y.2d at 237–38, 727 N.Y.S.2d 7, 750 N.E.2d 1055.

Here, unlike in *Hamilton,* where an individual plaintiff's rights were at issue, it is the duty of an industry putting at risk hundreds of thousands of members of the public by their intentional and negligent merchandising that is at stake. It is alleged that the safety and welfare of huge communities are being jeopardized by defendants' activities.

 A duty of care is breached where a defendant acts with a lack of ordinary care. Failure to use the degree of care that a reasonably prudent person––

here a reasonably prudent manufacturer or distributor of handguns—would have exercised under the same circumstances may arise from a defendant's actions and from a defendant's failures to act. *See Baltimore & Potomac R. Co. v. Jones,* 95 U.S. (5 Otto) 439, 441–42, 24 L.Ed. 506 (1877). To prove such a breach a plaintiff must show both a reasonably foreseeable danger of injury to another and conduct that is unreasonable in proportion to that danger. *See Caldwell v. Village of Island Park,* 304 N.Y. 268, 274, 107 N.E.2d 441 (1952). The exact occurrence or exact injury does not have to be foreseeable, but injury as a result of negligent conduct must be probable. *See Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928); *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916). "[W]hat is negligence in a given case is a question of fact." *Caldwell,* 304 N.Y. at 274, 107 N.E.2d 441.

There is little difference between negligence as treated by the New York Court of Appeals in *Hamilton* and intent when defined as becoming aware that conduct is interfering with a public right and nevertheless continuing to engage in that conduct. To prove that a defendant's conduct was intentional rather than negligent requires only a slightly greater showing of knowledge—that a defendant knew or was substantially certain of the harmful results of its conduct as opposed to knew or should have known of such results.

While the test of negligence remains the same—what a reasonable person would do—it is obviously easier to find negligence from a failure to act as the scope of the danger increases. A reasonable person is likely to take more serious precautions to avoid horrific consequences. Here, where danger to a whole community is involved, the degree of seriousness with which reasonable entrepreneurs will seek to avoid the danger increases.

### b. Causation

#### (1). Factual Cause

■ It is necessary in a suit seeking the injunction of a public nuisance, just as in other tort actions, for a plaintiff to show causation. *See, e.g., Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.,* 210 F.R.D. 446, 456, 460 (E.D.N.Y.2002) (allegations of causation sufficient to survive a motion to dismiss for lack of standing); *Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.,* 210 F.R.D. 268 (E.D.N.Y.2002) (releasing under a protective order the ATF data relied on by plaintiff in attempting to prove causation); *Nat'l Ass'n for the Advancement of Colored People v. Acusport Corp.,* 2003 WL 1049011, at *4–5 (E.D.N.Y.2003) (noting that the New York Supreme Court in *People v. Sturm, Ruger & Co., et al.* Index No. 402586/00, at 27 (N.Y.Sup.Ct. Aug. 10, 2001) had identified the availability of more extensive ATF data as a factor that could significantly change their causation analysis).

■ Satisfaction of the causation requirement for liability in a public nuisance action requires specific proof that a defendant, alone or with others, created, contributed to, or maintained the alleged interference with the public right. *See, e.g., Hine v. Aird–Don Co.,* 232 A.D. 359, 250 N.Y.S. 75, 77 (1931) ("Every one who creates a nuisance or participates in the creation or maintenance thereof is liable for it."); *McNulty v. Ludwig & Co.,* 153 A.D. 206, 138 N.Y.S. 84, 91 (1912) ("once it is established ... that the sign constituted a nuisance, all who participated in creating or maintaining such nuisance were jointly and severally liable for it"); *Uggla v. Brokaw,* 117 A.D. 586, 102 N.Y.S. 857, 862, 864 (1907) ("There is another rule, equally well settled, that every one who creates a nuisance, or participates in the creation or maintenance thereof, is liable for it....");

*Sullivan v. McManus,* 19 A.D. 167, 45 N.Y.S. 1079, 1080 (1897) ("the defendants in some way were parties in the creation or maintenance of a public nuisance"). Whether specific actions or omissions meet this standard is of necessity a fact-specific inquiry.

Causation analysis in an equitable action seeking to enjoin an alleged public nuisance action differs in several significant respects from causation analysis in an action based strictly on negligence toward a specific individual. First, defendants may be found liable for conduct creating in the aggregate a public nuisance. Second, intervening actions, even multiple or criminal intervening actions, need not break the chain of causation.

▇▇ Where multiple actors contribute to a public nuisance, equity can reach actors whose conduct standing alone might not be actionable. *See Warren v. Parkhurst,* 45 Misc. 466, 92 N.Y.S. 725 (1904), *aff'd* 105 A.D. 239, 93 N.Y.S. 1009 (1905), *aff'd* 186 N.Y. 45, 78 N.E. 579 (1906); *State of New York v. Schenectady Chems., Inc.,* 103 A.D.2d 33, 479 N.Y.S.2d 1010 (1984); *Restatement (Second) of Torts* § 840E, cmt. b ("Situations may arise in which each of several persons contributes to a nuisance to a relatively slight extent, so that his contribution taken by itself would not be an unreasonable one and so would not subject him to liability; but the aggregate nuisance resulting from the contributions of all is a substantial interference, which becomes an unreasonable one."); *cf.* American Law Institute, *Restatement of the Law of Torts: Liability for Physical Harm (Basic Principles)* (Tentative Draft No. 3) § 28(b), at 143 (April 7, 2003) (recognizing the special problems caused where two or more defendants cause harm). *But cf. Town of Orangetown v. Gorsuch,* 718 F.2d 29, 40–41 (2d Cir.1983) (holding that the town's public nuisance claim against the county

for primarily injunctive relief was properly dismissed where the district judge was unable to determine that the county's waste treatment plant alone was a "significant and unreasonable interference with public rights" because both the town and the county waste treatment plants generated offensive odors and were located within 1800 feet of one another).

▇▇ The question of the liability of multiple actors for the creation of a public nuisance in the aggregate arises where it is difficult or impossible to separate the injury done by one contributing actor from that done by another and where the injury imposed by each contributing actor individually does not constitute a substantial interference with a public right. Under such circumstances contributing actors cannot be held jointly and severally liable in an action for damages, but an equitable action for injunctive relief to abate the nuisance will lie against them all. *See Chipman v. Palmer,* 77 N.Y. 51 (1879). A common fact pattern is the discharge of waste or other substances into a stream by multiple upstream entities resulting in significant pollution or obstruction downstream, *see, e.g., Warren v. Parkhurst,* 45 Misc. 466, 92 N.Y.S. 725 (N.Y.Sup.Ct. 1904), *aff'd* 105 A.D. 239, 93 N.Y.S. 1009 (1905), *aff'd* 186 N.Y. 45, 78 N.E. 579 (1906), but the liability of multiple actors for the creation of a public nuisance in the aggregate is not limited to such facts *see, e.g., Warren v. Parkhurst,* 186 N.Y. 45, 52–53, 78 N.E. 579 (citing *Lambton v. Mellish,* "1894" 3 Ch. 163, 1894 WL 9627 (1894) (noise)); *Chipman v. Palmer,* 77 N.Y. 51, 55 (1879) (citing *Thorpe v. Brumfitt,* (1972–73) 8 L.R.-Ch. App. 650, 1873 WL 14785 (1873) (obstruction of roadway)). That the contributions differ in kind or in degree does not change the equation. *See, e.g., Sullivan v. McManus,* 19 A.D. 167, 45 N.Y.S. 1079 (1897); *Pittsburg, Cincinnatti,*

*Chicago & St. Louis Ry. Co. v. Town of Crothersville,* 159 Ind. 330, 64 N.E. 914 (1902) (contribution of hogpens and stockpens as used and maintained to a public nuisance) (citing *Sullivan v. McManus,* 19 A.D. 167, 45 N.Y.S. 1079 (1897)). The Restatement cogently suggests that the liability of a contributing actor under such circumstances may be dependent on that actor's awareness of the other contributors or of the effect of their actions in the aggregate. *Restatement (Second) of Torts* § 840E, cmt. b.

▮ The tortious actions or omissions of a defendant or defendants need not be the immediate cause of the injury to the public. If a defendant's conduct "remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did," *United States v. Hooker Chems. & Plastics Corp.,* 722 F.Supp. 960, 968 (W.D.N.Y.1989), a defendant may be held liable for setting in motion or being a force in a chain of events resulting in injury to the public. *See, e.g., City of Rochester v. Premises Located at 10–12 South Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 527 (1998) (preliminary injunction issued against nightclub and its owner where immediate cause of the public nuisance was off-premises conduct of the club's patrons upon leaving the club); *State of New York v. Fermenta ASC Corp.,* 160 Misc.2d 187, 608 N.Y.S.2d 980 (1994) (lack of control over an herbicide at the time injury to the public allegedly occurred does not preclude action against manufacturer for creation of public nuisance despite intervening actions of retailers, purchasers, and users of the product); *cf. Henrietta D. v. Bloomberg,* 331 F.3d 261, 279 (2d Cir.2003) ("The common law of torts, however, instructs that the existence of additional factors causing an injury does not necessarily negate the fact that the defendant's wrong is also the legal cause of the injury. In assessing whether one cause among many constitutes proximate cause, courts have engaged in inquires such as whether a cause is a substantial factor in bringing about the harm . . . ." (internal citations omitted)).

▮ Intervening actions between a defendant and the harm suffered by the public, even multiple or criminal actions taken by third parties or occurring naturally, do not break the chain of causation if a defendant could reasonably have expected their nature and effect. *See, e.g., Shaw's Jewelry Shop, Inc. v. New York Herald Co.,* 170 A.D. 504, 156 N.Y.S. 651 (1915) (newspaper responsible for public nuisance where its exhibition attracted large crowds interfering with passage on the sidewalks and in the street), *aff'd without op.,* 224 N.Y. 731, 121 N.E. 890 (1918); *State of New York v. Schenectady Chems., Inc.,* 103 A.D.2d 33, 479 N.Y.S.2d 1010 (1984) (chemical manufacturer may be liable in public nuisance action even where it contracted with third party for the disposal of chemical by-product wastes); *Caso v. District Council 37,* 43 A.D.2d 159, 350 N.Y.S.2d 173 (1973) (common law cause of action for public nuisance lies where work stoppage by public employees who serviced sewage treatment plants in Manhattan led to the release of raw sewage into the East River that ultimately washed up onto the beaches of Nassau Country and contaminated the water supply); *United States v. Hooker Chems. & Plastics Corp.,* 722 F.Supp. 960 (W.D.N.Y.1989) (corporation releasing chemical waste into a canal liable for public nuisance resulting from migration of the chemicals even where construction and other activities of third parties might have contributed to causing the migration to occur when and where it did); *cf.* American Law Institute, *Restatement of the Law of Torts: Liability for Physical Harm (Basis Principles )* (Tentative Draft No. 3) § 34, at 99 (April 7, 2003) ("An actor is not

subject to liability for harm, for which a force of nature or an independent act is also a factual cause of the harm, if the harm is different from the harms whose risks made the actor's conduct tortious."). As is particularly clear from *Shaw's Jewelry Shop, Inc., v. New York Herald Co.,* 170 A.D. 504, 156 N.Y.S. 651 (1915), and *City of Rochester v. Premises Located at 10–12 South Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 527 (1998), the causal chain is not broken even where it is the third party that is the most immediate causal event in injury to the public.

The fact that this action involves allegations against manufacturers, importers, and distributors of handguns does not change the causation analysis. The possibility that under some set of circumstances a causal connection between some harm suffered by individuals, organizations, or the public and the conduct of members of the gun industry might be shown has not been precluded by the New York courts. As already demonstrated, the New York Court of Appeals, while not yet faced with the connection between the merchandising practices of members of the gun industry and the harm suffered as a result of illegally possessed and used handguns in the context of a public nuisance action, has addressed causation peripherally in *Hamilton.*

In considering the question of whether gun manufacturers owe a duty to individual victims of gun violence to exercise reasonable care in the marketing and distribution of the handguns they manufacture, the New York Court of Appeals repeatedly emphasized that, although it found a sufficient showing of causation lacking on the record before it, such a showing might be possible in some other future case. *Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 233–34, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) ("without a more tangible showing that defendants were a direct link

in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs"); *id.* at 237–38, 727 N.Y.S.2d 7, 750 N.E.2d 1055 ("[w]ithout a showing that specific groups of dealers play a disproportionate role in supplying the illegal gun market"); *cf. id.* at 242, 727 N.Y.S.2d 7, 750 N.E.2d 1055 ("Whether, in a different case, a duty may arise remains a question for the future.").

A court in the State of New York, while finding that the complaint failed to alleged facts sufficient to "demonstrate that defendants are somehow contributing to the handgun nuisance," explicitly left open the possibility that such a showing might be possible with advances in research and available data: "[P]laintiffs must allege more facts which would demonstrate that defendants are somehow contributing to the handgun nuisance. This may become possible as further [ATF] investigations provide more information about the manufacture, sale and eventual unlawful use of handguns." *People v. Sturm, Ruger & Co., et al.* Index No. 402586/00, at 27 (N.Y.Sup.Ct. Aug. 10, 2001); *People of the State of New York v. Sturm, Ruger & Co.,* —— A.D.2d ——, 761 N.Y.S.2d 192 (2003) (Rosenberger, J., dissenting). The language used by the court in *Sturm, Ruger* in discussing causation reaffirms the conclusion that the relevant inquiry is whether a defendant's conduct creates, contributes to, or maintains a public nuisance, and that this analysis is unique to a public nuisance cause of action. *See id.* at 20 ("The issue then is whether the conduct of the defendants, as alleged in the complaint, is sufficient to establish liability for the creation or maintenance of a public nuisance.").

(2). Proximate Cause

Defendants argue that the NAACP must show that each defendant's conduct was the legal, or proximate, cause of the inju-

ries alleged. The sources cited by defendants in support of their request for a jury instruction on proximate cause, the New York Pattern Jury Instructions and *Nat'l R.R. Passenger Corp. v. New York City Housing Authority*, 819 F.Supp. 1271 (S.D.N.Y.1993), are inapplicable. The comments to New York Pattern Jury Instruction Civil 3:17, the relevant charge on public nuisance, simply notes that the charge assumes causation is not at issue and that the charge must be modified where there is a question of causation. *Nat'l R.R. Passenger Corp. v. New York City Housing Authority* does indeed state that "[c]ommon to the claims for intentional and negligent nuisance is the requirement that defendants' actions be the legal or proximate cause of plaintiff's injury," but it is discussing the requirements for liability on a private, not a public, nuisance claim. 819 F.Supp. 1271, 1278 (S.D.N.Y. 1993).

The concept of "proximate cause" embodies a policy requirement in negligence and some other tort actions that a defendant's tortious conduct be in such closeness in the causal chain to the harm suffered that it is just or fair to hold the defendant liable for the consequences of its actions. *See, e.g.,* Fowler Harper, Fleming James, Jr., & Oscar S. Gray, *The Law of Torts* § 20.4 (3d ed. 2003) ("Harper, James & Gray, *Torts*"). The requirement has been explained as follows: "Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir.1999). The term describes a policy-based judicial limitation on liability, separate and apart from questions of factual cause. *See Holmes v. Securities Investor Protection Corp.*, 503

U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ("Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."); *see also* W. Page Keeton et al., *Torts Prosser and Keeton on the Law of Torts* 264, 273 (5th ed.1984).

The label "proximate cause" is occasionally employed in public nuisance actions. The cases often involve more than one cause of action or are otherwise ambiguous. *See, e.g., Kuenzler v. Village of South Nyack*, 133 A.D.2d 100, 518 N.Y.S.2d 638, 639 (1987) (referring without discussion to a jury verdict in the lower court that a condition created by defendant was a proximate cause of plaintiff's injury); *Eastern States Health and Welfare Fund v. Philip Morris, Inc.*, 188 Misc.2d 638, 729 N.Y.S.2d 240 (2000) (granting defendants' motion to dismiss twelve tort claims, including a public nuisance claim, for failure to state a claim because the harm alleged by plaintiffs was too remote, indirect, and derivative to show proximate cause without addressing the relationship of any one of the twelve tort claims to the requirement of proximate cause); *Fulton Light, Heat, & Power Co. v. Oswego Power Transmission Co.*, 128 N.Y.S. 290, 292–93 (1911) (mentioning proximate cause, but relying on the private plaintiff's failure to show the "special" damages suffered or feared to dismiss the complaint).

The rule employed with respect to limitations on liability, whatever label is used, in public nuisance actions must be less restrictive than in individual tort actions. *See, e.g., Cohen v. City of New York*, 113 N.Y. 532, 537–39, 21 N.E. 700 (1889); *United States v. Hooker Chems. & Plastics Corp.*, 722 F.Supp. 960, 968 (W.D.N.Y.1989); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532

(1992); W. Page Keeton et al., *Prosser & Keeton on The Law of Torts* § 42, at 279 (5th ed. 1984) ("Proximate cause is an elusive concept, one 'always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent.'" (quoting 1 Thomas A. Street, *Foundations of Legal Liability* 110 (1906))). Discussions of proximate cause in cases based on negligence alone, then, are applicable but not determinative. *Cf. Sabater ex rel Santana v. Lead Industries Ass'n, Inc.*, 183 Misc.2d 759, 704 N.Y.S.2d 800, 806 (2000) ("Nuisance is distinguishable from negligence."). Here, where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases.

The flexible boundary of proximate cause is set by public policy created ad hoc by the judiciary for individual classes of cases rather than mechanically or according to generalized theory; it is designed to protect the public while not unduly inhibiting the necessary activities of business people and others. The boundary will be extended as the dangers to be protected against increase. Proximate cause where the injury foreseen is slight moral distress is quite different from proximate cause where the destruction of the World Trade Towers may result in the killing of thousands.

3. Particular Harm

Since the possibility of a suit brought by a private plaintiff for a public nuisance was first recognized, as early as the sixteenth century, it has been emphasized that no private suit for public nuisance may be brought "unless it be where one man has greater hurt or inconvenience than any other man had, and then he who had more displeasure or hurt, etc., can have an action to recover his damages that he had by reason of this special hurt." Y.B. Mich. 27 Hen. 8, f. 26, pl. 10 (1536), *quoted in*

William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L.Rev. 997, 1005 (citing this anonymous case as the break away point from the position that public nuisance was a crime and actionable only by the king). A private party bringing an action for public nuisance is acting as a *de facto* private attorney general, suing on behalf of itself as well as the public.

Such a quasi-public action is not appropriate unless the private plaintiff shows some special harm. Prosser succinctly explains this necessity:

> The reasons for the requirement of particular damage have been stated many times. The plaintiff did not and could not represent the king, and the vindication of royal rights was properly left to his duly constituted officers. This is no less true when the rights of the crown have passed to the general public. Defendants are not to be harassed, and the time of the courts taken up, with complaints about public matters from a multitude who claim to have suffered.

Prosser, *supra*, at 1007.

While the special harm required in the anonymous case quoted by Prosser is referred to as "greater" or "more" harm, the case law since that time has consistently recognized that a private plaintiff must show not just that it suffered more harm, but that it suffered some particular harm not shared in common with the rest of the public. *See, e.g., Callanan v. Gilman*, 107 N.Y. 360, 370, 14 N.E. 264 (1887) ("It is the undoubted law that the plaintiffs could not maintain this action without alleging and proving that they sustained special damage from the nuisance, different from that sustained by the general public; in other words, that the damage they sustained was not common to all the public living or doing business in Vesey street and having occasion to use the same."); *532 Madison Ave. Gourmet Foods, Inc. v.*

*Finlandia Ctr.,* 96 N.Y.2d 280, 294, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001) ("[I]n that the [harm] was common to an entire community and the plaintiffs suffered it only in a greater degree than others, it is not a different kind of harm and the plaintiffs cannot recover for the invasion of a public right.") (quoting *Restatement of the Law (Second) of Torts* § 821C, cmt. h).

As usually stated, the harm must be different in kind, not just in degree. This is true regardless of the form of the relief requested. *See Graceland Corp v. Consol. Laundries Corp.,* 7 A.D.2d 89, 180 N.Y.S.2d 644, 646–47 (1959); Prosser, *supra,* at 1006 ("This rule is not confined to actions for damages, and it applies equally where the private individual is seeking an injunction, or even abatement of the nuisance by self-help.").

Although it is not necessary that the particular harm alleged be exclusive or unique to a single plaintiff, when the class harmed in the same way "becomes so large and general as to include all members of the public who come in contact with the nuisance ... the private action will fail." Prosser, *supra,* at 1009; *see also Wheeler v. Lebanon Valley Auto Racing Corp.,* 303 A.D.2d 791, 755 N.Y.S.2d 763, 764–65 (2003). Physical harm, pecuniary loss, or delay and inconvenience suffered by a private plaintiff may satisfy this requirement, but not when they are so widespread as to affect "a whole community, or a very wide area within it." Prosser, *supra,* at 1015.

Some examples illustrate this requirement. New York courts have found that the harm suffered by commercial fishermen as a result of the pollution of the Hudson River was different in kind from that suffered by the public at large. *See Leo v. General Elec. Co.,* 145 A.D.2d 291, 538 N.Y.S.2d 844 (1989). The partial obstruction of a sidewalk, although having an effect on the general public's access, affected the owner of neighboring apartment buildings in a peculiar manner. *See Graceland Corp. v. Consol. Laundries Corp.,* 7 A.D.2d 89, 180 N.Y.S.2d 644 (1958), *aff'd,* 6 N.Y.2d 900, 190 N.Y.S.2d 708, 160 N.E.2d 926 (1959).

Particular harm was found not to exist where two law firms sought damages for loss resulting when a labor strike forced the closure of the New York City transit system because "every person, firm and corporation conducting [a] business or profession in the City" suffered damage of a similar kind. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 334, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983). As the New York Court of Appeals pointed out in *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.,* consolidated cases arising out of several construction disasters in Manhattan that resulted in the closure of the affected areas of the City for significant periods of time, "the hot dog vendor and taxi driver suffered the same kind of injury as the plaintiff law firm. Each was impacted in the ability to conduct business, resulting in financial loss." 96 N.Y.2d 280, 294, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001). The difference in the degree of that injury was irrelevant to determining whether the private plaintiffs had stated claims for public nuisance. *See id.*

The requirement that a private plaintiff suing for public nuisance demonstrate particular harm different from that suffered by the public at large may be criticized on the ground that it inhibits adequate protection of the public when government authorities can not or will not act. *See, e.g.,* Denise E. Antolini, *Modernizing Public Nuisance: Solving the Paradox of the Special Injury Rule,* 28 Ecology L.Q. 755 (2001). It does cut down potential suits by "busybodies" having no particular interest in abating the nuisance except ideology. It thus stands in somewhat the same shoes

as the doctrine of prudence in constitutional Article III standing. New York courts have embraced the doctrine in private suits, preferring in general to rely on public officials such as the Attorney General of the State.

The application of the "harm different in kind" requirement to the facts and issues presented in the instant case, because it is this element on which the court's ruling turns, is decisive. The court holds that the extensive and severe harm proven by plaintiff to be suffered by the NAACP, its members, and the African–American community in the state of New York is not "different in kind" as that phrase is defined in the case law. It therefore is not necessary to decide precisely who is a member of and represented in the instant action by the NAACP, and therefore whose "injury" should be considered for the purposes of this third element of a private plaintiff's public nuisance action.

African–Americans do suffer greater harm from illegal handguns for complex socioeconomic and historical reasons. But to say that they suffer a greater amount of harm is not enough under New York law. In order to show the particular harm necessary to have standing to sue for public nuisance as a private plaintiff, the harm suffered must be different in kind. That is not the case here.

It seems almost offensive that, almost a century and a half, after the freeing of the slaves and formal insistence by the courts of full legal equality, African–Americans feel compelled to argue that they must sue to be specially protected on the streets of New York from guns. New York City is the most heterogenous city in the world. There has been a free African–American population here since well before the Revolutionary War—African–Americans helped to build forts for Generals Washington and Howe. It cannot be said as a legal matter that African–Americans or the NAACP have a special obligation or need to enforce their rights to safety on the streets of New York. There is an absolute duty on the part of the government to provide equal protection and safety for all its people. Defendants' moral and legal obligation is no narrower.

## PART THREE

*Findings of Fact*

## PART THREE A

*Findings Based upon Defendants' Proposed Findings as Modified by the Court*

I. Procedural Posture

1. Plaintiff, the NAACP, filed Civil Action No. 99 Civ. 3999 on or about July 16, 1999, against approximately 80 manufacturers and importers of firearms. Complaint in 99 Civ. 3999.

2. The NAACP filed Civil Action No. 99 Civ. 7037 on or about October 28, 1999, against approximately 50 distributors of firearms.

3. By order of May 23, 2002, the two actions were consolidated and plaintiff filed a Fifth Amended and Consolidated Complaint ("Fifth Am. Comp.") on or about June 10, 2002.

4. At a conference with counsel on September 9, 2002, the court indicated its intention to employ an advisory jury to try plaintiff's public nuisance claim, which was later confirmed in a written order. See Oct. 1, 2002 Order.

5. With the aid of an extensive written questionnaire, selection of the twelve member advisory jury commenced on March 24, 2003, and opening statements were made on March 31.

6. Plaintiff presented its direct case from April 1 through April 28; defendants presented their evidence from April 28

through May 5; and plaintiff presented a rebuttal case from May 5 into May 6. Following summations and charge the jury began deliberations on May 8.

7. On May 14, 2003, the advisory jury concluded its deliberations. For each company listed on the verdict sheet, it indicated either that the party was "liable" or "not liable" or that the jury had "no verdict" because at least ten jurors could not reach agreement.

8. As to 45 of the defendants, the jury returned a verdict of "not liable." Those defendants were Arms Technology, Inc.; Bangers, LP; Bersa S.A.; Bill Hick's & Co.; Brazas Sporting Arms, Inc.; Braztech International L.C.; Browning Arms Co.; Camfour, Inc.; Carl Walther GmbH; Century International Arms, Inc.; Charco 2000, Inc.; Chattanooga Shooting Supplies, Inc.; Colt's Manufacturing Company, Inc.; Ceska Zbrojovka, A.S.; CZ–USA, Inc.; Davidson's, Inc.; Eagle Imports, Inc.; European American Armory Corp.; Excel Industries; Fabbrica d'Armi Pietro Beretta S.p.A.; Faber Bros., Inc.; Glock Ges. m.b.H.; Glock, Inc.; Forjas Taurus SA; Heritage Manufacturing, Inc.; Import Sports, Inc.; Israel Military Industries, Ltd.; K.B.I., Inc.; Kel–Tec CNC Industries, Inc.; Kiesler's Police Supply, Inc.; Lew Horton Distributing Company, Inc.; L.W. Seecamp Company, Inc.; Magnum Research, Inc.; North American Arms, Inc.; Para–Ordnance, Inc.; Para–Ordnance Mfg. Inc.; Riley's, Inc.; Ron Shirk's Shooters Supply; Sigarms Inc.; SIG/Sauer; SGS Importers International Inc.; Fratelli Tanfoglio S.n.c.; Walter Craig, Inc.; Williams Shooters Supply, Inc.; and Zanders Sporting Goods, Inc.

9. As to 23 of the defendants, the jury reached "no verdict." Those defendants were AcuSport, Inc.; Alamo Leather Goods, Inc.; Beemiller, Inc., d/b/a Hi-Point Firearms; B.L. Jennings, Inc.; Bryco Arms, Inc.; Dixie Shooters' Supply, Inc.; Ellett Brother, Inc.; Euclid Avenue Sales Co.; Haskell Manufacturing, Inc.; Hicks, Inc.; Interstate Arms Corp.; Lipsey's, Inc.; Lorcin Engineering Co., Inc.; MKS Supply, Inc.; Phoenix Arms; RSR Group, Inc.; Scott Wholesale, Inc.; Smith & Wesson Corp.; Sturm, Ruger & Co., Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Taurus International Manufacturing, Inc.; and Valor Corporation.

## II. Parties

10. The NAACP, is a corporation organized under the laws of the State of New York with its headquarters in the State of Maryland.

11. The NAACP is a national membership organization with members in all 50 states.

12. Defendants are either manufacturers, importers or distributors of firearms. They are citizens of at least 30 states and a number of foreign countries, but none are citizens of the States of New York or Maryland.

## III. Related Litigation

13. The Court has taken judicial notice of the complaint filed in *People of the State of New York v. Sturm, Ruger & Co.*, No. 4502586/00 (N.Y. Sup.Ct. filed June 26, 2000).

14. The Court has taken judicial notice of the New York Supreme Court decision dismissing *People of the State of New York v. Sturm, Ruger & Co.*, No. 4502586/00 (N.Y.Sup.Ct. Aug. 10, 2001), *aff'd*, *People of the State of New York v. Sturm, Ruger & Co.*, —— A.D.2d ——, 761 N.Y.S.2d 192 (2003).

15. The Court deems all defendants' answers amended to assert the affirmative defense of *res judicata.*

## IV. Structure of Firearms Market

16. The firearms market consists of a primary and a secondary market.

17. The primary market provides transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

18. The secondary market is made up of private transactions among non-federally licensed individuals.

19. More firearms are sold in the secondary market than in the primary market.

20. No defendants in this case are part of the secondary market. Defendants are aware that many guns find their way into the secondary market and into the hands of criminals through careless, negligent and intentional straw, multiple and other questionable sales practices by retailers of guns sold to them directly and indirectly by defendants.

## V. Regulation of the Firearms Market

21. The firearms industry is comprised of a tiered system of regulated federal firearms licensees ("FFLs").

22. The Gun Control Act of 1968 charges the Bureau of Alcohol, Tobacco and Firearms ("ATF") with the responsibility to: 1) license FFLs; 2) ensure that FFLs comply with the law; and 3) otherwise enforce the law. Other state, municipal and federal agencies also assist in enforcement of federal, state and local laws regulating gun sales, transfers, possession, and use.

23. ATF is mandated by law to produce publications cataloging federal, state and local laws, ordinances and regulations relating to firearms. When dealers receive their licenses, they are given complete copies of the federal firearms laws, the federal firearms regulations, a publication on state law, published ordinances, and local laws pertaining to the sale and distribution of firearms. These laws are generally known to gun dealers and other industry members. They are violated by some retailers and this is known to defendants.

24. The firearms laws and regulations, including one of ATF's functions as it relates to firearms, are designed in part to prevent guns from falling into criminals' hands. ATF educates FFLs through seminars, meetings, newsletters, publications and other means about such illegal activities as straw purchasing. In straw purchasing one person who is authorized to buy a gun purchases the gun for another person who is not authorized by law to make the purchase. ATF personnel are well trained and motivated, but inhibited by lack of resources and other limitations from fully enforcing the law. Government and private studies and evidence at the trial indicated that only a minuscule percentage of federal crimes committed with firearms result in federal prosecutions; most federal laws controlling guns result in almost no prosecutions; this is particularly true of prosecutions for smuggling guns across state boundaries and for acts of corrupt dealers.

25. An unlicensed purchaser of a firearm from an FFL must complete a Firearms Transaction Record Over-the-counter form 4473.

26. A potential purchaser of a firearm can be prosecuted for knowingly providing false information on the 4473 form. Few such prosecutions take place even though an appreciable number of dealers are known to circumvent the law and sell to purchasers for the use of another in straw purchases.

27. An FFL selling a firearm at a gun show must do so in compliance with the same regulations that would apply for a sale at his business establishment. This

rule is frequently circumvented in practice. Gun shows are the source of substantial quantities of guns that fall into the hands of criminals.

28. A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and thereby commits a felony. This law does not deter a substantial number of sellers.

29. The law requires FFLs, which include manufacturers and distributors, to report thefts and losses of firearms to ATF within 48 hours. This law is not uniformly followed. Some retailers are careless about safeguarding guns from theft. Some use claims of theft to support diversions of guns to criminal elements.

30. The law does not require private sellers of firearms—i.e., those who are not "engaged in the business" of selling firearms—to conduct background checks or to maintain records that an FFL is required to maintain. This constitutes a loophole for diversion of guns to criminal elements.

31. Sales at gun shows by non-licensed persons to private citizens are outside the normal three-tier process of the sale of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns supplied to criminals.

32. FFL applicants must follow many requirements as part of the application process, including notifying the chief law enforcement officer in their jurisdiction of their intent to procure such a license; submitting photographs and fingerprints to ATF; and providing ATF with a certification that the licensed operation complies with all state and local laws.

33. Multiple sales are supposed to be reported by the retail dealer to the chief law enforcement officer in that jurisdiction and to ATF on a Form 3310 by the close of business on the day of sale.

34. ATF uses the multiple sales form as an investigative tool, but the ATF does not control multiple sales. Multiple sales in some states to the same person at the same or almost the same time result in many guns being diverted to criminal elements. When the State of Virginia recently strictly limited multiple sales, illegal importation of guns for the criminal market in New York from Virginia dropped sharply.

35. ATF attempts to gather information and conduct an investigation to determine whether a dealer is involved in a straw purchase. This is difficult and often involves undercover work. Defendants could sharply limit straw sales by regulating and disciplining their own customers through the use of contracts and supervision. This result from prudent merchandising practices could be achieved at little cost and loss of business.

36. ATF is not limited to entering and inspecting the premises of an FFL once a year if ATF is investigating a suspected violation of the law. It is otherwise limited in its power to make more than usual inspections and is also limited by lack of resources.

37. If ATF believes that certain traces warrant further examination, it has the power to, among other things, conduct inspections, obtain subpoenas and assign undercover agents to the case.

38. ATF has the authority to conduct criminal investigations as to unlicensed sellers and prohibited purchasers.

39. ATF has the power to try to identify and investigate corrupt dealers.

40. ATF has substantial, unique investigative resources not available to manufacturers, importers or distributors.

41. Despite its considerable powers, ATF lacks the resources to enforce the law without the cooperation of the defendants.

That cooperation has been extensive, but does not include contractual control of customers by defendants to minimize leakage of guns into criminal's hands through gun shows, straw purchases, imprudent merchandising and other merchandising failures of defendants.

## VI. Tracing

42. A trace is an attempt to identify (a) the FFL or gun store where a recovered gun was initially sold; and (b) the initial gun purchaser.

43. "Tracing" tracks a gun only through the primary market, namely from the gun manufacturer or importer, distributor and retail dealer to the first retail purchaser.

44. The law requires an FFL to keep records of all firearms which it acquires and disposes of. ATF can inspect these records at any time in connection with a criminal investigation.

45. Through the Access 2000 program, ATF can usually trace firearms from many manufacturers and importers 24 hours a day, 7 days a week by downloading information from a computer on the licensee's premises without ever actually contacting the licensee.

### A. ATF Disclosure of Trace Data

46. The firearms trace database of ATF contains some law enforcement sensitive information which is segregated from large data sets without such sensitive information.

47. Not all of the data contained in the trace database is publicly available.

48. Law enforcement sensitive information sometimes includes data linking a traced gun to a specific crime location, as well as identifying data concerning the firearms distributor and dealer. Cooperation among defendants using trace data available to them can reveal problem retailers who are the source of a dispropor-

tionate number of guns leaking into criminals' hands.

49. Trace information that identifies a retailer or distributor's name or FFL number is not publicly available until the trace request is more than five years old. This information as to specific sales may be inferred readily by manufacturers and distributors cooperating in a way that will not endanger law enforcement activities of ATF or other agencies.

50. Manufacturers and distributors do not receive trace requests for all of their products that are traced. They are generally not contacted if ATF is first able to obtain the disposition information from available databases, including out-of-business records, the multiple sales database, the reported thefts database, and the demand database. In most cases the method of tracing is from manufacturer to distributer to retailer.

51. Because manufacturers and distributors do not receive notification of all traces of the products they sell and do not receive the trace requests concerning the products of other manufacturers or distributors, a manufacturer or distributor would know the totality of its own traces but not the totality of traces related to specific dealers. It would, however, be able to know most traces related to guns sold by specific dealers and could use this information to require responsible merchandising by such retailers, thus substantially reducing the flow of guns into criminal hands.

52. Responsible merchandising using data available to defendants would not interfere with pending or prospective law enforcement proceedings.

53. The ATF was ordered in this case to produce trace data which had not been made publicly available outside of the ATF. *NAACP v. Acusport Corp.*, 210

F.R.D. 268, 269 (E.D.N.Y.2002) (hereinafter, the "Sept. 18, 2002 Order").

54. Identification of retailer and distributor names and FFL numbers for traces within the prior five years is among the trace data ordered produced in this case which had not been made publicly available. This data provided a large and reliable pool of information that could be analyzed by experts for defendants and plaintiff. Analysis of the data demonstrated that more prudent merchandising programs by defendants could have substantially reduced guns flowing into criminal hands, used in many murders and injuries which could have been avoided by defendants' more prudent merchandising.

### B. Limitations of Trace Data

55. Comprehensive tracing is an ATF effort to have law enforcement agencies trace all the guns they recover. There is nothing inconsistent between ATF efforts and use of the data by defendants to reduce the flow of their firearms to criminal elements.

56. Some firearms are traced even though they were not involved in a crime. These are a relatively small number of traces that do no affect the conclusions of plaintiff's experts.

57. During the tracing process, manufacturers are not told the purpose of the trace, who the requesting police agency is, what the crime code was, where the gun was recovered, or who is being investigated. When a relatively large number of traces are determined by defendants to be attributable to particular retailers, prudent defendants can take steps to ensure that their guns are not too easily falling into criminals' hands. Such steps by defendants will not interfere with or endanger law enforcement.

58. Most trace requests originate from state and local law enforcement agencies. The trace request form does not contain information about the reasons for the trace request or the circumstances of the recovered gun, other than an NCIC crime code if provided. ATF does not normally receive underlying police reports reflecting the circumstances surrounding recovery of a firearm. The National Tracing Center does not normally conduct any further follow-up on trace requests to learn the outcome of any investigations or the reasons underlying the trace requests. ATF does follow-up in some cases. In some cases the results are public knowledge.

59. After a manufacturer responds to a trace request, it normally receives no further contact from ATF with respect to that trace.

60. A trace does not mean that the FFL retailer or the first purchaser engaged in illegal or wrongful activity. Relatively excessive numbers of traces to specific retailers or first purchasers is, however, cause for alarm by defendants who are not foreclosed from closing off illegal flows of their guns to such retailers.

61. The ATF can use trace data and other information to determine that an FFL has engaged in illegal or improper activities.

62. A law enforcement investigation is one way of determining if any wrongdoing has occurred in any given circumstance.

63. If the sales volume of an FFL is large, it is more likely that the FFL will also have a larger number of traces, but in many instances traces to an FFL are much larger than would be predicated from sales volume alone.

64. Plaintiff's statistical experts, Ms. Lucy Allen and Dr. Howard Andrews, despite the availability of non-public portions of the FTS databases for use in this case, were unable to identify specific dealers who had committed wrongdoing. They

were able, however, to determine that the likelihood of wrongdoing was substantially enhanced when certain practices by defendants were followed and certain precautions not taken by defendants.

65. Dr. William Wecker independently reviewed the FTS Database to see if it could be used to identify potential problem dealers. He concluded that it could not be used for that purpose. His testimony is not credited on this point.

### C. Use of Trace Data—Generally

66. Tracing provides investigative leads to law enforcement agencies so that if an initial purchaser of a recovered gun is identified, law enforcement officers can attempt to learn both the history of the gun and the circumstances surrounding how the gun reached its possessor.

67. The ATF trace database is a criminal investigative tool. ATF cannot be responsible for the validity of an analysis by anyone else who may use the database for some other purpose. This does not preclude defendants from using the elements of trace data available to them to reduce the numbers of guns from their customers going to criminals for use in crimes.

68. Law enforcement and other organizations, including the defendants, can conduct investigations based on trace leads without endangering law enforcement personnel.

69. Those outside of law enforcement can utilize ATF investigatory information without jeopardizing law enforcement personnel.

70. Trace data can be used for purposes other than as a law enforcement tool.

71. Disclosure of trace information need not compromise ongoing or potential criminal investigations, or lead to injuries to or the death of ATF agents or civilians involved in undercover investigations.

72. A manufacturer merely contacting a retailer and inquiring as to specific purchases that were the subject of traces could jeopardize a law enforcement investigation, but it is highly unlikely that it will do so. There is no reason not to use this information to enforce prudent merchandising by defendants.

73. ATF prohibits some information from being released to the public because it might jeopardize an investigation or some other ongoing matter. It can continue to do so without inhibiting defendants from prudent merchandising practices that will limit leaking of their guns into the hands of criminals.

74. Manufacturers and distributors are only expected to respond to trace requests in a timely and accurate manner. ATF does not expect them to do anything more. They are not precluded from doing more to prevent or limit unnecessary access to their guns by criminal elements.

75. ATF's stated position is that Access 2000 participants should "only [ ] provide the firearm dispositions to facilitate the timely completion of a firearm trace request for the National Tracing Center Division." This position is not inconsistent with defendants' use of the information for more prudent merchandising practices.

76. ATF has stated that it "urge[s] licensees not to undertake their own criminal investigations or take any other action that might interfere with a specific ATF or other governmental investigation unless directed to do so by a law enforcement agency." This position is not inconsistent with defendants' use of the information for more prudent merchandising practices.

77. ATF's position as to how FFLs should respond to trace requests has been stated in a letter to one defendant, sought by that defendant, to be the following: "[T]he role of federally licensed manufac-

turers and dealers in responding to trace requests is limited. Your understanding is correct that in the context of a trace request, ATF only requests manufacturers and dealers to provide trace information in a timely and accurate manner. ATF does not want licensees or members of the public to interfere with ongoing criminal investigations." This position is not inconsistent with defendants' use of the data available to them for more prudent merchandising practices.

78. It is appropriate for a manufacturer to undertake to control its customers by contract and supervision to reduce the probability that they will be sources of guns for criminals.

79. If a retailer had an "inordinate" amount of traces, it would be up to law enforcement, the ATF specifically, to use all of its investigative techniques and resources to determine whether any further action was needed concerning that FFL. This position is not inconsistent with defendants' use of the data available to them for more prudent merchandising.

### D. Use of Trace Data—Focused Inspections

80. ATF uses its resources to focus its investigations on FFLs identified by various factors to determine whether those FFLs are operating in compliance with the law.

81. Traces to a particular FFL, even a high number of traces, is not sufficient proof of wrongdoing by the FFL, but warrants investigation by defendants as well as the ATF of reasons for the discrepancy.

82. In the year 2000, ATF had some 800 inspectors to conduct focused inspections. This is far less than is required for full enforcement of the gun laws within ATF responsibility. Private help is welcomed by ATF and other law enforcement agencies to reduce crime.

83. ATF lacks sufficient resources to conduct focused inspections and investigations of many dealers who may be violating gun laws.

84. ATF has not told gun manufacturers or distributors to sell or to stop selling to any specific FFL dealers.

85. ATF has not told manufacturers or distributors that ATF has identified particular FFLs it believes are illegal or corrupt dealers. Defendants can draw reasonable inferences that this is the case with respect to some of its particular customers:

### VII. Firearm Industry Cooperation with ATF

86. Most members of the firearms industry do assist law enforcement officials in preventing their products from falling into the wrong hands. They could do, and could have done, much more in preventing their products from falling into the wrong hands.

87. Examples of industry cooperation, often through various trade associations, with ATF include:

(a) an ATF/industry working group that meets to discuss issues within the industry and possible approaches to dealing with problems of illegal use of guns;

(b) educating dealers;

(c) encouraging ATF to develop "E–Z Check" to permit easy verification of FFL status;

(d) the joint ATF and industry "Don't Lie for the Other Guy" program, which included pamphlets and videotapes;

(e) industry publications on safe handling and storage of firearms;

(f) industry-developed "Project Homesafe" and "Operation Child Safe;"

(g) the joint ATF and NSSF "Partnership for Progress" program; and

(h) Access 2000.

Other steps the industry could take are described below.

88. Most retail dealers cooperate with law enforcement investigations, including taking the initiative to notify ATF of suspicious activity. Most will, if asked to, participate in law enforcement sting operations.

89. Access 2000 was developed within the industry to give ATF 24 hour access to a stand-alone computer containing acquisition and disposition records to conduct traces.

90. Members of the industry and ASSC, one of its trade associations, have worked with ATF on ways to attempt to identify dealers engaged in wrongful conduct.

91. ASSC and some members of the industry have advocated more resources for ATF.

92. ATF has issued bulletins to educate FFLs about straw purchases.

93. At industry trade shows, ATF, at times in conjunction with industry members or trade associations like NSSF, SAAMI, ASSC and NASGW, puts on seminars and utilizes display booths to educate dealers about straw purchases.

94. Posters and videotapes have been prepared and distributed as part of the industry's "Don't Lie for the Other Guy" program to minimize straw purchasing.

VIII. Defendants' Compliance with Laws and Regulations

95. Plaintiff presented no evidence that any defendant had violated any federal, state or local statute or regulation regarding the manufacture, distribution or sale of any firearm.

96. Plaintiff presented no evidence that any defendant had knowledge that it was selling firearms to any entity that intended to violate federal, state or local statutes or regulations. Defendants had reason to believe that some of the firearms they were selling would fall into the hands of those who would violate the law and that they could take steps to reduce those violations by more prudent merchandising.

97. Most members of the legal firearms industry in the United States conduct business in compliance with federal laws and regulations.

98. A relatively small number of dealers have engaged in criminal or corrupt conduct.

99. FFL dealers are rarely involved in criminal activity.

100. Corrupt FFLs are rare.

IX. Criminal Acquisition of Firearms

101. Over 500,000 guns are stolen each year from private homes and vehicles. Such thefts are a large source of criminal access to firearms.

102. Stolen guns merge with private, informal voluntary sales to supply a vast secondary market which is largely unregulated.

103. Criminologists have noted that the secondary market (i.e., sales by non-federally licensed persons) is a large source of firearms to criminals.

104. Most firearms acquired by criminals are acquired through transactions in the unregulated secondary market.

105. A small percent of the guns that get into criminals' hands have their source in known trafficking activities by FFLs.

106. Research by plaintiff's expert, Professor Jeffrey Fagan, demonstrated that inner city youth in New York secured guns from a variety of different sources.

107. None of the youths in Professor Fagan's research indicated that he or she

had acquired a gun from a retail store or as part of a straw purchase. His research regarding sources of firearms for inner city youth is consistent with the criminological literature determining where criminals or adolescents not entitled to possess firearms obtain them. Criminal cases in this court, general and peer-reviewed literature, and testimony reveal that many of the guns used by criminals in New York, including inner city youngsters, enter the stream of guns in the illegal market in other states by methods subject to some control by defendants through more prudent merchandising practices.

108. Gun shows are a source of firearms for the criminal market.

109. Most criminals probably do not obtain guns directly from FFL dealers except by straw purchases and large multiple sales to one person.

110. Diversion of firearms typically involves criminal behavior that the persons involved are trying to conceal. Defendants are aware that such diversions will take place on a fairly routine basis and, based on prior experience, over a substantial length of time in fairly predictable numbers.

X. Plaintiff's Injuries

111. Plaintiff's evidence of "injury" included testimony from Mildred Roxborough that (i) the NAACP had renovated its New York offices to increase security "because of threats and walk-ins from people who were sometimes threatening" and (ii) that some people, especially women, were afraid to go out at night to attend NAACP meetings, making it more difficult to get "enough volunteers to attend our meetings and to carry out certain projects."

112. The testimony of Ms. Roxborough was credible and is accepted.

113. There was no proof that men and women were afraid because of handguns to go out at night only to attend NAACP meetings. Such general fear extends to all areas of men's and women's individual and associational life. It would also extend to men and women who were not members of the NAACP or potential members.

114. Kwesi Mfume testified that the level of gun violence had made it more difficult because people are afraid to attend NAACP organizational meetings. His testimony was credible and is accepted. The level of gun violence affected other organizations as well.

115. Dr. Howard Andrews and Professor Jeffrey Fagan testified regarding the level of victimization of African–Americans through violence committed with handguns. This evidence was credible and is accepted.

116. While African–Americans have a greater risk of gun homicide victimization than do other population groups, much the same can be said about other population groups such as Hispanic males. All population groups in New York are potential homicide victims from illegal handguns in New York.

117. All types of misuse of firearms fall disproportionately on the poor and overwhelmingly on males rather than females, but no group is spared.

118. All segments of society, whether White, Occidental, African–American, Native American, Black, Hispanic, Oriental or other, suffer from handgun violence which would be reduced in New York were more prudent merchandising policies followed by defendants.

119. The type of injury that is suffered by African–Americans as a result of violence committed with firearms is not unique. Every segment of our society suffers the same kind of injury as a result of the criminal misuse of firearms, though the degree differs among segments.

120. Any statistical relationship between firearm seizures (as measured by firearms recovered and subsequently submitted for tracing) and the level of firearm homicides and assaults exists for all New Yorkers.

121. African–Americans live in a variety of different neighborhoods. Some neighborhoods are middle class, some neighborhoods are well to do, some neighborhoods are poor. Homicide rates in these neighborhoods are different. Even in the poorest African–American neighborhoods, where one would expect to see the highest rates of gun homicides, there are very strong differences in the homicide rates depending upon patterns of interactions of the individuals within those neighborhoods. In those places with people having strong ties with neighbors, closely bound together, assisting one another materially, watching out for each others' homes, caring for each others' children, and where there is a great deal of intimacy among those neighbors, homicide rates from guns are lower. The NAACP has attempted to increase such ties with neighbors, but the level of gun violence inhibits its work.

122. Based upon the evidence, higher gun homicide rates are associated with those communities in which NAACP members reside, which are most affected by gun violence.

123. There is a higher rate of firearm-related violence among the potential membership of the NAACP than there is among the New York community at large.

XI. Declining Homicide Rates

124. Gun homicide rates have declined in New York every year over the last ten years.

125. It has been relatively as easy to obtain a firearm during the ten-year period of homicide declines in New York as it was during the prior period of homicide increase.

126. Illegal firearms use in the communities most frequently affected by firearm violence declined in the period that homicides have declined in New York.

XII. Evidence Tying Defendants' Conduct to Plaintiff's Injuries

127. No defendant intends or desires that its guns be used in crime.

128. A substantial number of firearms manufactured, imported or distributed by defendants were acquired by a straw purchase, diverted to the illegal market in New York, and used to cause injury or threaten injury to the NAACP or one of its members or potential members.

129. Firearms manufactured, imported or distributed by defendants were acquired at a gun show, diverted to the illegal market in New York, and used to cause injury or threaten injury to the NAACP or one of its members or potential members.

130. Firearms manufactured, imported or distributed by defendants were acquired as part of a multiple purchase, diverted to the illegal market in New York, and used to cause injury or threaten injury to the NAACP or one of its members or potential members.

131. Firearms manufactured, imported or distributed by defendants were sold by an indicted dealer, diverted to the illegal market in New York, and used to cause injury or threaten injury to the NAACP or one of its members or potential members.

132. Firearms manufactured, imported or distributed by defendants were diverted into the illegal market through theft from a retailer, diverted to the illegal market in New York, and used to cause injury or threaten injury to the NAACP or one of its members or potential members.

133. Firearms manufactured or sold by a defendants were used to harm or threaten the NAACP or its members or potential members.

134. Some manufacturer or distributor defendants sold guns in states where gun regulations are lax, knowing that the guns would be illegally taken into New York City to be used illegally by young people.

135. Plaintiff presented no evidence that any defendant acted with any racial bias or motivation.

136. There was and is a link between the disproportionate effect of violence committed with firearms or homicide on African–Americans and imprudent merchandising of guns.

137. Plaintiff's proposals for changes in the marketing and distribution of firearms would reduce the illegal market in firearms and the injuries to the NAACP, its members, and potential members.

138. Manufacturing and distribution agreements that are readily entered into by defendants would have a substantial effect in reducing the illegfal flow of firearms into New York.

139. If some defendant had provided employee training for employees and others in the primary legitimate merchandising chain, many firearms would not have found their way illegally into New York where they caused fear and injury to NAACP members or potential members.

140. If defendants had studied available trace request data and acted upon it to better control its downstream customers, they could have used the information to prevent fear and injury to the NAACP and its members and potential members in New York. This information was and is available to defendants.

XIII. Plaintiff's Statistical Analysis of the Trace Database

A. Sample

141. Plaintiff's expert, Ms. Lucy Allen, properly assumed for purposes of her analyses that handguns submitted to ATF for tracing provide a sufficiently representative sample of all handguns recovered by law enforcement used in crime. She presented exhibits and offered opinions regarding handguns recovered or used in crime based on her appropriate analyses of data contained in ATF's Firearms Tracing System Database ("FTS Database"). These opinions and data are credible and are accepted.

142. All experts who testified in the case passed all *Daubert* tests. Their testimony met the standards of Rule 702 of the Federal Rules of Evidence. The data they relied upon met the standards of Rule 703 of the Federal Rules of Evidence and other rules of evidence and were admissible under those Rules for the purposes they were provided to the trier.

143. Firearms or handguns submitted to the ATF for tracing do not constitute a random sample of firearms or handguns recovered by law enforcement or used in crime. They do provide reliable data supporting the conclusions of plaintiff's experts. Attempts of defendants' witnesses to denigrate this data and the conclusions plaintiff's experts reached were biased, not credible and are rejected.

144. The FTS data can be generalized to explain the larger populations of firearms or handguns recovered by law enforcement.

145. Data in the FTS Database relate to firearms or handguns that constitute a representative, but not a random sample.

146. FTS data can be generalized to the larger populations of firearms or handguns used in crime.

147. Calculations made by plaintiff's experts from the FTS sample properly can be applied to larger populations.

### B. Age Bias in the Selection of Firearms to Trace

148. Law enforcement agencies do not seize all firearms used in crime. They do not submit trace requests for all firearms that they seize.

149. Law enforcement officers now infrequently decide which firearms to submit for tracing based on individual judgments about the need for and value of tracing the recovered firearms to accomplish specific law enforcement purposes. They essentially submit all such firearms for tracing.

150. Law enforcement officers have based their decision to submit a firearm to the ATF for tracing on, among other things, the perceived age of the firearm; this limiting practice is now seldom followed, since practically all firearms recovered are traced, and does not affect the accuracy of the calculations by plaintiffs' experts.

151. The "age selectivity bias" argument of defendants' experts is not accepted. Plaintiff's experts' analysis showing how quickly new guns move into the illegal market was cogent and is adopted.

152. Data comparing the median age of firearms or handguns submitted to the ATF for tracing from cities before and after they moved to so-called comprehensive tracing (i.e., the tracing of all firearms recovered by law enforcement), including Boston, Los Angeles and New York, do not demonstrate any substantial age selectivity bias. There is no substantial age related bias in submitting recovered firearms or handguns for tracing in cities that have not moved to comprehensive tracing. The use by defendants' experts of the Boston Police data to attack the conclusions of plaintiff's experts was inappropriate and proved nothing relevant to this case.

153. Data comparing the median age of firearms traced over time, in light of the fact that many cities have moved to comprehensive tracing since 1996, do not demonstrate that any substantial age selectivity bias has existed and continues to exist in jurisdictions that have not moved in whole or in part to comprehensive tracing.

154. Firearms and handguns numbers submitted to the ATF for tracing are not, on average, substantially younger in terms of age—the time between their dates of sale and recovery—than the populations of firearms and handguns recovered or used in crime.

155. Handguns in the FTS Database can be used to draw conclusions and to support inferences about handguns generally recovered by law enforcement or used in crime. The conclusions and inferences of plaintiff's experts were reasonable and are accepted.

156. Plaintiff's expert, Ms. Allen, successfully accounted for any "bias" in her analysis.

### C. FTS Data Are Properly Collected and Analyzed by the ATF and Were Properly Analyzed by Experts for Plaintiff

157. Data about firearms submitted to ATF for tracing were collected in a scientific and consistent manner and used properly by experts for plaintiff.

158. The FTS Database includes data collected about "non-crime guns," including firearms that are turned in to the police for safekeeping and law enforcement firearms that are used in incidents or turned in for replacement. Such guns traced do not appreciably affect the accuracy of the analysis of plaintiff's experts.

159. The FTS Database includes multiple records for the same recovered firearm and records of so-called "fictitious traces."

They have been appropriately considered in the analysis of plaintiff's experts and do not affect the accuracy of their conclusions.

160. Fictitious traces occur when law enforcement officers cannot read all of the digits of a firearm's serial number and therefore submit for tracing all possible combinations of the firearm's serial number. This results in a limited number of trace requests involving firearms neither recovered by law enforcement nor used in any crime. Manufacturers can take appropriate steps to design guns to reduce the possibility of erasing serial numbers, thus reducing or eliminating fictitious traces.

161. These "fictitious traces" did not appreciably affect the analyses of plaintiff's experts and do not affect the accuracy of their conclusions.

### D. Changing Methods and Standards of FTS Data Collection

162. There have been changes in recent years with respect to the selection of recovered firearms or handguns that are submitted to ATF for tracing and how and what data concerning traced firearms or handguns are entered into the FTS Database.

163. ATF initiated a program called the Youth Crime Gun Interdiction Initiative ("YCGII") in 1996. It involved, in part, obtaining agreement by participating cities to undertake comprehensive tracing—that is, the tracing of all firearms recovered by law enforcement in that city.

164. Seventeen cities committed to undertake comprehensive tracing in 1996. As of 2000, approximately 50 cities had agreed to undertake comprehensive tracing.

165. According to an ATF report published in 2000 concerning the YCGII program, 10 of the 38 cities participating in the program at that time were not tracing comprehensively.

166. According to an ATF report published in 2002, the YCGII program is undergoing constant change.

167. According to ATF, the extent of YCGII program implementation has varied from one jurisdiction to another based on each one's size, extent of agency computerization, information intake procedures, firearms-focused law enforcement activity, and the nature of its crime gun problem.

168. ATF concluded in 2002 that it was not appropriate to attempt to impose a single standard on all YCGII participating jurisdictions because the program is still evolving.

169. ATF concluded in 2002 that the available data from the YCGII participating jurisdictions do not yet constitute a fully developed statistical series.

170. The 2002 ATF report also concluded that the purpose of the YCGII reports are to assist law enforcement by providing a detailed description of crime guns recovered in a given jurisdiction during the past year, and that is the most appropriate use of the data.

171. ATF also concluded in 2002 that the approximately 50 jurisdictions participating in the YCGII do not represent a complete sample of crime guns recovered by law enforcement agencies.

172. None of the changes in the standards or methods of FTS data collection under YCGII throw doubt on the substantial accuracy of the analysis of the data relied upon by plaintiff's experts.

### E. Plaintiff's Experts' Use of the FTS Database

173. Plaintiff's statistical experts used the FTS Database in ways that are consistent with the disclaimers and conclusions of ATF as to the appropriate uses of the FTS Database.

174. Ms. Allen's attempts to draw comparisons across distributors or dealers are appropriate and reliable.

175. Ms. Allen's calculations of statistical significance using the FTS Database are essentially proper and appropriate.

176. It was appropriate for Ms. Allen to make calculations that are predicated on the available FTS data bases.

177. It would have been inappropriate to woodenly apply academic statistical tests in any overly rigorous and misleading manner so as to ignore the huge mass of useful data in the FTS data bases available in this case. Defendants' experts' proposed analyses did not throw doubt on the validity of plaintiff's experts' analyses.

### F. Other Data

#### 1. Smith & Wesson Warranty Card Information

178. Ms. Allen's use of information taken from Smith & Wesson warranty card returns to calculate whether the supply of handguns to a state exceeded so-called "legitimate demand" was appropriate.

179. Ms. Allen's use of this information was based on a number of reasonable assumptions, including: that the purchasers voluntarily returning warranty cards were representative of Smith & Wesson handgun purchasers; that the Smith & Wesson handgun purchasers returning the warranty cards were representative of handgun purchasers; and that Smith & Wesson handgun purchasers could be used as a proxy for legitimate demand.

180. The assumptions made by plaintiff's expert regarding the Smith & Wesson warranty card returns were well founded.

181. Ms. Allen's use of the Smith & Wesson warranty card information along with other evidence in the case to estimate legitimate demand was a reliable basis upon which to conclude that any particular state was "oversupplied" with handguns by defendants.

### 2. Dealer Survey

182. Ms. Allen designed a telephone survey of firearm dealers and used responses to one of the survey questions to determine dealer sales volumes. Ms. Allen used the dealer sales volumes appropriately to calculate dealer trace rates, in turn used by her to determine if there was a significant relationship between a dealer having certain "characteristics" and the dealer's trace rates.

183. Ms. Allen's survey of dealers sufficiently complied with generally accepted scientific procedures and principles concerning surveys.

184. Whatever irregularities there were in this survey did not put in question the accuracy and utility of her general conclusions based on other data.

### G. Calculation Methods

#### 1. Manufacturer Practices Regression

185. Ms. Allen showed that there was a statistically significant relationship between the number of certain distribution oversight practices followed by a manufacturer and its ratio of trace share to market share (Trace Ratios). This data and the conclusions reached are credible and appropriate.

186. No foreign manufacturer was shown to have a significantly different effect on illegal gun use in this country than American manufacturers. When foreign manufacturers' guns were used by criminals, it was because of the American imprudent system of merchandising. No foreign attempt to increase illegal use of handguns in the United States was shown. No pandering to users of illegally obtained handguns was attributable to foreign manufacturers of firearms.

187. Defendant's statistical expert, Dr. Wecker, did not demonstrate that Dr. Gundlach's analysis of manufacturer practices was inappropriate. Dr. Gundlach's analysis was accurate and reliable.

188. Dr. Wecker did not demonstrate that Ms. Allen's findings were not robust and adequate. Her findings were robust, adequate, accurate, and reliable.

### 2. Dealer Indicators

189. Ms. Allen used regression analyses appropriately to establish that there is a significant relationship between certain characteristics of dealers—e.g., selling firearms later recovered with an obliterated serial number—and dealer's trace rate (traces divided by sales).

190. Ms. Allen applied sales data appropriately.

191. Defense expert Dr. Wecker did not demonstrate that the predictive power of Ms. Allen's regressions was undetectable. They were detectable and useful.

192. Results in this area reached by Ms. Allen were of practical power and reliable.

### 3. Traces Related to Straw Purchases

193. Ms. Allen demonstrated that there is a statistically significant relationship between a dealer's "yes" answer to Question No. 20 in her Dealer Survey—whether anyone had ever attempted to make a straw purchase at the dealer's store—and a higher number of traces attributed to that dealer.

194. Ms. Allen's regression analysis in this area was sound and supported her conclusion that a relationship existed between an affirmative answer to Question No. 20 of the Dealer Survey and a dealer's number of traces.

### 4. Problem Dealer Groups

195. Using certain selection criteria, including a requirement that a dealer have 25 or more traces, Ms. Allen placed 1,559 dealers in "Problem Dealer" groups.

196. There is a correlation between sales volume and trace volume. Ms. Allen's list of problem dealers was, however, useful and appropriate for the conclusions she drew from her studies.

197. Ms. Allen's analysis regarding the problem dealer groups was sound, useful and supports her conclusions.

### 5. Flow of Guns

198. Ms. Allen demonstrated that the difference in severity of state laws partly explained the flow of guns from one state to another, such as from Georgia or Florida to New York. Her analysis of Virginia laws was inadequate for the future (but appropriate for past years) since Virginia has now restricted multiple gun sales, substantially reducing the flow of guns from that state to criminals in New York.

199. A substantial amount of movement of firearms from one state to another was explained by differences in state laws.

200. In her regression analyses concerning the effect of differences in state laws and "oversupply" on the movement of firearms between states, Ms. Allen calculated distributor sales using data from 14 of 31 available distributors. Defendants' expert, Dr. Wecker, re-ran the analysis using data on background checks of prospective handgun purchasers as a better proxy. Ms. Allen's analysis was useful and supported her conclusions when considered in the context of all the evidence in the case. Dr. Wecker's analysis was not helpful.

### 6. Percentage of Guns Used in Crime

201. Ms. Allen calculated the percentage of handguns sold in 1990, and separately in 1996, that were used in violent crime by the year 2000. She also did a similar calculation for each manufacturer separately for handguns sold in 1996.

202. The percentages calculated by Ms. Allen were appropriate and not overstated.

203. Dr. Wecker found that her calculations were overstated. The court accepts Ms. Allen's conclusions as appropriate when considered with all the evidence in the case. It does not accept Dr. Wecker's analysis.

### 7. Homicides and Number of Dealers

204. Ms. Allen found a statistically significant relationship between the decline in homicides in various states (the "crime states") and the decline in dealers with firearms traced in those states. Her conclusions were acceptable and sound.

205. Defendants' expert, Dr. Wecker, performed Ms. Allen's regression analysis doing what she claimed she did, i.e., excluding traces of firearms originating in the "crime state," and found no statistically significant relationship existed between the decline in homicides and the decline in traced guns originating from out-of-state. The court accepts Ms. Allen's conclusions as more accurate and useful than Dr. Wecker's.

### XIV. Analyses of the FTS Database

206. Dr. Andrews reviewed the FTS Database and did various counts of traced handguns, including handguns recovered in New York. He then set forth, in various exhibits, comparisons of the number of handguns traced by manufacturer, distributor and retail dealer.

207. Dr. Andrews used portions of the FTS Database that were not released to the public and were available to him only pursuant to the court's protective orders.

208. Dr. Andrews's analysis and conclusions were sound when considered with all the evidence in the case.

### XV. Analysis of Defendants' Practices

209. Dr. Gregory Gundlach's opinions were largely based on a study that he performed using "content analysis." He and several of his research assistants reviewed documents and deposition testimony from the various defendants in an attempt to draw inferences as to which defendants did or did not employ any one of 14 "countermarketing" strategies Dr. Gundlach had identified.

210. The results of this analysis were presented to the jury on charts that were useful and reliable in supporting his conclusions.

211. Dr. Gundlach's analysis of "countermarketing" activities produced reliable results when considered with all the evidence in the case.

212. Dr. Gundlach testified that trade associations can play a critical role in the culture of an industry. The basis of this conclusion is that they often involve many members from the industry, so they provide a convenient process and mechanism for disseminating information, providing communications, and through that process can create an overall culture of how the industry should go about its marketing tasks. His testimony was credible and is accepted.

### XVI. Special Findings as to Carl Walther GmbH ("Walther")

213. Walther was and is a corporation organized and existing under the laws of Germany with its principal place of business in Germany.

214. Walther does not manufacture firearms, and does not purchase firearms or other products from any manufacturer

other than the manufacturer of Walther-trademarked firearms.

215. Walther sells Walther-trademarked firearms and other Walther non-firearm products in Germany.

216. Walther does not sell firearms directly to United States distributors, retailers or consumers. Instead, Walther's sales of firearms are made in Germany to a few United States importers, which in turn sell them to wholesalers, which in turn sell them to retailers, which ultimately sell them to consumers. Currently, the primary United States importers of Walther firearms are Smith & Wesson, located in Springfield, Massachusetts, Champion's Choice, located in Tennessee, and Earl's Gun Repair, located in Massachusetts. They import high-end, Walther-trademarked target guns for marksmen and top international shooters, as well as for collectors of guns.

217. Walther never received an ATF trace request.

218. There was no evidence that the ATF has ever provided tracing data to Walther that identifies the retail dealer or the first unlicenced purchaser of traced firearms.

219. No United States importer of Walther weapons has forwarded any ATF trace requests to Walther.

XVII. Special Findings as to Fabbrica D'Armi Pietro Beretta S.P.A. ("Pietro Beretta")

220. Defendant Pietro Beretta is a corporation organized and existing under the laws of the Republic of Italy with its principal place of business in Italy.

221. Pietro Beretta manufactures guns in Italy and sells those guns in Italy.

222. Beretta U.S.A. Corp. (Beretta")is a separate company from Pietro Beretta.

223. Beretta is not a defendant in this case.

224. Beretta buys guns manufactured by Pietro Beretta from Pietro Beretta in Italy.

225. Beretta then imports the Pietro Beretta guns into the United States and sells them in the United States.

226. Beretta is the exclusive importer in the United States of guns bearing the Pietro Beretta name.

227. Pietro Beretta manufactures one model of firearm for Browning under the Browning name which Pietro Beretta sells to Browning in Italy. Browning is a separate company from Pietro Beretta.

228. Other than the fact that Pietro Beretta manufactures firearms in Italy and sells some of those firearms to Beretta and Browning in Italy, there was no evidence adduced at trial concerning Pietro Beretta's conduct.

XVIII. Special Findings as to Browning Arms Co. ("Browning") and Arms Technology Inc. ("ATI")

229. Browning and ATI are defendants.

230. ATI is a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake, Utah.

231. ATI manufactures the .22 caliber Browning Buck Mark pistol sold by defendant Browning.

232. Browning is located in Morgan, Utah.

233. There is no corporate relationship between ATI and Browning.

234. The only handgun manufactured by ATI is the .22 caliber Browning Buck Mark pistol.

235. ATI sells the .22 caliber Browning Buck Mark pistol exclusively to Browning.

236. ATI does not engage in any marketing, distribution or advertising of this gun.

237. ATI does not employ a sales or marketing staff.

238. ATI makes no decisions relative to the sales, marketing or distribution of the .22 caliber Browning Buck Mark pistols to distributors or dealers.

239. ATI and Browning have separate federal firearms licenses.

240. ATI and Browning have different letter identifiers in the ATF trace database.

241. For the purposes of their analyses, plaintiff's experts Lucy Allen and Gregory Gundlach, "combined" ATI and Browning. This was incorrect. This error has been considered by the court in evaluating all the evidence. It does not appreciably affect the court's conclusions.

XIX. Special Findings as to Ceska Zbrojovka, A.S. ("Ceska") and CZ–USA, Inc.

244. Ceska is a firearms manufacturer which is located in the Czech Republic, and was incorporated in the Czech Republic.

245. CZ–USA, Inc. is a subsidiary of Ceska which was incorporated in January of 1997. CZ–USA, Inc. imports and services Ceska firearms in the United States.

246. Prior to the incorporation of CZ–USA, Inc., Action Arms and Magnum Research were the exclusive United States importers of Ceska products.

247. For the purposes of her analysis, plaintiff's expert Lucy Allen combined CZ–USA, Inc. and Ceska even though CZ–USA, Inc. did not exist in 1996.

248. There is no evidence that Ceska guns recovered in the State of New York and the City of New York were imported by CZ–USA, Inc.

249. Plaintiff's expert Lucy Allen improperly combined CZ–USA, Inc. and Ceska. This error did not substantially affect her overall conclusions.

XX. Special Findings as to Excel Industries, Inc. ("Excel")

250. Accu-tek is a family partnership which existed from 1989 through its bankruptcy in approximately May or June of 1997.

251. Mr. Larry Gilliam was one of the partners of Accu-tek.

252. A Discharge of Debtor was entered by the United States Bankruptcy Court for the Central District of California on February 11, 1998 with respect to Accutek.

253. Excel is a California corporation which was formed in approximately July of 1997.

254. Excel purchased some of Accutek's tooling from a creditor (UC Capital) and the Accu-tek brand name through a bankruptcy sale.

255. Mr. Larry Gilliam did not become a shareholder in Excel until September of 2000.

256. Excel has not produced a firearm since 2001.

257. There is no evidence that the Accu-tek guns which plaintiff's expert Dr. Andrews determined were recovered in the State of New York and the City of New York were manufactured or distributed by Excel. Any error of Dr. Andrews in this respect did not affect the accuracy of his overall conclusions.

XXI. Special Findings as to Braztech International, L.C. ("Braztech"); Forjas Taurus, S.A. ("Forjas Taurus"); and Taurus International Manufacturing, Inc. ("TIMI")

258. Braztech is not related by interlocking corporate structure and ownership

to Forjas Taurus and TIMI. Each should be considered a separate entity. This finding does not substantially affect the analysis of plaintiff's experts with respect to the defendants generally.

XXII. Special Findings as to Bersa S.A.; Eagle Imports, Inc.; Imports Sports, Inc.; SGS Importers International, Inc.; Haskell Manufacturing, Inc.; K.B.I., Inc.; Fratelli Tanfoglio S.n.c.; Israel Military Industries Ltd.; and Century International Arms., Inc.

259. Bersa S.A. ("Bersa") is a manufacturer of firearms in Argentina. Bersa sells its firearms in Argentina, where it has a large police and consumer market, and to importers to be sold in other countries. For sales in the United States, Bersa sells its firearms to RSA Enterprises, an importer in the United States, which then sells the firearms to defendant Eagle Imports, Inc. ("Eagle Imports"), the exclusive distributor of Bersa products in the United States. Eagle Imports sells a limited number of Bersa firearms, since Bersa is limited in its production capacity. Mr. George Sodini, President of Eagle Imports, has no ownership interest in RSA Enterprises. Bersa, RSA Enterprises, and Eagle Imports are each separate and distinct companies.

260. Plaintiff incorrectly states that Eagle Imports, Inc. ("Eagle Imports") is "an importer of handguns made by Bersa. . . ." Eagle Imports is not the importer of Bersa products in the United States, but rather the United States distributor. Eagle Imports is not related by ownership and operation to SG International and Import Sports. Although Eagle Imports, Imports Sports, Inc. ("Import Sports") and SGS Importers International, Inc. ("SGS"), (not "SG International"), are owned by the same individuals, these companies are separate companies and are not operated in "exactly the same way."

261. Eagle Imports sells its products to a limited number (14) of distributors. Imports Sports sells its products (Llama firearms and products from Spain) to almost, but not all of, the same distributors. Imports Sports has established a Llama Master Dealer stocking dealer program. Most, but not all, of Eagle Imports' dealers are also Llama Master stocking dealers.

262. Eagle Imports' market for its products is different from that of Imports Sports. Eagle Imports' market includes law enforcement (many police officers carry Bersa firearms as a secondary or off-duty firearm), security guards, concealed carry, sportsmen, target shooters and women, since the firearm is light-weight and small caliber. Imports Sports' market is the 1911 Colt.45 enthusiast.

263. SGS sells Firestorm firearms (manufactured by Bersa in Argentina and Fabrinor in Spain) and accessories to only three exclusive distributors. Unique to SGS, the exclusive Firestorm distributor must sell to dealers located only within its exclusive assigned territory. The dealers to whom these distributors sell are Firestorm franchise dealers, who must have a storefront and advertise in the yellow pages.

264. Import Sports, Inc. ("Import Sports") is the exclusive United States distributor of Llama firearms, manufactured by Fabrinor in Spain. Fabrinor is not a defendant in this case.

265. SGS Importers International, Inc. ("SGS") sells Firestorm firearms (manufactured by Bersa in Argentina and Fabrinor in Spain) and accessories to only three exclusive distributors. Unique to SGS, the exclusive Firestorm distributor must sell to dealers located only within its exclusive assigned territory. The dealers to whom these distributors sell are Firestorm fran-

chise dealers, who must have a storefront and advertise in the yellow pages.

266. Fratelli Tanfoglio, S.n.c. ("Fratelli Tanfoglio") is a manufacturer of firearms in Italy. European American Armory Corp. ("EAA") is the exclusive importer of Fratelli Tanfoglio firearms in the United States. Fratelli Tanfoglio and EAA are separate and distinct companies. EAA imports and sells handguns manufactured by companies other than Fratelli Tanfoglio.

267. Israel Military Industries Ltd. ("IMI") is a firearms manufacturer wholly owned by the State of Israel. IMI sells two makes of handguns to Magnum Research, Inc. ("Magnum Research") in Minneapolis, Minnesota for importation and sale in the United States—the Desert Eagle and the Baby Eagle. Magnum Research and IMI are independent entities. From 1996 to the present Magnum Research distributed and sold other handguns manufactured by entities other than IMI, such as the BFR, a big-game hunting revolver manufactured by non-defendant JT Contract Manufacturing, and the Lone Eagle, a single-shot handgun.

268. Haskell Manufacturing Inc. ("Haskell") is not a contract manufacturer for Beemiller, Inc. d/b/a Hi–Point Firearms ("Beemiller").

269. K.B.I., Inc. ("K.B.I.") is an importer of firearms made by several foreign manufacturers, not just European companies. K.B.I. does not sell FEG firearms any longer. Over the years, the number of FEGs that K.B.I. imported and sold has declined. Since the time that K.B.I. acquired the Charles Daly line of firearms products, it has been K.B.I.'s focus to concentrate on the long gun market; consequently, K.B.I. has not sold many of the FEG model firearms for several years; they are left with one model. It is incorrect for plaintiff to impute findings regarding the FEG handguns to K.B.I.

270. No Century International Arms, Inc. ("Century") guns that were imported were recovered in crimes in New York State or City.

271. None of the findings in XXII affect the overall accuracy, reliability and utility of plaintiff's experts' conclusions.

## PART THREE B

*Findings Based upon Plaintiff's Proposed Findings as Modified by the Court*

I. Plaintiff's Witnesses and Contentions

1. Plaintiff demonstrated that a public nuisance exists in New York in the form of widespread access to illegal firearms that causes harm to the population at large in that it endangers and injures the property, health, safety or comfort of a considerable number of persons. The nuisance has a disproportionately greater impact on African–American residents of New York City and State than on other parts of the population and affects certain areas of the City and State more than others.

2. The nuisance was caused, contributed to and maintained by defendants in this action.

3. The NAACP was harmed by the nuisance in the loss of income, loss of membership, inability to carry out its functions in organizing communities and the necessity of spending program funds on gun violence prevention efforts instead of other programmatic endeavors.

II. Public Nuisance in New York

4. Plaintiff's evidence of the public nuisance in New York was supported by former New York City Police Detective Bryan Dunigan, Professor Jeffrey Fagan and Dr. Howard Andrews. This evidence was credible and is accepted.

5. New York strictly limits the people who may possess handguns in the City of New York.

6. Persons prohibited from owning firearms under law and those without the requisite New York license are easily able to obtain firearms illegally in New York City.

7. Firearm trafficking interdiction efforts of the New York City Police Department–ATF Joint Firearm Task Force, indicates that most of the guns purchased undercover were relatively new. Many times the task force members bought brand new guns, many of them still in original boxes with manuals and gun cleaning paraphernalia. The guns seized and investigated almost invariably did not come from retail sources in the City of New York, but came from out-of-state. Few of the guns recovered had been diverted into the illegal market through theft. Nearly all illegally purchased handguns originate out-of-state. Despite prices that are often two to three times the price charged by legitimate FFLs, handguns can be obtained easily in the illegal market in New York City.

8. Professor Jeffrey Fagan is an expert in criminology whose testimony was credible. It is accepted. He demonstrated that access to guns among young people in New York is a substantial contributing cause of firearm homicides and injuries.

9. Professor Fagan relied on peer reviewed studies, interviews in which young men were "asked about the kind of situations where gun violence takes place or where gun violence might have taken place or where they decided not to engage in gun violence," and other reliable information. Professor Fagan also obtained firearm trace data and added gun recovery information in his analysis of the contagious effects of gun acquisition, gun injury and homicide among youth. He properly relied upon New York City Department of Health (Vital Statistics and Injury) data for all persons whose deaths were classified as homicides by the Medical Examiner's Office and from the hospitalization records for persons admitted to the hospital because they were the victim of some kind of assault. He properly considered census data to take into account the demographics of the neighborhoods he was studying.

10. Professor Fagan demonstrated that the changes in the homicide rate between 1988 and 2000 were primarily attributable to changes in rates of gun homicides.

11. Professor Fagan demonstrated that incidents of gun violence spread "outward" to and "inward" from adjacent neighborhoods and that the risks of gun violence and its spread are particularly and disproportionately felt in African–American communities.

12. Having analyzed the testimony of defendants' statistical experts, Drs. Wecker and Mathiowetz, Professor Fagan declined to agree with their stated view of the trace database as "unreliable and inappropriate for any purpose." The court credits Professor Fagan's analysis and conclusions, not those of Drs. Wecker and Mathiowetz.

13. Mr. Joseph Vince, a former high level ATF official who headed the ATF Crime Gun Analysis Branch, testified based on his 30 years of experience in law enforcement and criminal firearms interdiction efforts. He confirmed the testimony of Professor Fagan that there is a strong correlation between the presence of illegally possessed guns in a community and the number of gun homicides and nonfatal gun injuries. His testimony is credited as accurate.

14. For the twenty year period from 1978 to 1998 there were 290,670 firearm homicides in the United States. Eighty percent (80%) of those involved a handgun.

Despite the fact that African–Americans are a minority in this country (accounting for some 12% of the population), there were more homicide deaths of African–Americans than there were of others: 142,819 firearm deaths of African–Americans and 141,456 deaths of others. Dr. Andrews found that firearm homicide is the leading cause of death for young African–American men in the age groups 15–19 and 20–24. African–American men in the 20 to 24 age range are more than ten times as likely as others in that age range to die by firearm homicide.

15. The same racial disparity between African–Americans and others exists in New York City where there is a constant finding over the years that African–American males age 15 to 24 are more than 10 times more likely to be killed with a firearm than others of the same age. Dr. Andrews properly found that this disparity is independent of the magnitude of the overall homicide rate.

16. There are approximately two non-fatal firearm injuries for every one homicide nationally and in New York. The same racial disparity of about 10:1 African–American to others applies to firearm injuries.

III. Defendants Contribute to the Proliferation of Guns Illegally Possessed and Used in New York

17. Plaintiff's experts provided reliable evidence of an industry-wide connection between the legal market and the illicit market that constitutes a public nuisance nationally and in New York State and City. Diversion from the legal to the illegal markets through imprudent marketing cause a large part of this diversion.

18. Three retired high ranking administrators of ATF, Steven Higgins, former Director, Joseph Vince, former Special Agent in Charge of the National Tracing Center and Crime Gun Analysis Unit, and Gerald Nunziato, also a former head of the Tracing Center, testified. They concluded that ATF lacked the ability to adequately regulate firearms transactions. They were credible witnesses whose testimony is accepted. They testified and presented documents describing ATF's inability to adequately regulate the gun industry, particularly the retail dealers, which are a primary conduit of guns from the legal to the illegal market. These experts, as well as Robert Ricker, a reliable witness with wide experience in the industry whose testimony is credited, described a severely under-funded ATF that is limited in its ability to prevent diversion of firearms to the illegal market and is forced to 'purge' important records. Their testimony is credited that the ATF is incapable of inspecting all but a tiny percentage of dealers, is restricted to one routine compliance inspection per year and cannot close corrupt dealers for many years even after notice of revocation, indictment and conviction.

19. Robert Ricker demonstrated what the industry knows about the diversion of firearms from the legal to the illegal market and how guns are diverted. His opinions were based on his years of experience as a National Rifle Association ("NRA") executive and a high official of one the principal gun industry trade associations, his participation in industry-wide planning and strategy meetings, and his work with all branches of the industry. Mr. Ricker testified that the industry knows that crime gun traces are indicators of problems at the dealer level and are adequate notice to all up-stream distribution partners of these problems. He testified that traffickers often report guns stolen to throw off a trace, thus covering their participation and inflating the number of guns reported stolen. He also testified that the reason industry members gave for not addressing the clear dangers posed by unsu-

pervised dealers causing widespread harm to communities was: "if the industry took voluntary action, it would be admitting responsibility," and "the concept that if you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem." This testimony is credible and is accepted.

20. The evidence presented on the firearm tracing process by Gerald Nunziato, Joseph Vince and the statistical experts, Lucy Allen and Howard Andrews, demonstrated that: 1) the guns in the trace database are overwhelmingly crime guns (that is, recovered in connection with a crime); 2) sufficient information in the trace database has been made available to defendants and would have been made more extensively available to any that sought information; 3) trace information provides to each manufacturer, distributor and dealer—with some technical assistance—information that could be used to improve their distribution system to protect against criminals obtaining their guns; and 4) New York is markedly different from any other state in terms of the extent to which guns used in crimes in this state come from another state. This evidence is credited.

21. Dr. Andrews presented credible evidence from the firearms trace database demonstrating that the defendants were a source of guns recovered in crime in New York City and New York State.

22. Ms. Allen properly concluded that criminals are an important market segment for the gun industry as a whole. She demonstrated that: (1) 11% of handguns sold between 1996 and 2000 were used in violent crimes by the year 2000; (2) 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000; and (3) on average there were over 600,000 incidents of violent crimes—rape, robbery, assault and homicide—with handguns each year. This data is accepted as accurate.

23. From her analysis of the firearms trace database, Ms. Allen properly found that guns move quickly from the legal to the illegal market; 13% were recovered within one year of their sale, and 30% were recovered within 3 years of their first sale.

24. Ms. Allen properly found that a large percentage of handguns recovered are found out of the state in which they were purchased. She showed that in states with stronger gun laws, like New York, higher percentages were purchased in another state. This finding is consistent with Dr. Andrews' findings that a large and variable percentage of recovered guns were sold at retail in another state. It is credited.

25. Ms. Allen properly found that a small number of dealers were responsible for most of the guns going to criminals. This finding was consistent with Dr. Andrews' analysis and the evidence presented by several ATF witnesses and defendants' witnesses.

26. Ms. Allen properly demonstrated that manufacturers that have the following practices have smaller crime gun ratios: requiring evidence of a storefront, having an authorized dealer program, maintaining records of sales to individual dealers, visiting dealers frequently, commissioning market studies, maintaining distributor agreements, imposing controls over how the product is advertised and inquiring about inventory level of distributors.

27. Ms. Allen properly demonstrated that there are indicators other than amount of sales which lead to the conclusion that a particular dealer's guns would be more likely to be in the hands of criminals. The dealer indicators related to crime gun flows are: (1) out of state traces; (2) obliterated serial number

traces; (3) multiple traces for the same purchaser; (4) multiple traces for the same purchaser and the same dealer; (4) multiple sales forms; (5) traces from multiple sales form guns; (6) record keeping problems; (7) multiple licenses at same location; and (8) bypassed geographically closer dealers to seller—i.e., the purchaser for illegal use goes out of his way geographically to buy from retailers with a poor record for crime gun traces.

28. Plaintiff's expert Gundlach, a professor of marketing at the Mendoza School of Business at the University of Notre Dame, was a credible witness. He described how marketers in the gun industry supply their products to legitimate customers and take steps to countermarket against prohibited customers. Relying on standard and accepted principles of marketing, his conclusion was that no defendant took adequate steps to prevent its products from being diverted to persons prohibited from owning or possessing firerarms. His testimony is credited.

29. Relying on ATF and industry documents, as well as established marketing principles and precepts, Professor Gundlach properly identified mechanisms that could have been employed by defendants—using their existing marketing infrastructures—to prevent 'diversion' or guns being acquired by persons prohibited from owning or possessing firearms. They include: requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; development of a management code that would establish standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; requiring minimum inventory; imposing liability insurance standards; limiting sales at gun shows; limiting multiple sales; limiting how the consumer gun transaction can be conducted to insure security; education and training of dealers; and monitoring dealers through visitation and other regular interaction.

IV. Defendants

30. Evidence as to sales and traces and sales practices as to particular defendants was accurate and buttressed by the testimony of plaintiff's experts. See plaintiff's proposed findings at pages 36–82.

31. The court did not rely on the Report of the UCLA School of Public Health, "Buying a handgun for someone else: Firearm dealer willingness to sell," supplied by plaintiff with its letter of June 17, 2003 because it was received after evidence was closed. See also Americans for Gun Safety, The Enforcement Gap, Federal Gun Laws Ignored (May 2003). Both documents were filed and docketed on June 18, 2003.

V. Evidence in the Record Demonstrated Specific Injury Suffered by the NAACP

32. Gun violence and the threat of pervasive gun violence caused specific harm to the NAACP in the State and City of New York. The Association has been harmed in its ability to organize and maintain its membership in New York communities as a result of the reluctance of volunteer members to venture out at night to attend meetings because of fear of gun violence and in the expenditure of programmatic funds on youth violence prevention programs.

33. The NAACP is a civil rights organization, which was established to protect the economic, political and social and civil rights of minorities in this country. It is a New York corporation, founded in New York City in 1909. It is a membership organization composed of branches (or 'units') that must have at least 50 members

and are chartered by the national organization. There are 1700 adult units and 500 youth and college units in the 50 states, 23 branches in the metropolitan area of New York City, and 30 to 40 branches in the State of New York.

34. The branches carry out the Association's national programs in the areas of health, education, housing, employment and economic development designed to improve conditions in their communities for both members and constituents. The health program encompasses all aspects of a good quality of life, including prevention of illness and injury and violence. Included in the national health program is a youth violence intervention component that concentrates on young people up to the age of 30. This youth violence program created task forces to engage in counseling and outreach to teach conflict resolution without resort to violence and to work to prevent violence. New York City is one of the 100 cities targeted for this program because of the large size of its minority youth population. Proactive programs such as "Stop the Violence Start the Love," and the "Hip Hop Summit" designed to dissuade young people from thinking that "a gun is the way you settled things" required a substantial expenditure of Association funds and staff time for work in the City and State of New York.

35. Funds had to be expended at the New York office of the NAACP to secure it against the threat of gun violence. The threat of gun violence has adversely affected the ability of the NAACP to organize and to function as a membership organization in New York communities plagued by gun violence. Ms. Roxborough testified that the majority of NAACP volunteers are women, and "in recent years it has become very difficult to get enough volunteers to attend our meetings and to carry out certain projects. The meetings are scheduled in the evenings, and the reason that [they do not attend] is because they feel afraid to come out of their homes at night and ... come to an NAACP office *or a church*." (emphasis added.)

36. The NAACP's work and organization has historically been on behalf of the constituents of the NAACP, not just its immediate members. NAACP constituents are prospective members. They are harmed by gun violence in predominantly African–American communities. The court did not allow specific evidence to prove harm to specific individuals since the more general statistics and testimony sufficed to prove a public nuisance caused by defendants affecting the NAACP and its members—actual and potential.

VI. Remedies Sought

37. Were the remedies sought by plaintiff to be enforced through injunction the public nuisance in New York from handguns sold by defendants would be sharply reduced, lives would be saved, and many gun injuries avoided. Among remedies demonstrated to be efficacious were they adopted by defendants are the following:

1. Industry-wide and specific defendant oversight of dealers to assemble appropriate data respecting individual dealers including:

a) The number of crime-gun traces from participating distributors and retail dealers;

b) Unsuccessful crime-gun traces involving a lack of acquisition or disposition records;

c) The number of firearms reported stolen or missing from a distributor or dealer;

d) Crime-guns most associated with unsuccessful traces by a distributor or retail dealer;

e) The number of crime-guns reported stolen and later traced;

f) Crime-guns recovered in the possession of juveniles;

g) Crime-guns that were recovered with obliterated serial numbers;

h) Crime-guns that have a short time-to-crime;

i) Identification of distributors and retail dealers that do not adequately respond to crime-gun traces;

j) Distributors and retail dealers' explanations given for why they could not provide disposition for a crime-gun;

k) Identification of distributors and retail dealers that could not be located by ATF's National Tracing Center;

l) Identification of distributors and retail dealers that are most associated with crime-guns recovered from juveniles;

m) Identification of distributors and retail dealers who repeatedly reported stolen or missing firearms.

2. A practice of firearm manufacturers and distributors distributing their product only through distributors and retail dealers that have successfully completed required training of staff in addition to adoption of standards governing relationships between manufacturers, distributors, and retail dealers including:

a) Retail Dealers: Manufacturers and distributors should only allow their products to be distributed through retail dealers who adhere to the following: (1) maintain store-front premises; (2) maintain operative insurance; (3) participate in safe sales practice training; (4) maintain a minimum inventory; (5) refuse to sell more than one handgun per month per private customer; (6) allow manufacturers to review the retail dealers' firearm acquisition and disposition book; (7) allow manufac-turers to review records relating to sales incentives or product promotions maintained by the retail dealer at least four times per year and (8) maintain and provide to the manufacturer state sales data on a monthly basis.

b) Distributors: Manufacturers should only sell their products to distributors that adhere to the following: (1) maintain operative insurance; (2) participate in safe sales practice training; (3) allow manufacturers to review the distributors' firearm acquisition and disposition book; (4) allow manufacturers to review sale incentive records or product promotion records maintained by the distributor; and (5) maintain and provide to the manufacturer state sales data.

c) Providing by contract that defendants may:

(1) conduct inspection and visitation of all downstream distribution partners and retailers;

(2) refuse to allow retail dealers to sell handguns at gun shows;

(3) institute an industry-wide program of warranty revocation upon individual resale of handguns, unless the firearm is resold only through a storefront stocking handgun retailer so that secondary sales are subject to background checks;

(4) institute and contribute to a fund for the education, supervision and regulation of firearm distributors and retail dealers;

(5) maintain operative insurance; and

(6) create and enforce distributor and retail reseller agreements that contain appropriate provisions for retail dealers or distributors that

are contained in this and the two previous paragraphs.

38. The court would reject the plaintiff's proposal for a creation by the court of an agency to oversee this industry. Most of the requests of plaintiff could readily and voluntarily be adopted as part of a prudent merchandising procedure for this dangerous but legal product—handguns. Continued supervision of the industry by the courts is undesirable and unnecessary.

39. The essential suggestions of plaintiff appear to be capable of adoption with some modification to avoid anti-trust laws since they are designed to improve public safety rather than decrease competition.

VII. Damages of a Special Kind

40. Plaintiff has failed to prove it suffered special damages different in kind from those of other organizations and people in New York subject to gun violence as a result of the marketing failure of defendants to prudently merchandise their products.

PART THREE C

*Findings of Fact Based upon Joint Submission by Observers, Attorney General of the State of New York and Corporation Counsel of the City of New York, as Modified by the Court*

1. *Res judicata* does not bar this action. The court is not barred by the judgment in *People of the State of New York v. Sturm, Ruger & Co., et al.* Index No. 402856/00 (N.Y.Sup.Ct. Aug. 10, 2001), *aff'd, People of the State of New York v. Sturm, Ruger & Co.,* —— A.D.2d ——, 761 N.Y.S.2d 192 (2003), because that case was decided on a motion directed at the pleading based on assumptions as to the facts belied by proof in the instant case.

2. New York burden of proof law does not require findings of fact different from those made by the this court.

3. The New York Court of Appeals is open to new legal solutions created by the judiciary to overriding social problems even when other branches of the government are heavily involved in attempting to solve the problems. *See, e.g., Campaign for Fiscal Equity v. the State of New York* 2003 N.Y. Slip Op. 15615, 2003 WL 21468502 (June 26, 2003) (reform of financing for New York State schools is required).

PART FOUR

*Conclusion*

Since plaintiff has not proved all elements of its cause of action as required by applicable New York Law the case is dismissed. No costs or disbursements are awarded to any party.

SO ORDERED.

Appendices

The following illustrative charts are adopted as generally accurate except as indicated in findings of fact, *supra.* They are made a part of this memorandum, order, and judgment.

Criminal Users of Handguns

**Percent of Handguns Sold in 1996 Used in Violent Crime by 2000
By Manufacturer**

Hi-Point/Beemiller 55%
Haskell 44%
Bryco Arms 42%
Lorcin Engineering 34%
Davis Industries 31%
Tanfoglio 25%
Ceska Zbrojovka / CZ USA 24%
Sundance Industries 22%
Bersa 17%
Phoenix Arms 15%
Arcadia Machine & Tool 13%
Taurus 12%
Glock Gmbh / Glock, Inc. 11%
Keltec CNC Industries 8%
Walther 7%
Beretta USA 7%
Sturm Ruger 7%
Smith & Wesson 7%
Colt 5%
North American Arms 4%
Heckler and Koch 4%
Para Ordnance 4%
Sig-Arms 4%
Browning 3%
L.W. Seecamp 3%
Heritage Mfg. 2%
Freedom Arms 2%
Thompson/Center Arms 1%
0%

**Sources:** ATF Annual Production Reports and *Firearms Commerce in the United States 2001/2002*. FBI Uniform Crime Reports. US Department of Justice, *Survey of State Prison Inmates, 1991*. Wright, James, and Peter Rossi, *Armed Criminals in America: A Survey of Incarcerated Felons, 1983*.

# The Majority of Recovered Handguns that were Purchased Out of State were Purchased in States with Weaker Gun Laws

Weaker Laws
65%

Stronger Laws

Equal Laws
14%

Outside of
State
41%

Inside

Percent of Handguns
by Relative Strength of
Source to Crime State Gun Laws

Percent of Handguns
by Recovery Location

**530**

Open Society Institute, Gun Control in the United States:
A Comparative Survey of State Firearm Laws (April 2000)

Gun Control in the United States
A Comparative Survey of State Firearm Laws

SIDE 1

Market Share Of U.S. Sales
1996-2000
By Manufacturer

Share of Young Crime Handgun Traces
1996-2000
By Manufacturer

Ratio of Young Crime Handgun Share to Overall Market Share
1996-2000
By Manufacturer

**Ratio of Young Crime Handgun Share to Overall Market Share**
**1996-2000**
**By Distributor**

## Dealer Indicators (1996-1998) Predict the Likelihood that a Dealer's Sales are Recovered in Crime (1999-2000)

| Dealers With: | Heckler and Koch | Beretta | Survey |
|---|---|---|---|
| 1 Out-of-State Traces | ** | ** | ** |
| 2 Obliterated Serial Number Traces | ** | ** | ** |
| 4 Multiple Traces for Same Purchaser | ** | ** | ** |
| 5 Multiple Traces for Same Purchaser at Same Dealer | ** | ** | ** |
| 6 Multiple Sales Form | ** | ** | ** |
| 7 Traces from Multiple Sales Form Guns | ** | ** | -- |
| 8 Record Keeping Problems | -- | ** | ** |
| 9 Multiple Licenses at Same Location | -- | ** | -- |
| 10 Bypassed Closer Dealer | -- | ** | -- |

** represents significance at the 95% level

Sources:
Heckler and Koch sales database received in discovery (1996-2000), Beretta's sales documents received in discovery (1998-2000), NERA survey conducted by Schulman, Ronca and Bucuvalas, Inc., ATF Firearms Trace Database.

536

Distribution Management Countermarketing to Prohibited Customers (Manufacturers)

| Manufacturer Defendant | |
|---|---|
| **Illegal Sales** | **Indicted dealers** |
| | Evidence indicates DEFENDANT has stopped, would not sell or would stop selling to indicted distributors or dealers |
| | **Trace Information** |
| | Evidence indicates DEFENDANT analyzes trace information to identify in any way problem distributors or dealers |
| **Non-Storefront** | **Distributors** |
| | Evidence indicates DEFENDANT requires that distributors sell to dealers who, in turn, only sell to storefront place of business |
| | Authorized dealer/direct dealer and/or stocking program dealers |
| | Evidence indicates DEFENDANT requires direct dealers or program dealers to have storefront place of business |
| **Gun Shows** | **Distributors** |
| | Evidence indicates DEFENDANT restricts their distributors from selling at gun shows |
| | **Distributors** |
| | Evidence indicates DEFENDANT restricts their distributors from selling to dealers who, in turn, sell at gun shows |
| | **Authorized/program dealers** |
| | Evidence indicates DEFENDANT restricts their direct or program dealers from selling at gun shows |
| **Straw purchase** | **Training** |
| | Evidence endorses DEFENDANT has disseminated materials on straw purchase to others in their distribution system |
| | **Training** |
| | Evidence indicates DEFENDANT has trained others in their distribution system on strawpurchases |
| | **Don't Lie Program** |
| | Evidence indicates DEFENDANT requires others in their distribution system to participate in Don't Lie... |
| **Multiple Sales** | **Restrictions** |
| | Evidence indicates DEFENDANT limits multiple sales in their distribution system |
| | **Information** |
| | Evidence indicates DEFENDANT attempts to obtain information from members in their distribution system about multiple sales |
| **Thefts** | **Security** |
| | Evidence indicates DEFENDANT requires members in their distribution system to take measures to prevent theft |
| | **Notification** |
| | Evidence indicates DEFENDANT requires that members in their distribution system report incident of thefts to them |

Legend

green/light gray = yes

red/dark gray = no

Awareness and Knowledge of Diversion to Prohibited Customers (Manufacturers)

| | 3 | 4 | 6 | 7 | 8 | 10 | 11 | 12 | 13 | 15 | 17 | 18 | 20 | 21 | 23 | 26 | 27 | 30 | 31 | 35 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 49 | 53 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manufacturer Defendant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Diversion to prohibited Customers** — Evidence indicates DEFENDANT is aware and/or has knowledge of the different forms of diversion

Legend

green/light gray = yes

red/dark gray = no

Distribution Management: Countermarketing to Prohibited Customers (Distributors)

| Distributor Defendant: | | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 |
|---|---|---|
| Distributor Defendant: | | |
| **Illegal Sales / unscrupulous dealers** | Indicted dealers | |
| | Evidence indicates DEFENDANT has stopped, would not sell or would stop selling to indicted dealer. | |
| | Trace Information | |
| | Evidence indicates DEFENDANT analyzes trace information to identify in any way problem distributors or dealers | |
| **Non-Storefront** | Distributors | |
| | Evidence indicates DEFENDANT requires their dealer operate from a storefront place of business | |
| **Gun shows** | Distributors | |
| | Evidence indicates DEFENDANT restricts their dealers from selling at gun shows. | |
| **Strawpurchase** | Training | |
| | Evidence indicates DEFENDANT has disseminated materials on strawpurchase to dealers. | |
| | Training | |
| | Evidence indicates DEFENDANT has trained dealer on strawpurchases | |
| | Don't Lie Program | |
| | Evidence indicates DEFENDANT requires dealers to participate in Don't Lie. | |
| **Multiple Sales** | Restrictions | |
| | Evidence indicates DEFENDANT limits dealer multiple sales | |
| | Information | |
| | Evidence indicates DEFENDANT attempts to obtain information from dealers about multiple sales. | |
| **Thefts** | Security | |
| | Evidence indicates DEFENDANT requires dealers to take measures to prevent theft | |
| | Notification | |
| | Evidence indicates DEFENDANT requires that dealers report incident of theft to them | |

Legend

green/light gray = yes

red/dark gray = no

Awareness and Knowledge of Diversion to Prohibited Customers (Distributors)

Legend

green/light gray = yes

red/dark gray = no